# EXHIBIT "A"

1

Volume: I
Pages: 1-212
Exhibits: 1-12

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
- - - - - - - - - - - - - - - - - - x
ERIC SOUVANNAKANE,

        Plaintiff,       Civil Action

    v.              No. 0412164MLW

SEARS, ROEBUCK & CO., WILLIAM
SULLIVAN, RICHARD SPELLMAN,
BARBARA TAGLIARINO, KEVIN SULLIVAN,
ALICIA COVIELLO, GARY MANSFIELD,

        Defendants.
- - - - - - - - - - - - - - - - - - x

    DEPOSITION of ERIC SOUVANNAKANE, a witness

called by counsel for the Defendants Sears

Roebuck & Co., William Sullivan, Richard

Spellman, Barbara Tagliarino, Kevin Sullivan and

Alicia Coviello taken pursuant to the applicable

provisions of the Massachusetts Rules of Civil

Procedure, before Toni F. Beckwith, Registered

Merit Reporter, CSR No. 111293 and Notary Public

in and for the Commonwealth of Massachusetts, at

the Offices of Sugarman, Rogers, Barshak &

Cohen, P.C., 101 Merrimac Street, Boston,

Massachusetts, on Wednesday, February 8, 2006,

commencing at 10:11 a.m.

7

Q.  Also, because everything is being
recorded, I'm going to need you to respond
verbally.  So you can't shrug or nod your head
because she can't record that if she's writing
down what we're saying.  So you have to answer
verbally even if normally you shrug your head to
answer.

A.  Understood.

Q.  Can you please state your full name
for the record?

A.  Eric Souvannakane.

Q.  Do you have a middle name?

A.  No.

Q.  Can you spell your last name?

A.  S O U V A N N A K A N E.

Q.  And what is your date of birth?

A.  October 25, 1982.

Q.  Where were you born?

A.  Salem, Massachusetts.

Q.  Where do you currently reside?

A.  Where am I living?

Q.  Yes.

A.  12 Eutaw Ave., Lynn, Mass.

Q.  How long have you lived at 12 Eutaw

9

1      A.   No.

2      Q.   Do you have any children?

3      A.   I have one daughter.

4      Q.   What is her name?

5      A.   Zuriah, Z U R I A H.

6      Q.   How old is Zuriah?

7      A.   One years old.

8      Q.   Does she live with you?

9      A.   Yes.

10     Q.   Does anybody else live with you

11  besides your daughter?

12     A.   The mother of the child.

13     Q.   What is her name?

14     A.   Sarah.

15     Q.   What is Sarah's last name?

16     A.   McDonald.

17     Q.   Can you spell her last name?

18     A.   M C D O N A L D.

19     Q.   What is your educational background?

20     A.   The automotive industry.

21     Q.   Did you go to high school?

22     A.   Yes, I did.

23     Q.   Did you graduate?

24     A.   Yes, I did.

10

1          Q.   Did you go to college or any post high

2    school?

3          A.   No, I haven't.

4          Q.   Have you ever done any trainings or

5    seminars or anything for the automotive work

6    that you do?

7          A.   Yes, I did.

8          Q.   What trainings have you done?

9          A.   Automotive training, the vocational

10   building in the high school facility.

11         Q.   Is this something you did while you

12   were in high school?

13         A.   Yes.

14         Q.   Have you done anything post high

15   school in terms of trainings for your

16   profession?

17         A.   Jobs, local jobs.

18         Q.   But no other educational courses,

19   seminars, trainings, anything like that?

20         A.   No.

21         Q.   How long have you been in the

22   automotive industry?

23         A.   About seven years.

24         Q.   What year did you graduate high

11

1    school?

2         A.  '02.

3         Q.  So you were working in the automotive

4    industry while you were in high school?

5         A.  Yes.

6         Q.  What do you do in the automotive

7    industry?

8         A.  Right now?

9         Q.  Yes.

10        A.  I'm a car salesman right now.

11        Q.  Where are you a car salesman?

12        A.  Ira Toyota in Danvers.

13        Q.  How long have you been employed by Ira

14   Toyota?

15        A.  Since October.

16        Q.  October of what year?

17        A.  '05.

18        Q.  Is that all you do at Ira Toyota, is

19   sell cars?

20        A.  Sales consultant, yeah.

21        Q.  Do you make a set salary at Ira Toyota

22   or do you make a commission?

23        A.  Commission.  And there is a set

24   salary.

60

1        A.   Holding.

2             MS. TRAN:   I'm going to take a very

3    brief bathroom break.

4             (Recess taken)

5    BY MS. TRAN:

6        Q.   Do you remember when you were hired by

7    Sears?

8        A.   August.

9        Q.   Of what year?

10       A.   At this point in time, I want to say

11   '03, '04.

12       Q.   So it was either 2003 or 2004?

13       A.   Yes.

14       Q.   You previously testified that you were

15   employed by Sears for about a year and a half?

16       A.   Year and a couple of months.

17       Q.   And were you terminated from Sears in

18   October of 2003?

19       A.   Yes.

20       Q.   So then is it accurate to say that you

21   were hired in August of 2002?

22       A.   Sure.

23       Q.   Sure, that's correct?

24       A.   Yes, correct.

61

1          Q.   And what was your job title at Sears?

2          A.   Tire tech and oil lube tech, battery

3     tech, maintenance tech.

4          Q.   Were those titles that you held all at

5     the same time, or were they titles that you held

6     separately?

7          A.   All at the same time.

8          Q.   What did your job responsibilities at

9     Sears entail?

10         A.   Tires, oil changes, batteries.

11         Q.   Was it unusual at Sears at that time

12    for one person to hold that many positions or

13    was it something that was common?

14         A.   I'd say common to me.

15         Q.   What do you mean by common to you?

16         A.   Something I can handle.

17         Q.   Did anybody else hold more than one

18    position or more than one title?

19         A.   Yes.

20         Q.   Do a lot of other auto techs hold more

21    than one title or just a few?

22         A.   A few.

23         Q.   Do you remember who they were?

24         A.   No.

62

1    Q.  Do you remember any of them?

2    A.  No.

3    Q.  Did you have a set schedule when you

4    were working at Sears?

5    A.  Yes.

6    Q.  Did that schedule change during the

7    course of your employment or was it the same for

8    the entire time?

9    A.  Same for the entire time.

10    Q.  What was that schedule?

11    A.  I don't remember.

12    Q.  Did you work weekends as well as

13    weekdays?

14    A.  Yes.

15    Q.  Do you remember if you worked standard

16    nine to five shifts or if you worked evening

17    shifts?

18    A.  I don't remember.  Some -- go ahead.

19    Q.  Do you remember how many hours a week

20    you worked when you were employed by Sears?

21    A.  I would say 40.  I was full time.

22    Q.  An average day at Sears, what kind of

23    work did you do?  I know you said you did oil

24    changes and changed tires and batteries.  But

66

1    was?

2         A.   No.  I don't remember.

3         Q.   Was he your direct supervisor when you

4    were first employed?

5         A.   Yes.

6         Q.   Do you remember about how long you

7    were employed at Sears when he left?

8         A.   I don't remember.

9         Q.   Do you remember what Anthony's last

10   name was?

11        A.   No.

12        Q.   Do you know who William Sullivan is?

13        A.   No.

14        Q.   Do you know if he's a Sears employee?

15        A.   No.

16        Q.   Have you ever heard the name before?

17        A.   No.

18        Q.   Do you know who Kevin Sullivan is?

19        A.   Yes.

20        Q.   Who is he?

21        A.   A fellow employee, was a fellow

22   employee.

23        Q.   What was his position with Sears?

24        A.   Service writer.

69

1    termination from Sears?

2        A.  No.  That's after, right?  No.

3        Q.  Either before or after.

4        A.  No.

5        Q.  Did you and Kevin get along?

6        A.  I will say yes.

7        Q.  You will say yes or yes?

8        A.  Yes, ma'am.

9        Q.  Thank you.

10           Were you guys friends?

11       A.  No.

12       Q.  Why not?

13       A.  Good question.

14       Q.  Just never happened?

15       A.  Fellow employee acquaintance.

16       Q.  Do you feel Kevin ever discriminated

17   against you on the basis of your race?

18       A.  I don't remember.

19       Q.  You don't remember whether or not he

20   ever discriminated against you on the basis of

21   your race?

22       A.  I want to say no.  No.

23       Q.  So no, he did not ever discriminate

24   against you on the basis of your race?

70

1          A.  Yeah.

2          Q.  Is that correct?

3          A.  Correct.

4          Q.  To your knowledge, Kevin was not

5    involved in the decision to terminate your

6    employment; is that correct?

7          A.  I don't know.

8          Q.  Would Kevin have had the authority to

9    do that?

10         A.  No.

11         Q.  Do you know who Alicia Coviello is?

12         A.  Yes.

13         Q.  Who is she?

14         A.  A girl that works at Sears.

15         Q.  Do you know what her job title was at

16    Sears?

17         A.  No.

18         Q.  Did she work in the automotive

19    department?

20         A.  No.

21         Q.  How did you know Alicia?

22         A.  Court.

23         Q.  Could you be more specific?

24         A.  Appear for a citation that was issued.

76

1    before Alicia, and she gave it to me with no

2    hassle.

3        Q.  But you don't, as you sit here today,

4    remember why Alicia wouldn't give you your last

5    paycheck; is that correct?

6        A.  Correct.

7        Q.  To your knowledge, was Alicia in a

8    position to hire or fire you?

9        A.  I honestly don't know.  She's loss

10   prevention.  She wasn't in management, I don't

11   think.  I don't know nothing about her.  All I

12   know is loss prevention.

13       Q.  Do you know whether or not loss

14   prevention had any authority to hire or fire

15   employees?

16       A.  Don't know.

17       Q.  Did Alicia ever discriminate against

18   you on the basis of your race?

19       A.  I don't know.

20       Q.  You don't know if she ever

21   discriminated against you on the basis of your

22   race?

23       A.  I don't know.

24       Q.  That one time you spoke to her, that's

77

1      the first time you met her; is that correct?

2           A.   Other than we had to appear in court

3      for that citation.

4           Q.   Other than --

5           A.   We didn't share no words.

6           Q.   Other than appearing in court, the

7      only time you ever spoke to her was after your

8      termination when you went to get your paycheck;

9      is that correct?

10          A.   Correct.

11          Q.   Do you know who Barbara Tagliarino is?

12          A.   Barbara rings a bell.

13          Q.   Do you know who she is?

14          A.   I want to say the manager in charge of

15     the whole Sears operation.

16          Q.   Have you ever met her?

17          A.   Termination day, yes.

18          Q.   When you say you want to say she's the

19     manager, do you believe she is the manager or do

20     you want to say she is the manager?

21          A.   I want to say she's the manager.

22          Q.   But you don't know for sure?

23          A.   No.

24          Q.   Is Barbara Tagliarino the same Barbara

78

1  you met with at your termination?

2       A.  I'm not familiar with the last name.

3  The first name is Barbara.

4       Q.  You met with a woman named Barbara

5  when you were terminated?

6       A.  Yes.

7       Q.  Was anybody else present when you were

8  terminated?

9       A.  Yes, my automotive manager, Anthony,

10  at the time.

11       Q.  Had you ever met Barbara before the

12  day of your termination?

13       A.  No.

14       Q.  Do you know what Barbara's job title

15  was at Sears?

16       A.  The woman named Barbara that I knew of

17  was the general manager of the store.

18       Q.  Did Barbara have authority to hire or

19  fire you, to your knowledge?

20       A.  I will say yes.  The Barbara I know?

21       Q.  Yes, the Barbara you know?

22          (Pause)

23       Q.  Yes?

24       A.  The Barbara that I know of, yeah, the

79

1    general manager, yes.

2         Q.   Prior to the day of your termination

3    you never spoke with Barbara, the Barbara you

4    knew?

5         A.   The Barbara that's -- after the

6    termination?

7         Q.   Prior to your termination, you never

8    spoke with Barbara; is that correct?

9         A.   Yes.

10        Q.   The Barbara employed by Sears that

11   we're discussing?

12        A.   Explain that again.

13        Q.   Prior to the day of your termination,

14   is it correct that you never spoke with Barbara?

15        A.   Yeah.

16        Q.   Did you speak with Barbara after your

17   termination?

18        A.   No.

19        Q.   So that conversation you had in which

20   you were terminated is the only time you ever

21   spoke with Barbara?

22        A.   Correct.

23        Q.   Did Barbara ever discriminate against

24   you on the basis of your race?

80

1      A.   Not that I know of.

2      Q.   Do you know who Richard Spellman is?

3      A.   No, I don't.

4      Q.   Do you know if he's employed by Sears?

5      A.   I don't know.

6      Q.   Do you know who Anthony Cieri is?

7      A.   No.   I know Anthony, my manager

8  Anthony, but I don't know if that's the same

9  Anthony.

10      Q.   Your manager Anthony, do you know what

11  his job title is?

12      A.   Shop manager.

13      Q.   And he managed the automotive shop

14  when you worked --

15      A.   Yes.

16      Q.   -- at Sears?

17      A.   Yes.

18      Q.   If you can let me finish my question

19  even though you know what it's going to be so

20  she can record it.

21      A.   I apologize.

22      Q.   That's okay.

23      A.   It slipped my mind.

24      Q.   It does mine all the time.   Don't

81

1    worry.

2              Did you get along with Anthony?

3         A.   I'd say we had a good relation until

4    the termination.

5         Q.   How frequently did you see Anthony

6    while you were employed at Sears?

7         A.   When we worked the same -- when he --

8    when we worked the same schedule.

9         Q.   To your knowledge, did Anthony have

10   the authority to terminate your employment at

11   Sears?

12        A.   Yes.

13        Q.   Did Anthony ever discriminate against

14   you on the basis of your race?

15        A.   Not that I know of.

16        Q.   Do you know who Jose Hernandez is?

17        A.   Yes.

18        Q.   Who is he?

19        A.   A fellow employee.

20        Q.   When you were employed at Sears?

21        A.   When I was employed at Sears.

22        Q.   Did you and Jose get along?

23        A.   Yes.

24        Q.   Was Jose a supervisor or was he the

84

1          A.   Why did I get terminated.

2          Q.   When did you talk to John about why

3     you got terminated?

4          A.   The day I returned his pickup truck

5     that he let me borrow.

6          Q.   When did you return the pickup truck?

7          A.   The day of termination.

8          Q.   Do you remember what day you were

9     terminated?

10         A.   No.  I don't remember.

11         Q.   During the course of your appointment

12    at Sears, do you remember if anybody

13    discriminated against you on the basis of your

14    race, or do you know if anybody discriminated

15    against you on the basis of your race?

16         A.   Yes.

17         Q.   Who?

18         A.   A man named Sal, Sal something.

19         Q.   Do you remember his last name?

20         A.   No, I don't.

21         Q.   Do you remember what his job title was

22    at Sears?

23         A.   Service writer.

24         Q.   So he had the same job title as Kevin

85

1    Sullivan?

2         A.  Yes.

3         Q.  How did Sal discriminate against you?

4         A.  He came at me one day angry and he

5    told me to go back to Cambodia you fucking Gook.

6         Q.  Those are the exact words he used?

7         A.  Yes.

8         Q.  Why was he angry at you?

9         A.  Because I didn't do something that I

10   wasn't supposed to do.  No.  Let me rephrase

11   that.  He expected me to do something that was

12   out of my job title.

13        Q.  What did he expect you to do?

14        A.  Go to the warehouse and grab a tire

15   when a sales writer is supposed to do it.

16        Q.  Go to the warehouse and grab a tire,

17   you said?

18        A.  Yes.

19        Q.  Where is the warehouse?

20        A.  Downstairs underneath -- under the

21   automotive center.

22        Q.  And did Sal ask you to do that?

23        A.  Yes.  But I was busy myself.

24        Q.  Was Sal a supervisor?

90

1      Q.   Was it shortly after the racial slur?

2      A.   Yeah.

3      Q.   The same day?

4      A.   No.

5      Q.   Was it within a week?

6      A.   Somewhere in that time frame, I guess.

7      Q.   Did you speak with anybody else at

8   Sears about the comment that Sal made to you?

9      A.   I don't remember.

10      Q.   Do you remember when this happened,

11   Sal's comment to you?

12      A.   Sometime during my employment.

13      Q.   Do you remember how far into your

14   employment it was?

15      A.   I don't remember.

16      Q.   Was it more than six months into your

17   employment?

18      A.   I honestly don't remember.

19      Q.   Do you remember if it was more than a

20   year into your employment?

21      A.   I don't remember.

22      Q.   And you don't remember telling anybody

23   else at Sears about the comment Sal made to you?

24      A.   Yeah.

93

1    remember the date?

2         A.  No, I don't.

3         Q.  Do you remember the month you were

4    terminated?

5         A.  I don't remember.

6         Q.  You testified earlier that Barbara and

7    Anthony were the only two people that were

8    present when you were terminated; is that

9    correct?

10        A.  Correct.

11        Q.  What reason were you given for your

12   termination?

13        A.  I don't know.

14        Q.  You don't remember?

15        A.  I don't remember.  Exact written

16   reason?

17        Q.  Any reason.  What reason were you

18   given for your termination?

19        A.  At this point, I don't remember.

20        Q.  What were the circumstances

21   surrounding your termination?

22        A.  Swearing.

23        Q.  Swearing at whom?

24        A.  Not me.  Another employee.

94

1         Q.  Some other employee swore?

2         A.  Mm-hmm.

3         Q.  But you were terminated for it?

4         A.  Yeah.

5         Q.  What's the other employees name that

6  swore?

7         A.  I don't remember.

8         Q.  Who did the other employee supposedly

9  swear at?

10        A.  A customer.

11        Q.  And you never swore at that customer?

12        A.  No.

13        Q.  Had you ever been reprimanded for

14  swearing prior to that incident?

15        A.  I don't remember.

16        Q.  When you say Barbara and Anthony were

17  the only two people present when you were

18  terminated, where was it when you were

19  officially terminated?  Were you in Barbara's

20  office or Anthony's office?

21        A.  Barbara's office.

22        Q.  Was it at the end of a shift that you

23  were called in to Barbara's office?

24        A.  No.

99

1    what.

2         A.   Okay.

3         Q.   So you walk into her office, and what

4    happens next?

5         A.   From what I remember, it's, Have a

6    seat.

7         Q.   Who says, Have a seat?

8         A.   Barbara says, Have a seat.

9         Q.   Okay.

10        A.   You're terminated.

11        Q.   Barbara says, You're terminated?

12        A.   She didn't even -- she didn't even

13   allow me to explain myself.  She just basically

14   said, You're terminated.  Go.  Get off the

15   property.

16        Q.   Did you want to explain yourself?

17        A.   Oh, yes.

18        Q.   What were you going to say if you were

19   given an opportunity to explain yourself?

20        A.   It wasn't me.

21        Q.   Did you tell Anthony it wasn't you?

22        A.   Yes.

23        Q.   What did Anthony say?

24        A.   He told me that the customer said it

100

1   was me.

2          Q.   What did you say when he told you that

3   the customer said it was you?

4          A.   I asked him to pull the other

5   technician in.

6          Q.   Who was the other technician?

7          A.   I don't remember his name.

8          Q.   Did he pull the other technician in?

9          A.   I don't think he was on schedule.  I

10  could be wrong though?

11         Q.   But as you sit here today, you don't

12  remember that he was working that day, the other

13  technician?

14         A.   Yes.

15         Q.   Had you been reprimanded or warned for

16  swearing at a customer prior to that incident?

17         A.   I don't remember.

18         MS. TRAN:  I'm going to have these

19  marked as 5, 6, 7 and 8.

20              (Exhibits 5 through 8 marked

21              for identification)

22         Q.   I'm going to show you what's been

23  marked as Exhibit No. 8.  Just take a minute to

24  review that and let me know when you're finished

101

1    reading it.

2                    (Pause)

3        Q.  Eric, I've shown you what appears to

4    be a statement signed by a Sears employee.  Do

5    you know whose signature that is on the bottom

6    of the statement?

7        A.  I know it says Andy.

8        Q.  Did you know anybody named Andy that

9    worked with you when you worked at Sears?

10       A.  Yeah, a fellow employee.

11       Q.  What was Andy's last name, do you

12   know?

13       A.  I honestly don't know.

14       Q.  Was it Andy DiGaetono?

15       A.  That rings a bell.

16       Q.  Does that look like it's Andy

17   DiGaetono's signature?

18       A.  I don't know what he signs like.

19       Q.  But it looks like that's what it says

20   at the bottom of the page?

21       A.  Yes.

22       Q.  And this is dated October 15, 2003; is

23   that correct?

24       A.  Yes.

102

1        Q.   And the statement talks about an

2    incident with a customer that occurred on

3    October 14, 2003; is that correct?

4        A.   From what I see, correct.

5        Q.   Is this the incident that you were

6    talking about a moment ago in which another

7    fellow employee swore at a customer?

8        A.   Yes.

9        Q.   Reading down on the statement, it

10   says, A customer came in last night, 10/14/03,

11   for a flat repair.  Tire could not be repaired.

12   G. Caleo notified customer that tire could not

13   be repaired.  Customer and G. Caleo had argument

14   about purchase a new tire.

15            Is G. Caleo the person that was

16   involved with the swearing with the customer?

17       A.   I don't know.

18       Q.   Next it says, Frank could not repair

19   tire.  Frank said the F word out loud.

20            Is Frank the other employee that was

21   involved?

22       A.   Yes.  That rings a bell.  Frank rings

23   a bell.

24       Q.   Is Frank the other employee that was

108

1    that signature out.

2        Q.  On the bottom of the first page --

3    obviously it's cut off -- but you don't know

4    whose signature that is either?

5        A.  I have no idea.

6        Q.  Did you at any time tell Ms. Lacroix,

7    who is the customer that's named in these pages,

8    did you at any time swear at her as she stated

9    you did?

10       A.  No, I didn't.

11       Q.  Did Frank swear at her?

12       A.  Yes, he did.

13       Q.  When you said that the statements were

14   false, what did you mean by that?

15       A.  The statement says that I swore at

16   her, which I didn't.

17       Q.  Which statement?

18       A.  Both of them, right?

19       Q.  Right.  What's false about them?  Is

20   it that the substance of the statements is false

21   or that whoever wrote them wrote them falsely?

22   Take them one at a time.

23           The first page of Exhibit 7, the one

24   that's dated October 14, 2003, okay?

111

1      Q.  Do you remember if you were ever

2   reprimanded by Sears for swearing other than the

3   time you were terminated as a result of the

4   incident on October 14?

5      A.  I want to say yeah, but I don't

6   remember, honestly.  You asked me a question

7   like that before.  I didn't remember.

8      Q.  So you think so, but you don't

9   remember; is that correct?

10      A.  I remember I had to do a written

11   statement for something, but I don't remember

12   what it was for.

13      Q.  I'm going to show you what's been

14   marked as Exhibit No. 5.  Take a minute to look

15   at it.

16      A.  I remember this now (indicating).

17      Q.  And is that your signature on the

18   bottom of that page?

19      A.  Yes, it is.

20      Q.  Whose signature is below yours?

21      A.  I have no clue.

22      Q.  What's the date on the signature below

23   yours?

24      A.  10 -- October 2, '03.

112

1    Q.  This is a statement that says, Eric

2    Souvannakane -- is that how you pronounce your

3    last name?

4    A.  No, Souvannakane.  It's ain't as hard

5    as it looks.

6    Q.  It says, Eric Souvannakane has been

7    given a final warning per Barbara Tagliarino for

8    the incident that occurred with customer on

9    September 29, 2003.

10    Is that an accurate reading of that

11    statement?

12    A.  I'd say so, yes.

13    Q.  Do you remember the incident that

14    occurred on September 29, 2003?

15    A.  I remember now, yes.

16    Q.  What was that incident?

17    A.  An upset customer that -- yeah,

18    another racial -- something else, another racial

19    thing.

20    Q.  What was it?

21    A.  An upset customer, just upset.

22    Q.  Can you be more specific as to the

23    details?

24    A.  I guess --

113

1      Q.  I need you to be certain, so don't

2  guess.  Just tell me what you remember

3  happening.

4      A.  To the best of my knowledge, I'll

5  break it down for you.  In the morning time I

6  guess another technician serviced this

7  customer's vehicle, but I guess they put on the

8  wrong tires.

9      Q.  This is on September 29?

10      A.  I don't remember.  But if it was

11  September 29, I'm assuming it was September 29.

12      Q.  You have no reason to think it wasn't

13  September 29?

14      A.  I don't know.  I don't remember.  But

15  if it says right there in black and blue, I

16  guess so.

17      Q.  So what happened?

18      A.  It could be a 4.

19      Q.  What happened next?

20      A.  A customer dropped off their vehicle.

21  Another technician, I guess, did some service to

22  it, but I guess they put on the wrong tires.

23  And that technician left.  This customer dropped

24  off the vehicle.  And I came to do my shift in

114

1    the afternoon and the customer was there to pick

2    up the vehicle.  The customer complained to the

3    manager.  The manager came at me, Can you solve

4    this problem for me?  And the customer is still

5    upset.  So I said, Yeah, sure.

6              I took the vehicle in and corrected,

7    started to correct the problem while this upset

8    customer was waiting by his vehicle just upset

9    and obnoxious.  And I remember he called me a

10   Chink.  He swore at me.  That was it.  And the

11   customer complained.

12        Q.   What did you say?

13        A.   I shouldn't have, but I know I swore

14   back at him.

15        Q.   Did you swear at him?

16        A.   Yes, after he called me a Chink

17   though.

18        Q.   When you said a manager came to you

19   and asked you if you could correct the problem,

20   by problem, you mean put the right tires on the

21   car?

22        A.   To the best of my knowledge, that's

23   what I remember.  It was tire work.

24        Q.   Something was wrong with the tires,

122

1    swore at her?

2        A.  From what this document says, that's

3    what it looks like.

4        Q.  By "this document," we're referring to

5    the second page of Exhibit 7?

6        A.  Second page of Exhibit No. 7.

7        Q.  And as a result of the incident with

8    this customer on October 14, 2003, you were

9    terminated, your employment at Sears was

10   terminated; is that correct?

11       A.  I was terminated for this incident,

12   yes.

13       Q.  And your termination occurred on

14   October 16, 2003, two days after that swearing

15   incident?

16       A.  Is that right?

17       Q.  I'm asking you.

18       A.  I don't remember.

19       Q.  But you have no reason to think

20   October 16 wasn't the day that you were

21   terminated?

22       A.  It's a possibility, correct.

23       Q.  It's your understanding that you were

24   terminated because of that swearing incident on

123

1    October 14; is that correct?

2          A.   I believe so, which I didn't swear

3    though.

4          Q.   Right.   What I'm asking you is, is it

5    your understanding that you were terminated as a

6    result of that incident?   I'm not asking whether

7    or not you swore at her.   I'm simply asking is

8    it your understanding that your employment at

9    Sears was terminated as a result of that

10   incident on October 13, 2003?

11         A.   Correct.

12              MS. TRAN:   Why don't we take a lunch

13   break now because it's a good time.

14              (Lunch recess taken)

15   BY MS. TRAN:

16         Q.   Eric, shortly after your termination

17   from Sears, is it your understanding that there

18   was an oil spill at Sears?

19         A.   I was informed of.

20         Q.   You were informed that there was an

21   oil spill at Sears?

22         A.   Yeah, the citation (indicating).

23         Q.   When were you informed of it?

24         A.   When I received the citation.

124

1          Q.   From whom did you receive the

2     citation?

3          A.   In the mail.

4          Q.   That's the first time that you heard

5     of the oil spill?

6          A.   Correct.

7          Q.   Do you remember how long after your

8     termination you received the citation?

9          A.   No, I don't remember.

10         Q.   Do you know when the oil spill

11    occurred?

12         A.   No.

13         Q.   Do you know how much oil was spilled?

14         A.   No.

15         Q.   Do you know any of the circumstances

16    surrounding the oil spill?

17         A.   I don't understand.

18         Q.   Do you know how the oil was spilled,

19    how it was cleaned up?

20         A.   Oh, no.

21         Q.   You don't have any knowledge of how it

22    was spilled or how it was cleaned or when the

23    spill occurred?

24         A.   No.

125

1      Q.  You said that you had to return a

2  pickup truck to John Baldi, Jr., the day you

3  were terminated; is that correct?

4      A.  Correct.

5      Q.  Where did you return that truck to

6  him?

7      A.  Sears.

8      Q.  The Sears in Saugus?

9      A.  Yes.

10      Q.  Did you go inside the Sears that

11  night?

12      A.  To give him the keys and to check out

13  my toolbox, yes.

14      Q.  And this is after you had been

15  terminated?

16      A.  Correct.

17      Q.  You said you went into the Sears.  And

18  by going into the Sears, you mean the Sears

19  Automotive Center?

20      A.  Correct.

21      Q.  And you went in to give him the keys?

22      A.  Correct.

23      Q.  "Him" being John Baldi, Jr.?

24      A.  Yes.

126

1       Q.  And you also did what?

2       A.  Check on my toolbox.

3       Q.  What do you mean by check on your

4   toolbox?

5       A.  When I was employed at Sears, I had a

6   toolbox there where I kept my tools.  And when I

7   got terminated, I left it there.  I didn't take

8   it with me because I had no means of

9   transportation.  That is one of the reasons why

10  I borrowed the pickup truck from John.

11      Q.  You borrowed the pickup truck to

12  remove your tools?

13      A.  To remove belongings from my house.

14      Q.  Remove what belongings from your

15  house?

16      A.  I was moving that day.

17      Q.  You were moving into a new apartment?

18      A.  Correct.

19      Q.  Where were you moving to?

20      A.  Autumn Street.

21      Q.  I'm sorry, what was that?

22      A.  39 Autumn Street.

23      Q.  In what city?

24      A.  Lynn, Mass.

129

1        A.   Correct.

2        Q.   Is it a single apartment?

3        A.   Yes, it is.

4        Q.   How many bedrooms?

5        A.   It's two bedrooms.

6        Q.   So do you, your daughter and your

7   girlfriend all share the same bedroom?

8        A.   Correct.

9        Q.   Getting back to the night of your

10  termination, after you returned the keys to John

11  Baldi, Jr., and checked on your toolbox, what

12  did you do?

13       A.   There was a lot of trash in my

14  toolbox, so I swept that out.  And there was an

15  oil thing next to my toolbox, so I pushed that

16  out of the way.

17       Q.   What do you mean by "oil thing"?

18       A.   An oil container.

19       Q.   How big was the oil container?

20       A.   It sits in a gallon, and there's a

21  nozzle that shoots straight up so you can dump

22  the oil in.  To be honest, I don't even know.

23       Q.   Is it a gallon?  Is it a barrel of

24  oil, when you say an oil container?

130

1          A.   Maybe a gallon or two.

2          Q.   It holds a gallon or two or there was

3     a gallon or two of oil in there?

4          A.   I don't know how much was in there.

5     It holds a gallon or two.

6          Q.   Is it the size of an oil barrel or an

7     oil drum or is it smaller than that?

8          A.   Smaller than that.

9          Q.   Is it on wheels?

10         A.   Yes, it's on wheels.

11         Q.   Is it like a tray?

12         A.   What do you mean by tray?

13         Q.   Is it a tray that holds oil?  What

14    does the container look like?

15         A.   Like, you know the Poland Spring

16    refill bottles that you put on the machine?

17         Q.   The ones that go into the water

18    dispensers?

19         A.   Yes, exactly like that that's sitting

20    upright, and there's a long shaft that sticks up

21    and a big funnel.

22         Q.   A big funnel that goes into the top of

23    the container?

24         A.   Yes.

131

1       Q.  Okay.  So you pushed that out of the

2   way.  What did you do next?

3       A.  As I pushed that oil dispenser, it

4   tripped over a lift and it fell.  So I turned

5   around quickly and I seen that it fell and oil

6   was spilling.

7       Q.  Yes.

8       A.  So I went over there, I picked it up,

9   and I cleaned up the oil spill.

10      Q.  Did you inform anybody at Sears that

11  you had spilled the oil?

12      A.  John Baldi Jr., seen it.

13      Q.  Did you inform anybody else?

14      A.  That was it.

15      Q.  You didn't inform Sears management

16  that you tripped over the oil?

17      A.  No.  I cleaned it up.  It wasn't much.

18      Q.  What happened next?

19      A.  I left.

20      Q.  Did you see anybody else when you were

21  there that night?

22      A.  Jose was there.  He was doing an

23  alignment.

24      Q.  Did you see Jose?

135

1          A.  I think I did.

2          Q.  Is this the complaint that you filed

3     in the lawsuit against Sears?

4          A.  Yeah.

5          Q.  If you turn to Page 4, Paragraph 19?

6          A.  Yes.

7          Q.  It says, At closing time on or about

8     October 16, 2003 management of the automotive

9     section of the Saugus store observed a spill of

10    waste oil, paren, less than 30 gallons, close

11    paren, on the floor of the oil change bay.  The

12    spill was confined to the bay by the lack of

13    volume in the spill, a drain in the bay floor,

14    and the slope of the floor towards the drain.

15              Is that an accurate reading of that

16    paragraph?

17         A.  Yeah.  You read it correctly.

18         Q.  How do you have knowledge about the

19    oil spill that happened on the evening of

20    October 16?

21         A.  The citation I received in the mail.

22         Q.  And the citation said all of these

23    things that are itemized in Paragraph 19?

24         A.  It says destruction of property.

136

1          Q.   So then how do you know that the oil

2     spill happened on October 16 and that it was

3     confined to the bay by a lack of volume in the

4     spill, a drain in the bay floor, and by the

5     slope of the floor?

6          A.   I hired a lawyer.

7          Q.   To your knowledge, on what do you base

8     the facts -- on what do you base this allegation

9     in the complaint, Paragraph 19?

10          A.   Say that again.

11          Q.   What facts do you have to support

12     Paragraph 19 of the complaint?

13          A.   I got no facts.

14          Q.   So you don't know any of the

15     circumstances regarding the oil spill that

16     happened on October 16, is that correct, the one

17     described in Paragraph 19?

18          A.   No.

19          Q.   Do you have any facts to support

20     Paragraph 20 in which you state, Management of

21     the automotive section made the decision to

22     leave the spill in place until the following

23     morning, October 17, 2003, at which time an

24     employee was assigned to clean up the spill?

140

1      Paragraph No. 23?

2             A.   I have no facts.

3             Q.   In Paragraph 25 you state that

4      defendant Mansfield created a report falsely

5      stating that the ethnicity of the plaintiff was

6      unknown, the waste oil had a value of $3,000 so

7      the plaintiff could be charged with the felony

8      of malicious destruction of property over $250,

9      and defendant Coviello and a Mr. Jose Hernandez

10     had witnessed the spill.

11             Is that an accurate reading of that

12     paragraph?

13             A.   You read that accurately.

14             Q.   What evidence do you have to suggest

15     that Officer Mansfield created a false report

16     stating that the ethnicity of the plaintiff was

17     unknown?

18             A.   The citation.

19             Q.   Do you have any reason to believe that

20     Officer Mansfield knew what your ethnicity was?

21             A.   I don't understand that.

22             Q.   You allege Officer Mansfield created a

23     false report and that part of that falseness was

24     that he wrote that your ethnicity was unknown.

141

1    Do you understand that?

2         A.  Not really.

3         Q.  Can you read Paragraph 25 for me to

4    yourself.

5         A.  Ethnicity.

6         Q.  What is your understanding of what

7    ethnicity is?

8         A.  I don't understand that question.

9         Q.  What is your understanding of the

10   allegations contained in Paragraph No. 25?

11        A.  I don't understand that word.

12        Q.  Do you believe Officer Mansfield

13   created a false police report?

14        A.  Yeah, I think so.

15        Q.  On what do you base that belief?

16        A.  Because I didn't know what the heck

17   was going on with that citation that they sent

18   me in the mail.

19        Q.  Understanding you didn't know why you

20   got the citation, on what do you base the belief

21   that officer Mansfield created a false police

22   report?

23        A.  The citation was for me that I didn't

24   know nothing about.

1          Q.  I don't understand your answer.

2              On what do you base the belief that

3     Officer Mansfield created a false police report?

4              Very specifically in Paragraph 25 you

5     allege the police report was false because it

6     stated that the ethnicity of the plaintiff was

7     unknown because it stated that the waste oil had

8     a value of $3,000 and because it stated that

9     Coviello and Mr. Jose Hernandez had witnessed

10    the spill.

11             Have you ever seen a police report

12    issued by Officer Mansfield that stated those

13    things?

14         A.  I don't remember.

15         Q.  As you sit here today, you don't have

16    any memory of seeing a police report written by

17    Officer Mansfield that stated those things; is

18    that correct?

19         A.  I don't remember.  I might have, but I

20    don't remember.

21         Q.  So do you have any knowledge as to

22    whether or not Officer Mansfield created a false

23    report stating these things that you allege in

24    Paragraph 25?

143

1          A.   I feel it was false.

2          Q.   On what do you base your belief that

3    it's false?

4          A.   Because I was getting a citation for

5    something I didn't do.

6          Q.   Okay.

7          A.   I don't understand.

8          Q.   Let's go back to that.  Actually, you

9    know what, let's stay with this.

10              You understand that you filed a

11   lawsuit against Sears, a bunch of named

12   defendants, and Officer Mansfield, correct?

13         A.   Correct.

14         Q.   And you understand that as part of

15   that lawsuit you've alleged that each of those

16   people did certain things, correct?

17         A.   I guess so.

18         Q.   Is that your understanding?

19         A.   I don't understand.

20         Q.   What don't you understand?

21         A.   What are you asking me?  If these

22   people were in the events of that day?

23         Q.   No.  I'm asking you as a general

24   matter, you understand that when you filed this

144

1    lawsuit against Sears, the named defendants, and

2    Officer Mansfield that you made allegations

3    about what each of those people did; is that

4    correct?

5         A.   That's correct.

6         Q.   One of the things that you've alleged

7    is that Officer Mansfield created a report

8    falsely stating that the ethnicity of the

9    plaintiff was unknown; is that correct?

10        A.   Correct.

11        Q.   What evidence do you have to support

12   that?

13        A.   I got no evidence, I guess.

14        Q.   Thank you.

15             Page 7 of the complaint -- actually,

16   Page 6, the last paragraph on Page 6 going into

17   Page 7, paragraphs numbered 32 and 33, can you

18   read Paragraph 33 to yourself, please, for me.

19   Let me know when you're done.

20             (Pause)

21        A.   To 33 also?

22        Q.   Yes.

23             (Pause)

24        Q.   All set?

149

1    rights?

2         A.   Some type of document, I guess.

3         Q.   Eric, what evidence do you have to

4    support that they conspired and interfered with

5    your civil rights?

6         A.   None, I guess.  I don't know.

7         Q.   None, you guess, or none?

8         A.   I'm lost right now.

9         Q.   Why are you lost?

10        A.   I don't know.  I don't understand the

11   question.

12        Q.   What don't you understand?

13        A.   Like, you keep asking me for

14   documents.

15        Q.   I'm not asking you for documents.  I'm

16   asking you what evidence, what do you know?  Do

17   you have any knowledge or any facts to support

18   your allegation that those parties listed in

19   Paragraph 33 conspired and interfered with your

20   civil rights?  What knowledge do you have to

21   support that allegation?

22        A.   The citation I received in the mail.

23        Q.   That's the only thing you have to

24   support the allegation that they conspired and

150

1    interfered with your civil rights?

2        A.   Yes.

3        Q.   So on the basis of a citation you

4    received from the Commonwealth of Massachusetts,

5    you've determined that the parties listed in

6    Paragraph No. 33 conspired together to interfere

7    with your civil rights?

8        A.   Yes.

9        Q.   Going down to Paragraph No. 36, can

10   you read that paragraph for me?

11       A.   Can I stop and take a break?

12       Q.   Absolutely.

13          (Recess taken)

14   BY MS. TRAN:

15       Q.   We've been looking at the complaint.

16   I understand you're not an attorney, and you

17   didn't draft this document.  So if there's any

18   confusion, please stop me.  I'll try to break it

19   down so that it's a good question.

20       A.   You already confused me twice.  I

21   don't know.

22       Q.   Going back to Paragraph No. 33?

23       A.   Yeah.

24       Q.   Do you know of any agreement between

154

1        Q.   That's what they told you?

2        A.   Yes.

3        Q.   So you were, in fact, provided with an

4   explanation when you were terminated?

5        A.   Basically, yes.

6        Q.   Going down to No. 18, can you read

7   Paragraph 18 for me to yourself.

8             (Pause)

9        Q.   All set?

10       A.   Yes.

11       Q.   In Paragraph 18 the paragraph states,

12  The plaintiff was fired for something he did not

13  do, parens, allegedly swore at a customer, close

14  parens, as a pretext for his dismissal for

15  racial and ethnic prejudice by defendant Sears

16  Roebuck & Co., and the management group in

17  control of the Saugus store.

18             Is that an accurate reading of that

19  paragraph?

20       A.   That's what it says.

21       Q.   What evidence do you have to suggest

22  that you were terminated as a result of your

23  race?

24       A.   The argument with Sal.

155

1    Q.  Aside from that argument with Sal, do

2    you have any other facts to support the

3    allegation that you were terminated because of

4    your race?

5    A.  No.

6    Q.  I want to talk a little bit about your

7    prosecution for the malicious destruction of

8    property.  If you turn to Page 5, Paragraph 26,

9    can you read that paragraph for me to yourself.

10              (Pause)

11   A.  Mm-hmm.

12   Q.  Then can you also read Paragraph 27

13   for me which is on Page 6.

14              (Pause)

15   A.  Mm-hmm.

16   Q.  Those two paragraphs talk about

17   testimony.  Paragraph 26 talks about testimony

18   bay Alicia Coviello, and 27 talks about a

19   conversation you had with Jose Hernandez; is

20   that correct?

21   A.  Yes.

22   Q.  Did those two things happen on

23   separate days or the same day?

24   A.  The same day.

170

1      Q.  Have you ever spoken with

2  Officer Mansfield?

3      A.  No.

4      Q.  Has anybody ever spoken with

5  Officer Mansfield on your behalf?

6      A.  I don't think so.

7          MS. TRAN:  I think that's it for me.

8  John?

9          CROSS EXAMINATION

10  BY MR. CLOHERTY:

11      Q.  Good afternoon, Mr. Souvannakane.  I'm

12  John Cloherty.  I represent Officer Gary

13  Mansfield in this lawsuit.  I have some

14  follow-up questions for you.

15      A.  Okay.

16      Q.  Do you know who Officer Gary Mansfield

17  is of the Saugus Police Department?

18      A.  No, I don't.

19      Q.  Have you ever met him in person?

20      A.  No, I haven't.

21      Q.  Have you ever had any contact with him

22  before the issuance of the citation that you

23  received in the mail?

24      A.  No, I haven't.

171

1      Q.  I wasn't here earlier when you were

2   asked about your prior contacts with the police

3   by Ms. Tran.  Did any of those contacts involve

4   the Saugus Police Department ever arresting you?

5      A.  No.

6      Q.  So you were never arrested by the

7   Saugus Police Department or any of its officers

8   at any time?

9      A.  No.

10      Q.  Now, you first became aware of the

11   charges concerning the oil spill by way of a

12   citation you received in the mail; is that fair

13   to say?

14      A.  Yes, it is fair.

15      Q.  I'm going to mark as an exhibit the

16   defendant's disclosure because co-defense

17   attorney has already made copies.  And among

18   these documents are various records reproduced

19   to your attorney.  So we'll have them marked and

20   I'll show them to you.

21          (Exhibit 11 marked

22           for identification)

23      Q.  Showing you, sir, what's been marked

24   as Exhibit No. 11, and I provided your attorney

172

1    a copy as well.  I suggest to you this is a copy

2    of the discovery documents we produced to your

3    attorney in this lawsuit.

4                I want to direct your attention to the

5    last page of this exhibit.

6                The quality of the copy may be

7    somewhat poor.  Do you recognize that document,

8    sir?

9        A.   I don't remember.  Oh, yeah.  This is

10   the citation; isn't it?

11       Q.   That's what I'm asking you.  Is that

12   the citation, a copy of the citation you

13   received in the mail?

14       A.   Yes.

15       Q.   Or similar to the citation that you

16   received in the mail, sir?

17       A.   I would say similar.

18       Q.   When you got that citation, sir, what

19   was the first thing that you did?

20       A.   Questioned myself.

21       Q.   Did you speak to anyone in the employ

22   or formerly in the employ of Sears after you

23   received that in the mail?

24       A.   Not right away, no.

175

1    A.   He told me that they think I did it.

2    Q.   And how did you respond to him?

3    A.   I didn't agree.

4    Q.   Did you tell him you did not do it?

5    A.   Yes.

6    Q.   What did he say in reply?

7    A.   He said, I know you didn't do it.

8    Q.   Did he say anything else?

9    A.   From there on, no.

10   Q.   Did he explain to you why he knew you

11   did not do it?

12   A.   I wasn't there at the time, I guess.

13   Q.   Did Mr. Baldi ever tell you he knew

14   who did cause the oil spill?

15   A.   No.

16   Q.   Have you ever heard from any source at

17   any time as to who caused the oil spill that you

18   were being charged with?

19   A.   No.

20   Q.   Do you today know who caused that oil

21   spill that you are being charged with?

22   A.   No.

23   Q.   Has anyone told you that they know who

24   caused that oil spill that you were charged

176

1    with?

2        A.  No.

3        Q.  Earlier in your testimony you did

4    testify that you yourself spilled some oil when

5    you were checking your toolbox; is that correct?

6        A.  Correct.

7        Q.  Are you contending that there were two

8    oil spills, one that you caused and then a

9    separate one that was the subject of a criminal

10   charge?

11       A.  I'm assuming so.

12       Q.  Why are you assuming that there were

13   two different oil spills, and you weren't being

14   charged for that one next to your toolbox?

15       A.  I cleaned it up.

16       Q.  How much of a volume of oil was

17   spilled at that one that you cleaned up?

18       A.  It wasn't much, but it was oil on the

19   ground.

20       Q.  What steps did you take to clean up

21   that oil?

22       A.  Right when I noticed that the oil

23   barrel tipped over, I rushed and picked up the

24   oil barrel.  I went to grab these foam pads that

177

1    we have that absorbs oil, and that's what I

2    used.

3            Q.   Were you trained in your employment at

4    Sears or elsewhere on how to deal with oil

5    spills if that happens?

6            A.   Yes.

7            Q.   What was your training?

8            A.   Oil training.

9            Q.   What did they train you to do?

10           A.   What to do if you spill oil.

11           Q.   What steps did they tell you to take?

12           A.   I don't remember.  But foam pads was a

13    good thing though.

14           Q.   What did you do after you put down the

15    foam pads on the oil that spilled?

16           A.   I just cleaned them up.

17           Q.   Was there a special area to dispose of

18    those foam pads after a cleanup?

19           A.   You wait until it absorbs all the oil,

20    then you just pick it up and throw it in the oil

21    wastebasket.

22           Q.   And how long did it take to do the

23    cleanup from the time you had that spill next to

24    your toolbox?

179

1    up good though.

2        Q.  So based on having cleaned it up, you

3    do not believe that this citation was for that

4    oil spill that you cleaned up?

5        A.  Yes.

6        Q.  Now, did you talk to Mr. Baldi about

7    Officer Mansfield in particular when you called

8    him?

9        A.  Not necessarily.

10       Q.  Did he indicate to you that he knew

11   Officer Mansfield?

12       A.  He's the one that told me about

13   Officer Mansfield.

14       Q.  What did he tell you about

15   Officer Mansfield?

16       A.  That he was down at Sears, Roebuck, I

17   guess, at the date of the oil spill.

18       Q.  What else did he tell you about

19   Officer Mansfield?

20       A.  That he was questioning everybody.

21       Q.  Did he tell you anything else about

22   Officer Mansfield?

23       A.  That's all I remember.

24       Q.  Did Mr. Baldi, Jr., know who Officer

180

1    Mansfield was from the day of the oil spill?

2           A.    I don't know.

3           Q.    He didn't tell you I know

4    Officer Mansfield from around town or anything

5    like that?

6           A.    I don't know.

7           Q.    Do you have a memory of him telling

8    you that he knew Officer Mansfield and who he

9    was?

10          A.    No.

11          Q.    Did Mr. Baldi relate to you who

12   Officer Mansfield spoke to at Sears?

13          A.    He just said everyone.

14          Q.    Did he include himself as having

15   spoken to Officer Mansfield?

16          A.    Yes.

17          Q.    Did he tell you what Mr. Baldi and

18   Officer Mansfield talked about?

19          A.    No.

20          Q.    At any point in time after the time

21   you first spoke to him about the citation, did

22   Mr. Baldi, Jr., tell you what he and

23   Officer Mansfield spoke about?

24          A.    Yes.

183

1       Q.  Does his father have any connection

2  with Sears at all?

3       A.  No.

4       Q.  Had he ever worked there in the past?

5       A.  I don't know.

6       Q.  Other than Mr. Baldi's statement, are

7  you aware of anyone else relating to you any

8  conversations with Officer Mansfield about the

9  investigation of the oil spill?

10       A.  Say that again.

11       Q.  Let me ask it a different way.

12       A.  I understand.  I wasn't focused.

13       Q.  Other than Mr. Baldi, Jr., who told

14  you what Officer Mansfield did to investigate

15  the oil spill, did anyone else tell you about

16  Officer Mansfield's actions about the oil spill?

17       A.  No.

18       Q.  Would you recognize Officer Mansfield

19  if you saw him today?

20       A.  Not from a hole in the wall.

21       Q.  You never met him in person?

22       A.  Uh-uh.

23       Q.  Is that a yes or no?

24       A.  No.

184

1      Q.  After you had the citation mailed to

2   you, did you appear in court in response to that

3   citation?

4          A.  The date on the citation?

5          Q.  Yes.

6          A.  I showed up in court.

7          Q.  You showed up on the date that was

8   stated on the citation?

9          A.  Yes.

10         Q.  And there was a hearing on the day

11  that you showed up?

12         A.  Yes, there was.

13         Q.  And that hearing was to determine

14  whether a summons should issue on the criminal

15  charge, correct?

16         A.  I don't remember.

17         Q.  There was evidence taken as far as

18  testimony being given in court that day,

19  correct?

20         A.  I don't remember.

21         Q.  Do you remember on the date you showed

22  up in court whether there were any Sears

23  employees there that day?

24         A.  Yes.

185

1        Q.  Who was there on behalf of Sears?

2        A.  Jose Fernandez (sic).

3        Q.  Who else?

4        A.  You are talking employees, right?

5        Q.  Right.

6        A.  Just Jose Fernandez (sic).

7        Q.  Was Alicia Coviello there that first

8 day when you showed up in court?

9        A.  She was there, too.

10       Q.  You don't consider her a Sears

11 employee?

12       A.  I do now.

13       Q.  Other than Alicia Coviello and

14 Mr. Hernandez, were there any other Sears

15 employees in court that day?

16       A.  No.

17       Q.  Do you know if Officer Mansfield was

18 there that day in court?

19       A.  I don't think so.

20       Q.  Do you know if the Saugus Police

21 Department has a different officer who appears

22 for court hearings?

23       A.  There was an officer there.

24       Q.  But it wasn't Officer Mansfield, was

186

1    it?

2              A.    Not that I know of.

3              Q.    Do you know who that officer was that

4    was in court that day?

5              A.    No.

6              Q.    Did either Mr. Hernandez or

7    Ms. Coviello give any sworn statements to the

8    clerk of the court that day?

9              A.    I don't remember.

10             Q.    Were you yourself asked to raise your

11   right hand and swear to tell the truth and give

12   a statement to the clerk that day?

13             A.    I don't remember.

14             Q.    Do you recall the case being called

15   before the clerk that day?

16             A.    I don't understand.

17             Q.    Do you recall being in court and the

18   matter coming to the attention of the clerk and

19   the clerk hearing anything about your case that

20   day?

21             A.    No.

22             Q.    Do you know who the clerk was that

23   day?

24             A.    A woman.

188

1        Q.  Is he an attorney?

2        A.  No.

3        Q.  Do you have any memory today of any

4  statements or sworn testimony before the clerk

5  that day at all, that first day that you

6  appeared in court?

7        A.  Ask me that again.

8        Q.  Do you have any memory of any sworn

9  statements being taken by the clerk that first

10  day you appeared in court?

11       A.  I don't remember.

12       Q.  Now, you've already testified you

13  received a citation to appear in court that day,

14  correct?

15       A.  Yes.

16       Q.  You were never arrested by

17  Officer Mansfield, correct?

18       A.  Correct.

19       Q.  You were never arrested by any member

20  of the Saugus Police Department about these

21  charges, correct?

22       A.  Correct.

23       Q.  You were never held in custody for any

24  period of time by Officer Mansfield, were you?

189

1      A.  Correct.

2      Q.  And you were never detained by

3  Officer Mansfield and told not to move, were

4  you?

5      A.  Correct.

6      Q.  In fact, you've never had any contact

7  with him whatsoever, have you?

8      A.  Correct.

9      Q.  Now, the matter after the first day

10  you appeared on the citation proceeded to other

11  hearings in Lynn District Court.  You said you

12  appeared three or four times total.  Do you

13  recall that, sir?

14      A.  Yes, sir.

15      Q.  And among those times was a trial

16  before a judge of the district court, correct?

17      A.  Correct.

18      Q.  And at that trial there was testimony

19  taken, correct?

20      A.  Yes, there was.

21      Q.  Do you know who testified at the

22  trial?

23      A.  Jose.

24      Q.  And did anyone else testify?

190

1    A.  That girl.

2    Q.  "That girl" is Alicia Coviello?

3    A.  Yes.

4    Q.  She testified as well?

5    A.  Yes, she did.

6    Q.  Did you yourself testify that day?

7    A.  Yes.

8    Q.  Did anyone else testify on your

9    behalf?

10   A.  My lawyer.

11   Q.  Besides your lawyer, did any other

12   witnesses come forward on your behalf besides

13   yourself?

14   A.  I don't remember.

15   Q.  Do you remember the result or the

16   outcome of that trial, sir?

17   A.  Not guilty.

18   Q.  Now, in your complaint there's an

19   allegation that Mr. Hernandez left the courtroom

20   at one point in time and refused to testify.  Do

21   you recall that, sir?

22   A.  Yes, sir.

23   Q.  But he did testify at the trial of

24   your case, correct?

191

1          A.   Yes, he did.

2          Q.   So the occasion when he left the

3     courtroom was when, when did that happen?

4          A.   The first time, the citation date.

5          Q.   Did you have any discussions with him

6     about why he was leaving the courtroom?

7          A.   Yes.

8          Q.   What discussions did you have with

9     him?

10          A.   He came to me first, How you doing,

11     meet and greet.  And from there, What are you

12     doing here.  I asked him, What are you doing

13     here.  And he goes, I'm here for Sears.  And

14     from there he goes, he just walked around real

15     quick and he comes back at me, You know what,

16     sorry man, but fuck this lying shit.  And he

17     leaves.

18          Q.   Did he say anything else to you?

19          A.   That is it.

20          Q.   Did you ask him what he meant by "this

21     lying shit" that he was telling you about?

22          A.   No.  He said it real quick, and he

23     left.  That was it.

24          Q.   Did you have any subsequent

192

1    conversations with him about what he meant by

2    that?

3         A.  No.

4         Q.  Have you ever talked to him since that

5    date in the courtroom about what he meant?

6         A.  No.

7         Q.  In fact, after telling you that, he

8    later did testify in court at your trial,

9    correct?

10        A.  Yes.

11        Q.  Was Officer Mansfield present at the

12   trial, sir?

13        A.  I don't believe so.

14        Q.  And you didn't have any police officer

15   witnesses testify at the trial, did they?

16        A.  I don't think so.  I don't remember,

17   to be honest with you.  I just remember what I'm

18   telling you.

19        Q.  Has anyone ever told you, other than

20   Mr. Baldi, that they spoke to Officer Mansfield

21   about this investigation?

22        A.  No.

23        Q.  Other than Mr. Baldi and what you

24   testified earlier, have you learned from any

193

1    other source of Officer Mansfield's conduct

2    concerning this investigation or this charge?

3        A.  Say that one more time.

4        Q.  Has any other source, besides

5    Mr. Baldi, Jr.'s version that you testified

6    about earlier, told you about what

7    Officer Mansfield did?

8        A.  No.

9        Q.  Before this citation was issued, you

10   already testified you never met with

11   Officer Mansfield, correct?

12       A.  Correct.  Unless he was the officer

13   that was at the citation date, but I don't

14   recall.  I don't remember.

15       Q.  I'm saying before the citation date.

16       A.  Oh, no.

17       Q.  You never met with Officer Mansfield,

18   correct?

19       A.  Correct.

20       Q.  Do you have any evidence or reason to

21   believe that Officer Mansfield knew about your

22   racial background or your ethnic background?

23       A.  Are you asking me if he knew?

24       Q.  Yes.

194

1      A.  I don't know.

2      Q.  You never knew whether he knew about

3  your racial or ethnic background, correct?

4      A.  Correct.

5      Q.  Did anyone ever tell you that they

6  informed Officer Mansfield about your racial or

7  ethnic background?

8      A.  I don't know.

9      Q.  Do you have any evidence from any

10 other source that they told Officer Mansfield

11 about your racial or ethnic background?

12     A.  No.

13     Q.  Now, you're aware that in the charge

14 that was listed in the citation, the value of

15 the property was estimated to be in excess of

16 $250?  Are you aware of that, sir?

17     A.  Right now I'm aware of it.

18     Q.  That was the basis of the charge,

19 correct?

20     A.  Correct.

21     Q.  And do you have any knowledge as to

22 how Officer Mansfield or the Saugus Police

23 Department listed this as being a destruction of

24 property in excess of $250 in value?

201

1     Q.  Is there anything in this police

2   report, sir, that indicates to you that there is

3   an agreement between the Sears employees and

4   Officer Mansfield to deprive you of your civil

5   rights?

6     A.  Here goes that question again.  I

7   don't remember.  I don't understand that

8   question.

9     Q.  I'm just trying to find out what

10  evidence you have, sir, for your claims against

11  Officer Mansfield.

12     A.  Yes.

13     Q.  Do you have any evidence or facts to

14  support a claim that he agreed or conspired with

15  the Sears employees to deprive you of your civil

16  rights?

17     A.  Other than the police report, the

18  citation, but the citation probably don't mean

19  nothing, right?

20     Q.  I'm asking you --

21     A.  The police report right here.

22     Q.  Where in this police report does it

23  indicate that there was an agreement between

24  Officer Mansfield and the Sears employees?

202

1    A.  Offenses.

2    Q.  Where are you indicating, sir?

3    A.  The offenses.  I don't understand.

4    Q.  Where it lists the offenses?

5    A.  Yeah, offenses, whatever.  I don't

6    understand, sir.

7    Q.  Well, other than the police report,

8    sir, do you have any other evidence that there

9    was any kind of an agreement between

10   Officer Mansfield and the Sears employees as it

11   relates to depriving you of civil rights?

12   A.  Not that I recall.

13   Q.  Now, you spoke to Mr. Baldi about the

14   citation that you received shortly after you

15   received it.  Do you recall that testimony, sir?

16   A.  Yeah.

17   Q.  Did he ever tell you that he was

18   threatened in any way in his employment for

19   talking to the Sears officials?

20   A.  Yes.

21   Q.  What did he tell you about that?

22   A.  If he didn't tell them who did it,

23   they would fire him.

24   Q.  Who said that to Mr. Baldi?