EXHIBIT 2

Page 1

```
                              Volume: I
                              Pages: 1-212
                              Exhibits: 1-12
               UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF MASSACHUSETTS
   - - - - - - - - - - - - - - - - - - x
   ERIC SOUVANNAKANE,

        Plaintiff,         Civil Action

        v.                 No. 0412164MLW

   SEARS, ROEBUCK & CO., WILLIAM
   SULLIVAN, RICHARD SPELLMAN,
   BARBARA TAGLIARINO, KEVIN SULLIVAN,
   ALICIA COVIELLO, GARY MANSFIELD,
        Defendants.
   - - - - - - - - - - - - - - - - - - x

        DEPOSITION of ERIC SOUVANNAKANE, a witness
   called by counsel for the Defendants Sears
   Roebuck & Co., William Sullivan, Richard
   Spellman, Barbara Tagliarino, Kevin Sullivan and
   Alicia Coviello taken pursuant to the applicable
   provisions of the Massachusetts Rules of Civil
   Procedure, before Toni F. Beckwith, Registered
   Merit Reporter, CSR No. 111293 and Notary Public
   in and for the Commonwealth of Massachusetts, at
   the Offices of Sugarman, Rogers, Barshak &
   Cohen, P.C., 101 Merrimac Street, Boston,
   Massachusetts, on Wednesday, February 8, 2006,
   commencing at 10:11 a.m.
```

Page 2

```
 1  APPEARANCES:
 2
 3     KURT S. OLSON, ESQUIRE
        500 Federal Street
 4      Andover, Massachusetts 01801
        Counsel for the Plaintiff
 5
 6
        SUGARMAN, ROGERS, BARSHAK & COHEN, P.C.
 7      By Liza J. Tran, Esquire
        and
 8      Christine M. Netski, Esquire
        and
 9      Sulekeyn Walker, Esquire
        101 Merrimac Street
10      Boston, Massachusetts 02114
        Counsel for Sears, Roebuck & Co.,
11      William Sullivan, Richard Spellman,
        Barbara Tagliarino, Kevin Sullivan
12      and Alicia Coviello
13
14      PIERCE, DAVIS & PERRITANO, LLP
        By John J. Cloherty, III, Esquire
15      Ten Winthrop Square
        Boston, Massachusetts 02110
16      Counsel for Gary Mansfield
17
18  (Exhibits retained by Attorney Tran)
19
20
21
22
23
24
```

Page 3

```
 1            INDEX
    Deposition of:  Direct Cross Redirect Recross
 2
    ERIC SOUVANNAKANE
 3
       By Ms. Tran      5     206
 4
       By Mr. Cloherty  170
 5
 6
 7
 8            EXHIBITS
       No.                         Page
 9
10  1   Plaintiff's Response to
        Defendant Sears, Roebuck & Co.,
11      First Set of Interrogatories    30
12
    2   Plaintiff's Response to
13      Defendant Sears, Roebuck & Co.,
        First Request for Production
14      of Documents                    30
15
    3   Plaintiff's Response to
16      Defendant Gary Mansfield's
        First Set of Interrogatories    30
17
18  4   Plaintiff's Response to
        Defendant Gary Mansfield's
19      First Request for Production
        of Documents                    30
20
21  5   Handwritten Note dated 10/2/03  100
22
    6   Documentation of Performance
23      Issues                          100
24
```

Page 4

```
 1
            (Exhibits, continued)
 2
        No.                         Page
 3
 4
 5  7   Handwritten Note dated 10/14/03  100
 6  8   Handwritten Note dated 1/15/03   100
 7  9   Preface                          134
 8  10  Plaintiff's Disclosure
        Pursuant to LR 26.2(A)
 9      & LR 26.1(B)(1)&(2)              158
10  11  Defendant Gary Mansfield's
        Local Rule 26.2(A) Disclosure    171
11
12  12  Formal Trespass Notice           206
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 57

1  Q. That's all that happened? Why were
2  you arrested?
3  A. Came back at me, came back and just
4  took us in.
5  Q. So you were peacefully walking through
6  the apartment building and randomly stopped by a
7  police officer and he arrested you for reasons
8  you can't understand?
9  A. Yes.
10  Q. It seems to happen a lot,
11  Mr. Souvannakane.
12      The next offense is dated October 24,
13  2000, resisting arrest. I assume that's related
14  to the same incident where you were arrested for
15  disturbing the peace?
16  A. Yes.
17  Q. Did you, in fact, resist arrest?
18  A. No.
19  Q. Why did he charge you for resisting
20  arrest, do you know?
21  A. They didn't even know why they took me
22  in. They had to think five minutes for the
23  charge, and that was it.
24  Q. So, again, you were charged with

Page 58

1  resisting arrest, but you didn't actually resist
2  an arrest, and nobody understands why you were
3  charged for it?
4  A. No. They handcuffed me.
5  Q. What happened when they handcuffed
6  you?
7  A. What else? What could I do?
8  Q. Did you resist arrest?
9  A. No.
10  Q. Did you have to appear in court as a
11  result of those charges?
12  A. Yeah.
13  Q. What resulted from that court
14  appearance?
15  A. Six month without a finding.
16  Q. So probation for six months; then
17  assuming you don't get into trouble during that
18  time, it's not -- it's no finding, nothing on
19  your record; is that correct?
20  A. Yes.
21  Q. Did you complete the terms of your
22  probation?
23  A. Yes.
24  Q. Have you ever been charged with any

Page 59

1  other crimes besides the ones listed on that
2  sheet?
3  A. Right here (indicating)?
4  Q. Yes.
5  A. No.
6  Q. Have you ever been convicted of any of
7  the offenses that you were charged for that are
8  listed on that sheet?
9  A. Convicted, as in?
10  Q. Found guilty. To your knowledge, do
11  you have a conviction on your record?
12  A. To the best of my knowledge, I don't
13  even know.
14  Q. Aside from the few times that you were
15  arrested and I assume spent some time in jail as
16  a result of those arrests, have you ever spent
17  any time in jail as a result of any of the
18  offenses that are listed on that sheet in front
19  of you?
20  A. Yes.
21  Q. The time that you spent in jail, was
22  that time in holding cells after you were
23  arrested waiting to go to court or was it any
24  longer length of time?

Page 60

1  A. Holding.
2      MS. TRAN: I'm going to take a very
3  brief bathroom break.
4      (Recess taken)
5  BY MS. TRAN:
6  Q. Do you remember when you were hired by
7  Sears?
8  A. August.
9  Q. Of what year?
10  A. At this point in time, I want to say
11  '03, '04.
12  Q. So it was either 2003 or 2004?
13  A. Yes.
14  Q. You previously testified that you were
15  employed by Sears for about a year and a half?
16  A. Year and a couple of months.
17  Q. And were you terminated from Sears in
18  October of 2003?
19  A. Yes.
20  Q. So then is it accurate to say that you
21  were hired in August of 2002?
22  A. Sure.
23  Q. Sure, that's correct?
24  A. Yes, correct.

SHEA COURT REPORTING SERVICES
617-227-3097

Page 61

1   Q. And what was your job title at Sears?
2   A. Tire tech and oil lube tech, battery
3   tech, maintenance tech.
4   Q. Were those titles that you held all at
5   the same time, or were they titles that you held
6   separately?
7   A. All at the same time.
8   Q. What did your job responsibilities at
9   Sears entail?
10  A. Tires, oil changes, batteries.
11  Q. Was it unusual at Sears at that time
12  for one person to hold that many positions or
13  was it something that was common?
14  A. I'd say common to me.
15  Q. What do you mean by common to you?
16  A. Something I can handle.
17  Q. Did anybody else hold more than one
18  position or more than one title?
19  A. Yes.
20  Q. Do a lot of other auto techs hold more
21  than one title or just a few?
22  A. A few.
23  Q. Do you remember who they were?
24  A. No.

Page 62

1   Q. Do you remember any of them?
2   A. No.
3   Q. Did you have a set schedule when you
4   were working at Sears?
5   A. Yes.
6   Q. Did that schedule change during the
7   course of your employment or was it the same for
8   the entire time?
9   A. Same for the entire time.
10  Q. What was that schedule?
11  A. I don't remember.
12  Q. Did you work weekends as well as
13  weekdays?
14  A. Yes.
15  Q. Do you remember if you worked standard
16  nine to five shifts or if you worked evening
17  shifts?
18  A. I don't remember. Some -- go ahead.
19  Q. Do you remember how many hours a week
20  you worked when you were employed by Sears?
21  A. I would say 40. I was full time.
22  Q. An average day at Sears, what kind of
23  work did you do? I know you said you did oil
24  changes and changed tires and batteries. But

Page 63

1   what does that entail, what type of things?
2   A. Tires, oil changes and batteries, yes.
3   Q. By "tires," what do you mean?
4   A. Swapping them and repairing them.
5   Q. And when you say "batteries," what do
6   you mean?
7   A. Recharge or replace.
8   Q. When you say "oil changes," you mean
9   standard oil changes?
10  A. Yes.
11  Q. Did you do alignments and things like
12  that or just the oil changing?
13  A. Just those three titles.
14  Q. If somebody came in for a full oil
15  change that included a tire alignment, would you
16  do the tire alignment, too, or would you just do
17  the oil change?
18  A. I would do what I'm capable of doing,
19  then I would pass it on to the alignment tech.
20      MR. OLSON: Just a second.
21      MS. TRAN: Sure.
22      (Counsel conferred with witness)
23  A. Just to run it back and clarify
24  something. When you asked me about tire

Page 64

1   alignments, what do you mean?
2   Q. I'm sorry?
3   A. When you asked me about tire
4   alignments, what did you mean?
5   Q. What I meant was you had said earlier
6   that you changed tires and repaired tires. Did
7   you also do alignment of tires?
8   A. Alignment is a whole different thing
9   from the tires.
10  Q. I understand that. Did you also
11  align, or did you just do repairs and changing
12  of the tires?
13  A. What I did was I did the tire work on
14  the vehicle, and from there the alignment tech
15  does the alignment, aligns the suspension.
16  Q. Were you limited to any one area of
17  the automotive shop when you were working or did
18  you work in more than one?
19  A. More than one.
20  Q. Were there any areas of the auto shop
21  that you didn't work in?
22  A. Yeah. Actually, no. I worked in all
23  areas.
24  Q. And by areas you understand I mean the

Page 69

1  termination from Sears?
2      A. No. That's after, right? No.
3      Q. Either before or after.
4      A. No.
5      Q. Did you and Kevin get along?
6      A. I will say yes.
7      Q. You will say yes or yes?
8      A. Yes, ma'am.
9      Q. Thank you.
10         Were you guys friends?
11     A. No.
12     Q. Why not?
13     A. Good question.
14     Q. Just never happened?
15     A. Fellow employee acquaintance.
16     Q. Do you feel Kevin ever discriminated
17 against you on the basis of your race?
18     A. I don't remember.
19     Q. You don't remember whether or not he
20 ever discriminated against you on the basis of
21 your race?
22     A. I want to say no. No.
23     Q. So no, he did not ever discriminate
24 against you on the basis of your race?

Page 70

1      A. Yeah.
2      Q. Is that correct?
3      A. Correct.
4      Q. To your knowledge, Kevin was not
5 involved in the decision to terminate your
6 employment; is that correct?
7      A. I don't know.
8      Q. Would Kevin have had the authority to
9 do that?
10     A. No.
11     Q. Do you know who Alicia Coviello is?
12     A. Yes.
13     Q. Who is she?
14     A. A girl that works at Sears.
15     Q. Do you know what her job title was at
16 Sears?
17     A. No.
18     Q. Did she work in the automotive
19 department?
20     A. No.
21     Q. How did you know Alicia?
22     A. Court.
23     Q. Could you be more specific?
24     A. Appear for a citation that was issued.

Page 71

1      Q. When?
2      A. I don't remember.
3      Q. What court?
4      A. Lynn District Court.
5      Q. Did you speak with her when she
6 appeared?
7      A. No.
8      Q. Did she appear more than once?
9      A. I don't remember.
10     Q. Did you know her or speak with her
11 during the time that you were employed by Sears
12 prior to the citation?
13     A. No, but...
14     Q. Just to be clear. That's a no, you
15 didn't know her or speak to her while you were
16 employed at Sears?
17     A. Correct.
18     Q. And what were you going to say?
19     A. She did loss prevention. Now I know
20 what she did.
21     Q. That was her job title at Sears?
22     A. Yes.
23     Q. You never had any occasion to talk to
24 her before your termination?

Page 72

1         (Pause)
2      Q. Is that a no?
3      A. After the termination?
4      Q. Before your termination.
5      A. No.
6      Q. And after your termination, the only
7 time you ever spoke to her was at the court
8 appearance; is that correct?
9      A. Before that we spoke, but I don't know
10 who she was.
11     Q. When did you speak with her?
12     A. No idea. She gave me a hard time to
13 get my last paycheck.
14     Q. So sometime after you were terminated
15 was the first time you spoke with her; is that
16 correct?
17     A. Yeah, but I don't know who she was.
18     Q. Do you remember about how long after
19 you were terminated that discussion happened?
20     A. No.
21     Q. Do you remember when you went to get
22 your last paycheck?
23     A. No.
24     Q. Was it within a week of your

Page 73

1  termination?
2      A. I don't remember.
3      Q. Within a month?
4      A. Yeah. I would say within the month.
5      Q. So it was within a month, to the best
6  of your knowledge?
7      A. Well, I'll just say I don't remember.
8      Q. Would you have waited six months to go
9  get your last paycheck?
10     A. No, not that long.
11     Q. Three months?
12     A. Not that long.
13     Q. And that conversation you had with
14 Alicia when you went to get your last paycheck
15 was the first time you had ever spoken with her?
16     A. Yes.
17     Q. When you said she gave you a hard
18 time, what do you mean?
19     A. She didn't want to give me my check.
20     Q. Did she tell you she didn't want to
21 give you your check?
22     A. Not in those exact words, but
23 basically.
24     Q. What did she say?

Page 74

1      A. I don't remember, but she gave me a
2  tough time.
3      Q. When did you appear to get your last
4  paycheck?
5      A. I don't remember.
6      Q. Do you remember where you went to get
7  your last paycheck?
8      A. Sears.
9      Q. Which building? The Sears in Saugus,
10 I assume?
11     A. Yes, the Sears in Saugus.
12     Q. Which building?
13     A. The main building.
14     Q. Where the retail store is located?
15     A. Yes.
16     Q. Did you go into the human resources
17 department?
18     A. Yes.
19     Q. Is Alicia the only person you spoke
20 with to get your last paycheck?
21     A. The secretary.
22     Q. You spoke with the secretary before
23 you spoke with Alicia?
24     A. Yes.

Page 75

1      Q. When you say Alicia gave you a hard
2  time, can you be more specific?
3      A. She gave me a hard time.
4      Q. Can you be more specific?
5      A. She wouldn't give it up.
6      Q. Can you be more specific?
7      A. I don't remember the events that
8  happened that day. Word for word, I don't
9  remember. But all I remember is she gave me a
10 tough time.
11     Q. Did you eventually get your last
12 paycheck?
13     A. No.
14     Q. Why not?
15     A. She wouldn't give it up.
16     Q. Did she say why?
17     A. I don't remember.
18     Q. Did you eventually after that
19 discussion with Alicia get your last paycheck
20 from Sears?
21     A. Yes.
22     Q. How did you receive that check?
23     A. I went to Sears a week after that day
24 and I spoke to a secretary, the same secretary

Page 76

1  before Alicia, and she gave it to me with no
2  hassle.
3      Q. But you don't, as you sit here today,
4  remember why Alicia wouldn't give you your last
5  paycheck; is that correct?
6      A. Correct.
7      Q. To your knowledge, was Alicia in a
8  position to hire or fire you?
9      A. I honestly don't know. She's loss
10 prevention. She wasn't in management, I don't
11 think. I don't know nothing about her. All I
12 know is loss prevention.
13     Q. Do you know whether or not loss
14 prevention had any authority to hire or fire
15 employees?
16     A. Don't know.
17     Q. Did Alicia ever discriminate against
18 you on the basis of your race?
19     A. I don't know.
20     Q. You don't know if she ever
21 discriminated against you on the basis of your
22 race?
23     A. I don't know.
24     Q. That one time you spoke to her, that's

Page 77

1  the first time you met her; is that correct?
2      A. Other than we had to appear in court
3  for that citation.
4      Q. Other than --
5      A. We didn't share no words.
6      Q. Other than appearing in court, the
7  only time you ever spoke to her was after your
8  termination when you went to get your paycheck;
9  is that correct?
10     A. Correct.
11     Q. Do you know who Barbara Tagliarino is?
12     A. Barbara rings a bell.
13     Q. Do you know who she is?
14     A. I want to say the manager in charge of
15 the whole Sears operation.
16     Q. Have you ever met her?
17     A. Termination day, yes.
18     Q. When you say you want to say she's the
19 manager, do you believe she is the manager or do
20 you want to say she is the manager?
21     A. I want to say she's the manager.
22     Q. But you don't know for sure?
23     A. No.
24     Q. Is Barbara Tagliarino the same Barbara

Page 78

1  you met with at your termination?
2      A. I'm not familiar with the last name.
3  The first name is Barbara.
4      Q. You met with a woman named Barbara
5  when you were terminated?
6      A. Yes.
7      Q. Was anybody else present when you were
8  terminated?
9      A. Yes, my automotive manager, Anthony,
10 at the time.
11     Q. Had you ever met Barbara before the
12 day of your termination?
13     A. No.
14     Q. Do you know what Barbara's job title
15 was at Sears?
16     A. The woman named Barbara that I knew of
17 was the general manager of the store.
18     Q. Did Barbara have authority to hire or
19 fire you, to your knowledge?
20     A. I will say yes. The Barbara I know?
21     Q. Yes, the Barbara you know?
22     (Pause)
23     Q. Yes?
24     A. The Barbara that I know of, yeah, the

Page 79

1  general manager, yes.
2      Q. Prior to the day of your termination
3  you never spoke with Barbara, the Barbara you
4  knew?
5      A. The Barbara that's -- after the
6  termination?
7      Q. Prior to your termination, you never
8  spoke with Barbara; is that correct?
9      A. Yes.
10     Q. The Barbara employed by Sears that
11 we're discussing?
12     A. Explain that again.
13     Q. Prior to the day of your termination,
14 is it correct that you never spoke with Barbara?
15     A. Yeah.
16     Q. Did you speak with Barbara after your
17 termination?
18     A. No.
19     Q. So that conversation you had in which
20 you were terminated is the only time you ever
21 spoke with Barbara?
22     A. Correct.
23     Q. Did Barbara ever discriminate against
24 you on the basis of your race?

Page 80

1      A. Not that I know of.
2      Q. Do you know who Richard Spellman is?
3      A. No, I don't.
4      Q. Do you know if he's employed by Sears?
5      A. I don't know.
6      Q. Do you know who Anthony Cieri is?
7      A. No. I know Anthony, my manager
8  Anthony, but I don't know if that's the same
9  Anthony.
10     Q. Your manager Anthony, do you know what
11 his job title is?
12     A. Shop manager.
13     Q. And he managed the automotive shop
14 when you worked --
15     A. Yes.
16     Q. -- at Sears?
17     A. Yes.
18     Q. If you can let me finish my question
19 even though you know what it's going to be so
20 she can record it.
21     A. I apologize.
22     Q. That's okay.
23     A. It slipped my mind.
24     Q. It does mine all the time. Don't

Page 81

1  worry.
2      Did you get along with Anthony?
3      A. I'd say we had a good relation until
4  the termination.
5      Q. How frequently did you see Anthony
6  while you were employed at Sears?
7      A. When we worked the same -- when he --
8  when we worked the same schedule.
9      Q. To your knowledge, did Anthony have
10 the authority to terminate your employment at
11 Sears?
12     A. Yes.
13     Q. Did Anthony ever discriminate against
14 you on the basis of your race?
15     A. Not that I know of.
16     Q. Do you know who Jose Hernandez is?
17     A. Yes.
18     Q. Who is he?
19     A. A fellow employee.
20     Q. When you were employed at Sears?
21     A. When I was employed at Sears.
22     Q. Did you and Jose get along?
23     A. Yes.
24     Q. Was Jose a supervisor or was he the

Page 82

1  same level as you?
2      A. Same level.
3      Q. Do you know who Michael Katsaris is?
4      A. Yes.
5      Q. Who is he?
6      A. A fellow employee.
7      Q. At Sears?
8      A. Yes.
9      Q. Was he also an automotive tech?
10     A. Yes.
11     Q. Did you and Michael get along?
12     A. I'd say yes.
13     Q. Do you know who John Baldi is?
14     A. Yes.
15     Q. Who is he?
16     A. Fellow employee.
17     Q. By John Baldi, I mean John Baldi, Jr.
18 Do you understand me?
19     A. Yes.
20     Q. He's a fellow employee at Sears?
21     A. Yes.
22     Q. Did you and John get along?
23     A. Yes.
24     Q. Did you ever talk with Jose Hernandez

Page 83

1  about the circumstances of your terminations
2  from Sears?
3      A. No.
4      Q. Did you ever talk -- I'm sorry. Go
5  ahead.
6      A. This would be after the termination?
7      Q. Either before or after the
8  termination, did you ever talk with Jose about
9  any of the circumstances that gave rise to your
10 termination?
11     A. No.
12     Q. Did you ever speak with Michael
13 Katsaris about the circumstances that gave rise
14 to your termination or about the termination
15 itself?
16     A. No.
17     Q. Did you ever speak with John Baldi
18 about the circumstances that gave rise to your
19 termination or about the termination itself?
20     A. After or before?
21     Q. Before or after.
22     A. Yes.
23     Q. What did you and John talk about with
24 regard to your termination?

Page 84

1      A. Why did I get terminated.
2      Q. When did you talk to John about why
3  you got terminated?
4      A. The day I returned his pickup truck
5  that he let me borrow.
6      Q. When did you return the pickup truck?
7      A. The day of termination.
8      Q. Do you remember what day you were
9  terminated?
10     A. No. I don't remember.
11     Q. During the course of your appointment
12 at Sears, do you remember if anybody
13 discriminated against you on the basis of your
14 race, or do you know if anybody discriminated
15 against you on the basis of your race?
16     A. Yes.
17     Q. Who?
18     A. A man named Sal, Sal something.
19     Q. Do you remember his last name?
20     A. No, I don't.
21     Q. Do you remember what his job title was
22 at Sears?
23     A. Service writer.
24     Q. So he had the same job title as Kevin

21 (Pages 81 to 84)

SHEA COURT REPORTING SERVICES
617-227-3097

Page 85

1  Sullivan?
2  A. Yes.
3  Q. How did Sal discriminate against you?
4  A. He came at me one day angry and he
5  told me to go back to Cambodia you fucking Gook.
6  Q. Those are the exact words he used?
7  A. Yes.
8  Q. Why was he angry at you?
9  A. Because I didn't do something that I
10 wasn't supposed to do. No. Let me rephrase
11 that. He expected me to do something that was
12 out of my job title.
13 Q. What did he expect you to do?
14 A. Go to the warehouse and grab a tire
15 when a sales writer is supposed to do it.
16 Q. Go to the warehouse and grab a tire,
17 you said?
18 A. Yes.
19 Q. Where is the warehouse?
20 A. Downstairs underneath -- under the
21 automotive center.
22 Q. And did Sal ask you to do that?
23 A. Yes. But I was busy myself.
24 Q. Was Sal a supervisor?

Page 86

1  A. No.
2  Q. Did Sal have the authority to
3  terminate your employment at Sears, to your
4  knowledge?
5  A. No.
6  Q. Was Sal still employed by Sears when
7  you were terminated?
8  A. I believe so.
9  Q. So he was still employed by Sears when
10 you left; is that correct?
11    (Pause)
12 Q. Is that a yes?
13 A. Yes.
14 Q. Thank you.
15    MS. TRAN: Do you want to take a quick
16 break?
17    (Recess taken)
18 BY MS. TRAN:
19 Q. Getting back to the incident you
20 described with Sal?
21 A. Okay.
22 Q. Was anybody else present when he made
23 these comments to you?
24 A. No.

Page 87

1  Q. It was just you and him at the shop?
2  A. Yes.
3  Q. What did you say in response when he
4  told you to go back to Cambodia?
5  A. I'm trying to remember.
6  Q. Take your time.
7  A. To the best of my knowledge, after he
8  spoke his racial slur I replied, I'm not
9  Cambodian. He said, Whatever you are. I called
10 him, Shut up, meatball, something like that.
11 Q. Is Sal Italian?
12 A. I guess so. I'm not sure. But I
13 guess so.
14 Q. But I assume when you said, Shut up,
15 meatball, you were referring to --
16 A. Yes. That's what I said.
17 Q. What did he say when you told him that
18 you weren't Cambodian?
19 A. Say that again.
20 Q. What did he say when you told him you
21 weren't Cambodian?
22 A. Whatever the hell you are.
23 Q. And that's when you replied, Shut up,
24 meatball?

Page 88

1  A. Basically, yes.
2  Q. By "basically" is that exactly what
3  you said, or is that what you remember saying?
4  A. To the best of my knowledge, I know I
5  said meatball. It was nonsense back and forth.
6  Q. What happened next?
7  A. We went our separate ways.
8  Q. Did you ever have any other
9  interactions with Sal in which he used racial
10 slurs against you?
11 A. Just that one time --
12 Q. Did you inform --
13 A. -- that I know of.
14 Q. That you remember, you mean?
15 A. Yes.
16 Q. Did you inform anybody else at Sears
17 about what Sal told you?
18 A. I don't remember.
19 Q. Do you remember telling Anthony about
20 what Sal said?
21 A. Yes.
22 Q. What did Anthony say in response to
23 that?
24 A. Oh, wow. Really? That's all I

Page 93

```
 1  remember the date?
 2     A. No, I don't.
 3     Q. Do you remember the month you were
 4  terminated?
 5     A. I don't remember.
 6     Q. You testified earlier that Barbara and
 7  Anthony were the only two people that were
 8  present when you were terminated; is that
 9  correct?
10     A. Correct.
11     Q. What reason were you given for your
12  termination?
13     A. I don't know.
14     Q. You don't remember?
15     A. I don't remember. Exact written
16  reason?
17     Q. Any reason. What reason were you
18  given for your termination?
19     A. At this point, I don't remember.
20     Q. What were the circumstances
21  surrounding your termination?
22     A. Swearing.
23     Q. Swearing at whom?
24     A. Not me. Another employee.
```

Page 94

```
 1     Q. Some other employee swore?
 2     A. Mm-hmm.
 3     Q. But you were terminated for it?
 4     A. Yeah.
 5     Q. What's the other employees name that
 6  swore?
 7     A. I don't remember.
 8     Q. Who did the other employee supposedly
 9  swear at?
10     A. A customer.
11     Q. And you never swore at that customer?
12     A. No.
13     Q. Had you ever been reprimanded for
14  swearing prior to that incident?
15     A. I don't remember.
16     Q. When you say Barbara and Anthony were
17  the only two people present when you were
18  terminated, where was it when you were
19  officially terminated? Were you in Barbara's
20  office or Anthony's office?
21     A. Barbara's office.
22     Q. Was it at the end of a shift that you
23  were called in to Barbara's office?
24     A. No.
```

Page 95

```
 1     Q. What happened during the termination?
 2  Where did you go?
 3     A. We went -- Anthony called me in his
 4  office, and from there we went to Barbara's
 5  office.
 6     Q. Did Anthony say why he was calling you
 7  into his office?
 8     A. Yeah, We have a problem.
 9     Q. Did he elaborate, or is that all he
10  said at that time?
11     A. He elaborated.
12     Q. What did he say?
13     A. From the best of my knowledge,
14  basically just the events that happened one
15  night from swearing back and forth.
16     Q. When you say "swearing back and
17  forth," what do you mean?
18     A. The other technician swearing.
19     Q. What happened after Anthony pulled you
20  into his office?
21     A. We have to wait for Barbara.
22     Q. Did you wait in Anthony's office for
23  Barbara?
24     A. No.
```

Page 96

```
 1     Q. Where did you go?
 2     A. Human resources.
 3     Q. Did you and Anthony go to human
 4  resources together?
 5     A. The first time, no.
 6     Q. What do you mean by "the first time"?
 7     A. After Anthony called me in the office,
 8  he told me what happened. So I went to go talk
 9  with Barbara.
10     Q. I'm going to stop you for a second.
11  When you say he told you what happened, what do
12  you mean?
13     A. The swearing back and forth with the
14  other technician.
15     Q. What did Anthony say to you about
16  that?
17     A. That's all I remember. He basically
18  said, We got a complaint on you about swearing
19  with another technician, or whatever, and we got
20  to let you go.
21     Q. Did he say the complaint was from
22  another technician or from a customer?
23     A. I don't remember.
24     Q. Did you ask him?
```

Page 109

```
 1    A. That is false.
 2    Q. You think this person wrote them
 3  falsely?
 4    A. Front and back, first and second.
 5    Q. So you think both people lied about
 6  what they wrote?
 7    A. The beginning starts to make sense,
 8  but when the argument started happening, it
 9  seems like things are just added in there.
10    Q. What do you think is exactly that is
11  just added in there?
12    A. First, at me swearing, I didn't swear.
13    Q. What else?
14    A. Me walking up to the technician.
15    Q. What else? This is on the first page
16  that we're talking about.
17    A. Yes, I understand. This is on the
18  first page.
19       (Pause)
20    A. Me getting involved.
21    Q. Are you talking about at the bottom of
22  the first page where it says Eric should not
23  have got involved?
24    A. Yes.
```

Page 110

```
 1    Q. You think that's false; is that
 2  correct?
 3    A. Correct.
 4    Q. The second page, you understand that
 5  that statement is a statement about what the
 6  customer told the person who signed it, it's not
 7  a statement of the person who signed it? You
 8  understand that, correct?
 9    A. Correct.
10    Q. Did you think that the customer lied
11  or the person that wrote this lied?
12    A. I don't know. I wasn't there. It
13  could have been either/or.
14    Q. But you don't know which one it is?
15    A. No.
16    Q. Irregardless, the events described in
17  these two pages reflect the swearing incident
18  we've been talking about, the one that led to
19  your termination; is that correct?
20    A. Correct.
21    Q. And do you remember if you were ever
22  reprimanded for swearing for any incidents other
23  than this one that occurred on October 14?
24    A. Say that again.
```

Page 111

```
 1    Q. Do you remember if you were ever
 2  reprimanded by Sears for swearing other than the
 3  time you were terminated as a result of the
 4  incident on October 14?
 5    A. I want to say yeah, but I don't
 6  remember, honestly. You asked me a question
 7  like that before. I didn't remember.
 8    Q. So you think so, but you don't
 9  remember; is that correct?
10    A. I remember I had to do a written
11  statement for something, but I don't remember
12  what it was for.
13    Q. I'm going to show you what's been
14  marked as Exhibit No. 5. Take a minute to look
15  at it.
16    A. I remember this now (indicating).
17    Q. And is that your signature on the
18  bottom of that page?
19    A. Yes, it is.
20    Q. Whose signature is below yours?
21    A. I have no clue.
22    Q. What's the date on the signature below
23  yours?
24    A. 10 -- October 2, '03.
```

Page 112

```
 1    Q. This is a statement that says, Eric
 2  Souvannakane -- is that how you pronounce your
 3  last name?
 4    A. No, Souvannakane. It's ain't as hard
 5  as it looks.
 6    Q. It says, Eric Souvannakane has been
 7  given a final warning per Barbara Tagliarino for
 8  the incident that occurred with customer on
 9  September 29, 2003.
10       Is that an accurate reading of that
11  statement?
12    A. I'd say so, yes.
13    Q. Do you remember the incident that
14  occurred on September 29, 2003?
15    A. I remember now, yes.
16    Q. What was that incident?
17    A. An upset customer that -- yeah,
18  another racial -- something else, another racial
19  thing.
20    Q. What was it?
21    A. An upset customer, just upset.
22    Q. Can you be more specific as to the
23  details?
24    A. I guess --
```

Page 113

1    Q. I need you to be certain, so don't
2  guess. Just tell me what you remember
3  happening.
4    A. To the best of my knowledge, I'll
5  break it down for you. In the morning time I
6  guess another technician serviced this
7  customer's vehicle, but I guess they put on the
8  wrong tires.
9    Q. This is on September 29?
10    A. I don't remember. But if it was
11 September 29, I'm assuming it was September 29.
12    Q. You have no reason to think it wasn't
13 September 29?
14    A. I don't know. I don't remember. But
15 if it says right there in black and blue, I
16 guess so.
17    Q. So what happened?
18    A. It could be a 4.
19    Q. What happened next?
20    A. A customer dropped off their vehicle.
21 Another technician, I guess, did some service to
22 it, but I guess they put on the wrong tires.
23 And that technician left. This customer dropped
24 off the vehicle. And I came to do my shift in

Page 114

1  the afternoon and the customer was there to pick
2  up the vehicle. The customer complained to the
3  manager. The manager came at me, Can you solve
4  this problem for me? And the customer is still
5  upset. So I said, Yeah, sure.
6      I took the vehicle in and corrected,
7  started to correct the problem while this upset
8  customer was waiting by his vehicle just upset
9  and obnoxious. And I remember he called me a
10 Chink. He swore at me. That was it. And the
11 customer complained.
12    Q. What did you say?
13    A. I shouldn't have, but I know I swore
14 back at him.
15    Q. Did you swear at him?
16    A. Yes, after he called me a Chink
17 though.
18    Q. When you said a manager came to you
19 and asked you if you could correct the problem,
20 by problem, you mean put the right tires on the
21 car?
22    A. To the best of my knowledge, that's
23 what I remember. It was tire work.
24    Q. Something was wrong with the tires,

Page 115

1  and you needed to fix it?
2    A. All four tires.
3    Q. Do you remember what manager it was
4  that came and asked you to fix the tires?
5    A. I don't remember.
6    Q. And do you remember signing this
7  statement?
8    A. Yes. I remember signing this.
9    Q. I'm going to show you what's been
10 marked as Exhibit No. 6.
11    (Pause)
12    Q. Have you had time to look at it?
13    A. I'm starting to look at it now.
14    Q. Let me know when you're all set.
15    (Pause)
16    A. Okay. What is it?
17    Q. I've shown you a document that's
18 titled Documentation of Performance Issues. Do
19 you see, if you look up on the top left-hand
20 side of the document, there's a box with a
21 checkmark next to Final Warning? Do you see
22 that?
23    A. Yes.
24    Q. And the date on that final warning is

Page 116

1  10/2/03. Do you see that?
2    A. Okay.
3    Q. Do you see that?
4    A. Yeah, I see it.
5    Q. If you look back at Exhibit No. 5, the
6  date on the bottom of that exhibit is also
7  10/2/03; is that correct?
8    A. I see it, yes.
9    Q. Would you assume this warning is the
10 same warning, reflects the same warning that you
11 signed the statement for on Exhibit No. 5?
12    MR. OLSON: Can I have a second?
13    MS. TRAN: I'd actually prefer he
14 answer before you go take --
15    A. Repeat your question.
16    Q. Would you assume this warning, this
17 documentation of performance issues, reflects
18 the same warning that's discussed in the
19 statement that you signed in Exhibit 5 since
20 they're dated the same day?
21    A. I don't recall this one (indicating).
22 I know I signed this one (indicating).
23    Q. You signed this one, but you've never
24 seen this one (indicating)?

Page 125

1    Q. You said that you had to return a
2 pickup truck to John Baldi, Jr., the day you
3 were terminated; is that correct?
4    A. Correct.
5    Q. Where did you return that truck to
6 him?
7    A. Sears.
8    Q. The Sears in Saugus?
9    A. Yes.
10    Q. Did you go inside the Sears that
11 night?
12    A. To give him the keys and to check out
13 my toolbox, yes.
14    Q. And this is after you had been
15 terminated?
16    A. Correct.
17    Q. You said you went into the Sears. And
18 by going into the Sears, you mean the Sears
19 Automotive Center?
20    A. Correct.
21    Q. And you went in to give him the keys?
22    A. Correct.
23    Q. "Him" being John Baldi, Jr.?
24    A. Yes.

Page 126

1    Q. And you also did what?
2    A. Check on my toolbox.
3    Q. What do you mean by check on your
4 toolbox?
5    A. When I was employed at Sears, I had a
6 toolbox there where I kept my tools. And when I
7 got terminated, I left it there. I didn't take
8 it with me because I had no means of
9 transportation. That is one of the reasons why
10 I borrowed the pickup truck from John.
11    Q. You borrowed the pickup truck to
12 remove your tools?
13    A. To remove belongings from my house.
14    Q. Remove what belongings from your
15 house?
16    A. I was moving that day.
17    Q. You were moving into a new apartment?
18    A. Correct.
19    Q. Where were you moving to?
20    A. Autumn Street.
21    Q. I'm sorry, what was that?
22    A. 39 Autumn Street.
23    Q. In what city?
24    A. Lynn, Mass.

Page 127

1    Q. How long did you live at 29 Autumn
2 Street?
3    A. Not long.
4    Q. How long?
5    A. Probably maybe a week.
6    Q. Was it a place that you rented or that
7 you --
8    A. No, my cousin.
9    Q. So you were living with your cousin
10 for about a week?
11    A. Yes, correct.
12    Q. Where did you move after Autumn
13 Street?
14    A. Back home.
15    Q. When we went over your current and
16 past residences at the beginning of the
17 deposition, you didn't mention living with your
18 cousin on Autumn Street.
19    A. I felt that there was no need to. It
20 was only for a week, and I really didn't
21 transfer my address or nothing like that. It
22 was like a trial thing if I wanted to move in
23 seriously with him or not.
24    Q. And you said you went back home after

Page 128

1 you lived at Autumn Street, correct?
2    A. Yes.
3    Q. With your parents?
4    A. Yes.
5    Q. Where did they live?
6    A. 12 Eutaw Ave.
7    Q. Where do you currently reside?
8    A. Where am I living right now?
9    Q. Yes.
10    A. 12 Eutaw Ave.
11    Q. You said that 12 Eutaw Ave. is an
12 apartment that you rented; is that correct?
13    A. No. I live there with my parents.
14    Q. I believe you testified earlier that
15 it was a place that you rented, but maybe my
16 memory is incorrect.
17        So 12 Eutaw Ave. --
18    A. I do pay rent.
19    Q. Let me finish my question.
20        12 Eutaw Ave. where you currently
21 reside is an apartment rented by your parents?
22    A. Yes.
23    Q. And your girlfriend and your daughter
24 live with you there with your parents?

Page 129

1   A. Correct.
2   Q. Is it a single apartment?
3   A. Yes, it is.
4   Q. How many bedrooms?
5   A. It's two bedrooms.
6   Q. So do you, your daughter and your
7   girlfriend all share the same bedroom?
8   A. Correct.
9   Q. Getting back to the night of your
10  termination, after you returned the keys to John
11  Baldi, Jr., and checked on your toolbox, what
12  did you do?
13  A. There was a lot of trash in my
14  toolbox, so I swept that out. And there was an
15  oil thing next to my toolbox, so I pushed that
16  out of the way.
17  Q. What do you mean by "oil thing"?
18  A. An oil container.
19  Q. How big was the oil container?
20  A. It sits in a gallon, and there's a
21  nozzle that shoots straight up so you can dump
22  the oil in. To be honest, I don't even know.
23  Q. Is it a gallon? Is it a barrel of
24  oil, when you say an oil container?

Page 130

1   A. Maybe a gallon or two.
2   Q. It holds a gallon or two or there was
3   a gallon or two of oil in there?
4   A. I don't know how much was in there.
5   It holds a gallon or two.
6   Q. Is it the size of an oil barrel or an
7   oil drum or is it smaller than that?
8   A. Smaller than that.
9   Q. Is it on wheels?
10  A. Yes, it's on wheels.
11  Q. Is it like a tray?
12  A. What do you mean by tray?
13  Q. Is it a tray that holds oil? What
14  does the container look like?
15  A. Like, you know the Poland Spring
16  refill bottles that you put on the machine?
17  Q. The ones that go into the water
18  dispensers?
19  A. Yes, exactly like that that's sitting
20  upright, and there's a long shaft that sticks up
21  and a big funnel.
22  Q. A big funnel that goes into the top of
23  the container?
24  A. Yes.

Page 131

1   Q. Okay. So you pushed that out of the
2   way. What did you do next?
3   A. As I pushed that oil dispenser, it
4   tripped over a lift and it fell. So I turned
5   around quickly and I seen that it fell and oil
6   was spilling.
7   Q. Yes.
8   A. So I went over there, I picked it up,
9   and I cleaned up the oil spill.
10  Q. Did you inform anybody at Sears that
11  you had spilled the oil?
12  A. John Baldi Jr., seen it.
13  Q. Did you inform anybody else?
14  A. That was it.
15  Q. You didn't inform Sears management
16  that you tripped over the oil?
17  A. No. I cleaned it up. It wasn't much.
18  Q. What happened next?
19  A. I left.
20  Q. Did you see anybody else when you were
21  there that night?
22  A. Jose was there. He was doing an
23  alignment.
24  Q. Did you see Jose?

Page 132

1   A. Yeah. I seen him.
2   Q. Did you talk to him?
3   A. A quick meet and greet.
4   Q. What did you say?
5   A. I'm out of here.
6   Q. Did you say anything else?
7   A. Just, yeah, that's what I said.
8   Q. Yes you said something else, or no you
9   didn't say anything else?
10  A. Yeah, I'm out of here. Don't say
11  nothing. I'm out.
12  Q. Don't say nothing about what?
13  A. About me being there.
14  Q. Why wouldn't you want Jose to say
15  anything about you being there?
16  A. Because that's how I felt at the
17  moment.
18  Q. Why?
19  A. That's how I felt. I didn't want
20  nobody to know I was around.
21  Q. Why didn't you want anybody to know
22  you were around?
23  A. Because I never been terminated in
24  that way.

Page 145

1  A. Yes. I read it.
2  Q. In Paragraph 33 you allege that Sears,
3  William Sullivan, Kevin Sullivan, Richard
4  Spellman, Barbara Tagliarino, Gary Mansfield and
5  Alicia Coviello conspired to interfere with your
6  civil rights by obstructing justice.
7     Do you understand that?
8  A. Somewhat.
9  Q. What evidence do you have to support
10 that allegation?
11 A. I have no evidence.
12 Q. What facts do you have to support any
13 conspiracy between those parties?
14 A. I don't know.
15 Q. Do you have any facts to support a
16 conspiracy between those parties?
17 A. I honestly don't know.
18 Q. You don't know if you have facts to
19 support a conspiracy between those parties?
20 A. Correct.
21 Q. So as you sit here today, you can't
22 tell me whether or not you have any facts that
23 supports a conspiracy between those parties to
24 interfere with your civil rights?

Page 146

1  A. Correct. I don't understand it.
2  Q. What don't you understand?
3  A. Basically what you're telling me,
4  you're asking me.
5  Q. I'm asking you do you have any
6  evidence to support that Sears, Roebuck & Co.,
7  William Sullivan, Kevin Sullivan, Richard
8  Spellman, Barbara Tagliarino, Barry Mansfield
9  and Alicia Coviello conspired to interfere with
10 your civil rights? What evidence do you have to
11 support that allegation?
12 A. I'm telling you I don't know.
13 Q. You don't know or you don't have any?
14 A. I don't know.
15 Q. You don't know if you have any
16 evidence to support that allegation?
17 A. Yeah.
18 Q. Then on what do you base that
19 allegation? On what do you base that
20 allegation?
21 A. I don't understand.
22 Q. If you don't know if it's true, how
23 can you make the allegation?
24 A. Then I must have something.

Page 147

1  Q. What do you have?
2  A. A document or something.
3  Q. What do you have?
4  A. A document or something.
5  Q. Where is the document? What document
6  do you have?
7  A. It's in my pocket. I don't know.
8  Q. Let me see.
9  A. I honestly don't know. I don't
10 remember.
11 Q. You don't remember whether or not they
12 conspired against you?
13 A. They probably did, I guess.
14 Q. They probably did, but you don't know?
15 A. Mm-hmm.
16 Q. Is that accurate?
17 A. Correct.
18 Q. You understand that you filed a
19 lawsuit claiming that they did conspire against
20 you, correct?
21 A. Correct. All right.
22 Q. Yet you don't have any knowledge of
23 whether or not they actually conspired against
24 you; is that correct?

Page 148

1  A. That shouldn't be correct.
2  Q. What shouldn't be correct?
3  A. What you just said.
4  Q. What?
5  A. Here. It's all false.
6  Q. What's all false?
7  A. Whatever this says, I guess.
8  Q. I don't understand, Eric. What is
9  false?
10 A. I don't understand you either.
11 That's...
12 Q. What is false?
13 A. Whatever -- see, I'm lost here.
14 Q. I'll ask it very simply. You've
15 alleged that the Sears, Roebuck & Co., William
16 Sullivan, Kevin Sullivan, Richard Spellman,
17 Barbara Tagliarino, Gary Mansfield and Alicia
18 Coviello conspired to interfere with your civil
19 rights.
20    Do you understand that you made that
21 allegation?
22 A. Yeah.
23 Q. What evidence do you have to support
24 that they conspired to interfere with your civil

Page 189

1  A. Correct.
2  Q. And you were never detained by
3  Officer Mansfield and told not to move, were
4  you?
5  A. Correct.
6  Q. In fact, you've never had any contact
7  with him whatsoever, have you?
8  A. Correct.
9  Q. Now, the matter after the first day
10 you appeared on the citation proceeded to other
11 hearings in Lynn District Court. You said you
12 appeared three or four times total. Do you
13 recall that, sir?
14 A. Yes, sir.
15 Q. And among those times was a trial
16 before a judge of the district court, correct?
17 A. Correct.
18 Q. And at that trial there was testimony
19 taken, correct?
20 A. Yes, there was.
21 Q. Do you know who testified at the
22 trial?
23 A. Jose.
24 Q. And did anyone else testify?

Page 190

1  A. That girl.
2  Q. "That girl" is Alicia Coviello?
3  A. Yes.
4  Q. She testified as well?
5  A. Yes, she did.
6  Q. Did you yourself testify that day?
7  A. Yes.
8  Q. Did anyone else testify on your
9  behalf?
10 A. My lawyer.
11 Q. Besides your lawyer, did any other
12 witnesses come forward on your behalf besides
13 yourself?
14 A. I don't remember.
15 Q. Do you remember the result or the
16 outcome of that trial, sir?
17 A. Not guilty.
18 Q. Now, in your complaint there's an
19 allegation that Mr. Hernandez left the courtroom
20 at one point in time and refused to testify. Do
21 you recall that, sir?
22 A. Yes, sir.
23 Q. But he did testify at the trial of
24 your case, correct?

Page 191

1  A. Yes, he did.
2  Q. So the occasion when he left the
3  courtroom was when, when did that happen?
4  A. The first time, the citation date.
5  Q. Did you have any discussions with him
6  about why he was leaving the courtroom?
7  A. Yes.
8  Q. What discussions did you have with
9  him?
10 A. He came to me first, How you doing,
11 meet and greet. And from there, What are you
12 doing here. I asked him, What are you doing
13 here. And he goes, I'm here for Sears. And
14 from there he goes, he just walked around real
15 quick and he comes back at me, You know what,
16 sorry man, but fuck this lying shit. And he
17 leaves.
18 Q. Did he say anything else to you?
19 A. That is it.
20 Q. Did you ask him what he meant by "this
21 lying shit" that he was telling you about?
22 A. No. He said it real quick, and he
23 left. That was it.
24 Q. Did you have any subsequent

Page 192

1  conversations with him about what he meant by
2  that?
3  A. No.
4  Q. Have you ever talked to him since that
5  date in the courtroom about what he meant?
6  A. No.
7  Q. In fact, after telling you that, he
8  later did testify in court at your trial,
9  correct?
10 A. Yes.
11 Q. Was Officer Mansfield present at the
12 trial, sir?
13 A. I don't believe so.
14 Q. And you didn't have any police officer
15 witnesses testify at the trial, did they?
16 A. I don't think so. I don't remember,
17 to be honest with you. I just remember what I'm
18 telling you.
19 Q. Has anyone ever told you, other than
20 Mr. Baldi, that they spoke to Officer Mansfield
21 about this investigation?
22 A. No.
23 Q. Other than Mr. Baldi and what you
24 testified earlier, have you learned from any