Page 101

1    reading it.
2        (Pause)
3        Q. Eric, I've shown you what appears to
4    be a statement signed by a Sears employee. Do
5    you know whose signature that is on the bottom
6    of the statement?
7        A. I know it says Andy.
8        Q. Did you know anybody named Andy that
9    worked with you when you worked at Sears?
10       A. Yeah, a fellow employee.
11       Q. What was Andy's last name, do you
12   know?
13       A. I honestly don't know.
14       Q. Was it Andy DiGaetono?
15       A. That rings a bell.
16       Q. Does that look like it's Andy
17   DiGaetono's signature?
18       A. I don't know what he signs like.
19       Q. But it looks like that's what it says
20   at the bottom of the page?
21       A. Yes.
22       Q. And this is dated October 15, 2003; is
23   that correct?
24       A. Yes.

Page 102

1        Q. And the statement talks about an
2    incident with a customer that occurred on
3    October 14, 2003; is that correct?
4        A. From what I see, correct.
5        Q. Is this the incident that you were
6    talking about a moment ago in which another
7    fellow employee swore at a customer?
8        A. Yes.
9        Q. Reading down on the statement, it
10   says, A customer came in last night, 10/14/03,
11   for a flat repair. Tire could not be repaired.
12   G. Caleo notified customer that tire could not
13   be repaired. Customer and G. Caleo had argument
14   about purchase a new tire.
15       Is G. Caleo the person that was
16   involved with the swearing with the customer?
17       A. I don't know.
18       Q. Next it says, Frank could not repair
19   tire. Frank said the F word out loud.
20       Is Frank the other employee that was
21   involved?
22       A. Yes. That rings a bell. Frank rings
23   a bell.
24       Q. Is Frank the other employee that was

Page 103

1    involved in swearing at the customer?
2        A. Yes.
3        Q. Do you know what Frank's last name
4    was?
5        A. No. I don't remember.
6        Q. The next line reads, Eric came over,
7    argued with the customer, and he said at the
8    customer the F word.
9        Did you, in fact, go over to the
10   customer and swear at her?
11       A. No.
12       Q. Do you know why Andy would have
13   written that?
14       A. No idea.
15       Q. The next line says, The customer was
16   unhappy. And she wanted to talk to management.
17   Andy spoked (sic) to the customer to calm her
18   down. She said that Eric had no right to talk
19   to her in a bad way.
20       Do you remember having that
21   conversation with her or with Andy about that
22   situation?
23       A. No.
24       Q. Next it says, G. Caleo told Eric to go

Page 104

1    back to work and that Andy and himself would
2    take care of the customer.
3        Do you remember that?
4        A. No. I don't even know who G. Caleo
5    is. Is that the name of the customer?
6        Q. I don't know. That's why I'm asking
7    you. But you don't know as you sit here now who
8    G. Caleo is; is that correct?
9        A. Correct.
10       Q. But it is your understanding that
11   Frank did swear at a customer on the night of
12   October 14, 2003?
13       A. I remember that.
14       Q. And is that the incident for which you
15   were fired?
16       A. I believe this is the incident that
17   led to my termination.
18       Q. I'm going to show you what's been
19   marked as Exhibit No. 7. I'll take back No. 8.
20   It's two pages. If you can take a minute to
21   review them and let me know when you're done.
22       A. Okay.
23       Q. All set?
24       A. Yes. Who's that (indicating)?

26 (Pages 101 to 104)

Page 105

1    Q. I can't answer any questions that you
2  have, as much as I'd love to.
3        MR. CLOHERTY: Do you want to have the
4  witness indicate where he was pointing to?
5        MS. TRAN: He was pointing to the
6  signature at the bottom of the second page of
7  Exhibit No. 7.
8    Q. Page 1 is a statement dated October
9  14, 2003. The signature on the bottom is cut
10 off.
11       MS. TRAN: I'll see if I have, Kurt, a
12 full signature. I don't know if mine is full or
13 not.
14       MR. OLSON: Okay.
15   Q. But the statement describes -- it's
16 apparently by a Sears employee and it describes
17 the swearing incident that we've been
18 discussing; is that correct?
19   A. Say that again.
20   Q. The statement is dated October 14,
21 2003 by a Sears employee that describes the
22 swearing incident we've been discussing?
23   A. I don't know if it's a Sears employee.
24   Q. Okay. But it is a statement

Page 106

1  describing the swearing incident we've been
2  discussing; is that correct?
3    A. It looks like it, yes.
4    Q. And that's the swearing incident that
5  led up to your termination; is that correct?
6    A. Correct.
7    Q. I'm sorry, is that correct?
8    A. Correct.
9    Q. And Page 2 is a statement dated
10 October 15, 2003 that details a telephone
11 conversation received from the signator or the
12 statement describing the call from the customer
13 where she complained about the swearing
14 incident; is that correct?
15   A. They're false events.
16   Q. The events are false?
17   A. The statements are false.
18   Q. False statement by whom?
19   A. By whoever this person is.
20   Q. By this second page meaning this
21 person never received a phone call from the
22 customer?
23   A. I don't know that.
24   Q. So you don't know whether or not the

Page 107

1  person that signed the second page of Exhibit 7
2  received a phone call from the customer?
3    A. Correct.
4    Q. So it's possible that that person
5  received a phone call from the customer and that
6  this is what the customer told that person?
7    A. I guess so.
8    Q. Right? Is that possible?
9    A. Say it again.
10   Q. It's possible this statement reflects
11 a phone call received by the person who signed
12 it in which the customer told the person these
13 things?
14   A. It's possible.
15   Q. Do you have any reason to believe that
16 somebody would make up the phone call from the
17 customer?
18   A. No, no reason to believe.
19   Q. And you don't know whose signature
20 this is on the bottom of that second page?
21   A. Correct.
22   Q. Does it look like it could be the
23 signature of Anthony Cieri?
24   A. I have no idea. I can't even make

Page 108

1  that signature out.
2    Q. On the bottom of the first page --
3  obviously it's cut off -- but you don't know
4  whose signature that is either?
5    A. I have no idea.
6    Q. Did you at any time tell Ms. Lacroix,
7  who is the customer that's named in these pages,
8  did you at any time swear at her as she stated
9  you did?
10   A. No, I didn't.
11   Q. Did Frank swear at her?
12   A. Yes, he did.
13   Q. When you said that the statements were
14 false, what did you mean by that?
15   A. The statement says that I swore at
16 her, which I didn't.
17   Q. Which statement?
18   A. Both of them, right?
19   Q. Right. What's false about them? Is
20 it that the substance of the statements is false
21 or that whoever wrote them wrote them falsely?
22 Take them one at a time.
23       The first page of Exhibit 7, the one
24 that's dated October 14, 2003, okay?

27 (Pages 105 to 108)

SHEA COURT REPORTING SERVICES
617-227-3097

Page 109

1      A. That is false.
2      Q. You think this person wrote them
3  falsely?
4      A. Front and back, first and second.
5      Q. So you think both people lied about
6  what they wrote?
7      A. The beginning starts to make sense,
8  but when the argument started happening, it
9  seems like things are just added in there.
10      Q. What do you think is exactly that is
11  just added in there?
12      A. First, at me swearing, I didn't swear.
13      Q. What else?
14      A. Me walking up to the technician.
15      Q. What else?  This is on the first page
16  that we're talking about.
17      A. Yes, I understand.  This is on the
18  first page.
19          (Pause)
20      A. Me getting involved.
21      Q. Are you talking about at the bottom of
22  the first page where it says Eric should not
23  have got involved?
24      A. Yes.

Page 110

1      Q. You think that's false; is that
2  correct?
3      A. Correct.
4      Q. The second page, you understand that
5  that statement is a statement about what the
6  customer told the person who signed it, it's not
7  a statement of the person who signed it?  You
8  understand that, correct?
9      A. Correct.
10      Q. Did you think that the customer lied
11  or the person that wrote this lied?
12      A. I don't know.  I wasn't there.  It
13  could have been either/or.
14      Q. But you don't know which one it is?
15      A. No.
16      Q. Irregardless, the events described in
17  these two pages reflect the swearing incident
18  we've been talking about, the one that led to
19  your termination; is that correct?
20      A. Correct.
21      Q. And do you remember if you were ever
22  reprimanded for swearing for any incidents other
23  than this one that occurred on October 14?
24      A. Say that again.

Page 111

1      Q. Do you remember if you were ever
2  reprimanded by Sears for swearing other than the
3  time you were terminated as a result of the
4  incident on October 14?
5      A. I want to say yeah, but I don't
6  remember, honestly.  You asked me a question
7  like that before.  I didn't remember.
8      Q. So you think so, but you don't
9  remember; is that correct?
10      A. I remember I had to do a written
11  statement for something, but I don't remember
12  what it was for.
13      Q. I'm going to show you what's been
14  marked as Exhibit No. 5.  Take a minute to look
15  at it.
16      A. I remember this now (indicating).
17      Q. And is that your signature on the
18  bottom of that page?
19      A. Yes, it is.
20      Q. Whose signature is below yours?
21      A. I have no clue.
22      Q. What's the date on the signature below
23  yours?
24      A. 10 -- October 2, '03.

Page 112

1      Q. This is a statement that says, Eric
2  Souvannakane -- is that how you pronounce your
3  last name?
4      A. No, Souvannakane.  It's ain't as hard
5  as it looks.
6      Q. It says, Eric Souvannakane has been
7  given a final warning per Barbara Tagliarino for
8  the incident that occurred with customer on
9  September 29, 2003.
10          Is that an accurate reading of that
11  statement?
12      A. I'd say so, yes.
13      Q. Do you remember the incident that
14  occurred on September 29, 2003?
15      A. I remember now, yes.
16      Q. What was that incident?
17      A. An upset customer that -- yeah,
18  another racial -- something else, another racial
19  thing.
20      Q. What was it?
21      A. An upset customer, just upset.
22      Q. Can you be more specific as to the
23  details?
24      A. I guess --

28  (Pages 109 to 112)

Page 113

1    Q. I need you to be certain, so don't
2 guess. Just tell me what you remember
3 happening.
4    A. To the best of my knowledge, I'll
5 break it down for you. In the morning time I
6 guess another technician serviced this
7 customer's vehicle, but I guess they put on the
8 wrong tires.
9    Q. This is on September 29?
10    A. I don't remember. But if it was
11 September 29, I'm assuming it was September 29.
12    Q. You have no reason to think it wasn't
13 September 29?
14    A. I don't know. I don't remember. But
15 if it says right there in black and blue, I
16 guess so.
17    Q. So what happened?
18    A. It could be a 4.
19    Q. What happened next?
20    A. A customer dropped off their vehicle.
21 Another technician, I guess, did some service to
22 it, but I guess they put on the wrong tires.
23 And that technician left. This customer dropped
24 off the vehicle. And I came to do my shift in

Page 114

1 the afternoon and the customer was there to pick
2 up the vehicle. The customer complained to the
3 manager. The manager came at me, Can you solve
4 this problem for me? And the customer is still
5 upset. So I said, Yeah, sure.
6    I took the vehicle in and corrected,
7 started to correct the problem while this upset
8 customer was waiting by his vehicle just upset
9 and obnoxious. And I remember he called me a
10 Chink. He swore at me. That was it. And the
11 customer complained.
12    Q. What did you say?
13    A. I shouldn't have, but I know I swore
14 back at him.
15    Q. Did you swear at him?
16    A. Yes, after he called me a Chink
17 though.
18    Q. When you said a manager came to you
19 and asked you if you could correct the problem,
20 by problem, you mean put the right tires on the
21 car?
22    A. To the best of my knowledge, that's
23 what I remember. It was tire work.
24    Q. Something was wrong with the tires,

Page 115

1 and you needed to fix it?
2    A. All four tires.
3    Q. Do you remember what manager it was
4 that came and asked you to fix the tires?
5    A. I don't remember.
6    Q. And do you remember signing this
7 statement?
8    A. Yes. I remember signing this.
9    Q. I'm going to show you what's been
10 marked as Exhibit No. 6.
11    (Pause)
12    Q. Have you had time to look at it?
13    A. I'm starting to look at it now.
14    Q. Let me know when you're all set.
15    (Pause)
16    A. Okay. What is it?
17    Q. I've shown you a document that's
18 titled Documentation of Performance Issues. Do
19 you see, if you look up on the top left-hand
20 side of the document, there's a box with a
21 checkmark next to Final Warning? Do you see
22 that?
23    A. Yes.
24    Q. And the date on that final warning is

Page 116

1 10/2/03. Do you see that?
2    A. Okay.
3    Q. Do you see that?
4    A. Yeah, I see it.
5    Q. If you look back at Exhibit No. 5, the
6 date on the bottom of that exhibit is also
7 10/2/03; is that correct?
8    A. I see it, yes.
9    Q. Would you assume this warning is the
10 same warning, reflects the same warning that you
11 signed the statement for on Exhibit No. 5?
12    MR. OLSON: Can I have a second?
13    MS. TRAN: I'd actually prefer he
14 answer before you go take --
15    A. Repeat your question.
16    Q. Would you assume this warning, this
17 documentation of performance issues, reflects
18 the same warning that's discussed in the
19 statement that you signed in Exhibit 5 since
20 they're dated the same day?
21    A. I don't recall this one (indicating).
22 I know I signed this one (indicating).
23    Q. You signed this one, but you've never
24 seen this one (indicating)?

29 (Pages 113 to 116)

Page 117

1    A. I don't know what this is.
2       MR. CLOHERTY: The record is not going
3  to reflect what this and this is.
4    Q. You signed Exhibit No. 5, but you've
5  never seen Exhibit No. 6; is that correct?
6    A. I don't know about this one
7  (indicating).
8    Q. When you say "this one," do you mean
9  Exhibit No. 6?
10   A. Sure.
11   Q. Sure or yes?
12   A. Yes.
13   Q. So you've never seen Exhibit No. 6; is
14 that correct?
15   A. Correct.
16   Q. But you've seen and signed
17 Exhibit No. 5?
18   A. Yeah. I remember this one. I
19 remember Exhibit No. 5, yeah.
20   Q. Other than the warning that you were
21 given on October 2, 2003, were you given any
22 other warnings for swearing prior to your
23 termination?
24   A. Say that again.

Page 118

1    Q. Other than the warning you were given
2  on October 2, 2003 as reflected in Exhibit 5,
3  were you given any other warnings for swearing
4  prior to your termination?
5    A. No.
6    Q. So that's the only warning you were
7  given; is that correct?
8    A. This one right here, Exhibit No. 5.
9    Q. Exhibit No. 5.
10      MS. TRAN: Did you want to talk to
11 him?
12      MR. OLSON: Are you going to have any
13 further questions on Exhibit No. 6?
14      MS. TRAN: Yes.
15      MR. OLSON: Yes.
16      (Counsel conferred with witness)
17      MS. TRAN: Kurt, I'm just going to
18 finish the questions about this on the
19 termination and then we can probably stop for
20 lunch.
21      MR. OLSON: It's up to you. We were
22 saying we could go right through.
23      MS. TRAN: I'm going to need something
24 even if it's a half an hour.

Page 119

1  BY MS. TRAN:
2    Q. Looking at Exhibit No. 6, Eric, the
3  second page of Exhibit No. 6?
4    A. Mm-hmm.
5    Q. Where it says, For termination only,
6  dash, approval signatures. Do you see that?
7    A. Yes.
8    Q. The date, is that October 16, 2003?
9    A. From what I see, yeah, 10/16/03.
10   Q. Is that the date you were terminated?
11   A. I don't know. Was it?
12   Q. I'm asking you. To the best of your
13 recollection, do you remember if that's the date
14 you were terminated?
15   A. I honestly don't remember.
16   Q. Do you have any reason to think it
17 wasn't the date you were terminated?
18   A. I honestly don't know.
19   Q. Just so I have an accurate
20 understanding of what happened leading up to
21 your termination, you were involved in a
22 swearing incident on what appears to be
23 September 29, 2003 with the customer who called
24 you a racial slur; is that correct?

Page 120

1    A. Correct. From what I see, yes.
2    Q. Are you looking at Exhibit 5?
3    A. Yes. Is that it?
4    Q. Yes. That's what I'm looking at. To
5  the best of your recollection, is that
6  approximately the date that you were involved in
7  that incident?
8    A. I honestly don't remember the date of
9  the incident, but...
10   Q. But you have no reason to think it
11 wasn't that day?
12   A. I have no reason to think it wasn't
13 that day.
14   Q. As a result of that incident, you
15 received a warning for swearing at the customer;
16 is that correct?
17   A. This right here, right (indicating)?
18   Q. By "right here," are you referring to
19 Exhibit 5?
20   A. Yes.
21   Q. As a result of that incident on
22 September 29, you received a warning for
23 swearing at the customer; is that correct?
24   A. Correct.

30  (Pages 117 to 120)

Page 121

1      Q.  And then after that incident -- and,
2  I'm sorry, that warning appears to have been
3  given on October 2, 2003; is that correct?
4      A.  From what I see on the Exhibit No. 5,
5  correct.
6      Q.  And you have no reason to think that
7  wasn't the date you were given the warning,
8  correct?
9      A.  Correct.
10      Q.  After that incident, there was a
11  separate incident with a Mrs. Lacroix, another
12  customer, where one of the Sears employees swore
13  at her; is that correct?
14      A.  Correct.
15      Q.  And according to Page 2 of
16  Exhibit No. 7, she told somebody at Sears that
17  you were the one that swore at her; is that
18  accurate?  Not whether or not you weren't the
19  one that swore at her but that she told somebody
20  at Sears?
21      A.  I don't know what happened over the
22  phone.
23      Q.  But based on this statement, it
24  appears she told somebody at Sears that you

Page 122

1  swore at her?
2      A.  From what this document says, that's
3  what it looks like.
4      Q.  By "this document," we're referring to
5  the second page of Exhibit 7?
6      A.  Second page of Exhibit No. 7.
7      Q.  And as a result of the incident with
8  this customer on October 14, 2003, you were
9  terminated, your employment at Sears was
10  terminated; is that correct?
11      A.  I was terminated for this incident,
12  yes.
13      Q.  And your termination occurred on
14  October 16, 2003, two days after that swearing
15  incident?
16      A.  Is that right?
17      Q.  I'm asking you.
18      A.  I don't remember.
19      Q.  But you have no reason to think
20  October 16 wasn't the day that you were
21  terminated?
22      A.  It's a possibility, correct.
23      Q.  It's your understanding that you were
24  terminated because of that swearing incident on

Page 123

1  October 14; is that correct?
2      A.  I believe so, which I didn't swear
3  though.
4      Q.  Right.  What I'm asking you is, is it
5  your understanding that you were terminated as a
6  result of that incident?  I'm not asking whether
7  or not you swore at her.  I'm simply asking is
8  it your understanding that your employment at
9  Sears was terminated as a result of that
10  incident on October 13, 2003?
11      A.  Correct.
12      MS. TRAN:  Why don't we take a lunch
13  break now because it's a good time.
14      (Lunch recess taken)
15  BY MS. TRAN:
16      Q.  Eric, shortly after your termination
17  from Sears, is it your understanding that there
18  was an oil spill at Sears?
19      A.  I was informed of.
20      Q.  You were informed that there was an
21  oil spill at Sears?
22      A.  Yeah, the citation (indicating).
23      Q.  When were you informed of it?
24      A.  When I received the citation.

Page 124

1      Q.  From whom did you receive the
2  citation?
3      A.  In the mail.
4      Q.  That's the first time that you heard
5  of the oil spill?
6      A.  Correct.
7      Q.  Do you remember how long after your
8  termination you received the citation?
9      A.  No, I don't remember.
10      Q.  Do you know when the oil spill
11  occurred?
12      A.  No.
13      Q.  Do you know how much oil was spilled?
14      A.  No.
15      Q.  Do you know any of the circumstances
16  surrounding the oil spill?
17      A.  I don't understand.
18      Q.  Do you know how the oil was spilled,
19  how it was cleaned up?
20      A.  Oh, no.
21      Q.  You don't have any knowledge of how it
22  was spilled or how it was cleaned or when the
23  spill occurred?
24      A.  No.

31  (Pages 121 to 124)

Page 125

1    Q. You said that you had to return a
2  pickup truck to John Baldi, Jr., the day you
3  were terminated; is that correct?
4    A. Correct.
5    Q. Where did you return that truck to
6  him?
7    A. Sears.
8    Q. The Sears in Saugus?
9    A. Yes.
10    Q. Did you go inside the Sears that
11 night?
12    A. To give him the keys and to check out
13 my toolbox, yes.
14    Q. And this is after you had been
15 terminated?
16    A. Correct.
17    Q. You said you went into the Sears. And
18 by going into the Sears, you mean the Sears
19 Automotive Center?
20    A. Correct.
21    Q. And you went in to give him the keys?
22    A. Correct.
23    Q. "Him" being John Baldi, Jr.?
24    A. Yes.

Page 126

1    Q. And you also did what?
2    A. Check on my toolbox.
3    Q. What do you mean by check on your
4  toolbox?
5    A. When I was employed at Sears, I had a
6  toolbox there where I kept my tools. And when I
7  got terminated, I left it there. I didn't take
8  it with me because I had no means of
9  transportation. That is one of the reasons why
10 I borrowed the pickup truck from John.
11    Q. You borrowed the pickup truck to
12 remove your tools?
13    A. To remove belongings from my house.
14    Q. Remove what belongings from your
15 house?
16    A. I was moving that day.
17    Q. You were moving into a new apartment?
18    A. Correct.
19    Q. Where were you moving to?
20    A. Autumn Street.
21    Q. I'm sorry, what was that?
22    A. 39 Autumn Street.
23    Q. In what city?
24    A. Lynn, Mass.

Page 127

1    Q. How long did you live at 29 Autumn
2  Street?
3    A. Not long.
4    Q. How long?
5    A. Probably maybe a week.
6    Q. Was it a place that you rented or that
7  you --
8    A. No, my cousin.
9    Q. So you were living with your cousin
10 for about a week?
11    A. Yes, correct.
12    Q. Where did you move after Autumn
13 Street?
14    A. Back home.
15    Q. When we went over your current and
16 past residences at the beginning of the
17 deposition, you didn't mention living with your
18 cousin on Autumn Street.
19    A. I felt that there was no need to. It
20 was only for a week, and I really didn't
21 transfer my address or nothing like that. It
22 was like a trial thing if I wanted to move in
23 seriously with him or not.
24    Q. And you said you went back home after

Page 128

1  you lived at Autumn Street, correct?
2    A. Yes.
3    Q. With your parents?
4    A. Yes.
5    Q. Where did they live?
6    A. 12 Eutaw Ave.
7    Q. Where do you currently reside?
8    A. Where am I living right now?
9    Q. Yes.
10    A. 12 Eutaw Ave.
11    Q. You said that 12 Eutaw Ave. is an
12 apartment that you rented; is that correct?
13    A. No. I live there with my parents.
14    Q. I believe you testified earlier that
15 it was a place that you rented, but maybe my
16 memory is incorrect.
17       So 12 Eutaw Ave. --
18    A. I do pay rent.
19    Q. Let me finish my question.
20       12 Eutaw Ave. where you currently
21 reside is an apartment rented by your parents?
22    A. Yes.
23    Q. And your girlfriend and your daughter
24 live with you there with your parents?

Page 129

1    A. Correct.
2    Q. Is it a single apartment?
3    A. Yes, it is.
4    Q. How many bedrooms?
5    A. It's two bedrooms.
6    Q. So do you, your daughter and your
7    girlfriend all share the same bedroom?
8    A. Correct.
9    Q. Getting back to the night of your
10    termination, after you returned the keys to John
11    Baldi, Jr., and checked on your toolbox, what
12    did you do?
13    A. There was a lot of trash in my
14    toolbox, so I swept that out. And there was an
15    oil thing next to my toolbox, so I pushed that
16    out of the way.
17    Q. What do you mean by "oil thing"?
18    A. An oil container.
19    Q. How big was the oil container?
20    A. It sits in a gallon, and there's a
21    nozzle that shoots straight up so you can dump
22    the oil in. To be honest, I don't even know.
23    Q. Is it a gallon? Is it a barrel of
24    oil, when you say an oil container?

Page 130

1    A. Maybe a gallon or two.
2    Q. It holds a gallon or two or there was
3    a gallon or two of oil in there?
4    A. I don't know how much was in there.
5    It holds a gallon or two.
6    Q. Is it the size of an oil barrel or an
7    oil drum or is it smaller than that?
8    A. Smaller than that.
9    Q. Is it on wheels?
10    A. Yes, it's on wheels.
11    Q. Is it like a tray?
12    A. What do you mean by tray?
13    Q. Is it a tray that holds oil? What
14    does the container look like?
15    A. Like, you know the Poland Spring
16    refill bottles that you put on the machine?
17    Q. The ones that go into the water
18    dispensers?
19    A. Yes, exactly like that that's sitting
20    upright, and there's a long shaft that sticks up
21    and a big funnel.
22    Q. A big funnel that goes into the top of
23    the container?
24    A. Yes.

Page 131

1    Q. Okay. So you pushed that out of the
2    way. What did you do next?
3    A. As I pushed that oil dispenser, it
4    tripped over a lift and it fell. So I turned
5    around quickly and I seen that it fell and oil
6    was spilling.
7    Q. Yes.
8    A. So I went over there, I picked it up,
9    and I cleaned up the oil spill.
10    Q. Did you inform anybody at Sears that
11    you had spilled the oil?
12    A. John Baldi Jr., seen it.
13    Q. Did you inform anybody else?
14    A. That was it.
15    Q. You didn't inform Sears management
16    that you tripped over the oil?
17    A. No. I cleaned it up. It wasn't much.
18    Q. What happened next?
19    A. I left.
20    Q. Did you see anybody else when you were
21    there that night?
22    A. Jose was there. He was doing an
23    alignment.
24    Q. Did you see Jose?

Page 132

1    A. Yeah. I seen him.
2    Q. Did you talk to him?
3    A. A quick meet and greet.
4    Q. What did you say?
5    A. I'm out of here.
6    Q. Did you say anything else?
7    A. Just, yeah, that's what I said.
8    Q. Yes you said something else, or no you
9    didn't say anything else?
10    A. Yeah, I'm out of here. Don't say
11    nothing. I'm out.
12    Q. Don't say nothing about what?
13    A. About me being there.
14    Q. Why wouldn't you want Jose to say
15    anything about you being there?
16    A. Because that's how I felt at the
17    moment.
18    Q. Why?
19    A. That's how I felt. I didn't want
20    nobody to know I was around.
21    Q. Why didn't you want anybody to know
22    you were around?
23    A. Because I never been terminated in
24    that way.

33 (Pages 129 to 132)

Page 133

1    Q. So why wouldn't you want anybody to
2  know that you were around?
3    A. Because I was terminated.
4    Q. So you didn't want anybody to know
5  that you were on the premises after your
6  termination?
7    A. Basically, yeah. It's kind of
8  embarrassing when you're terminated, especially
9  a false termination.
10    Q. Did you do anything else when you
11  left?
12    A. I said bye to Jose, I said bye to John
13  Baldi, Jr., and I went on my way.
14    Q. Did you have any contact with Sears or
15  any Sears employees between the time you left
16  that night and when you received the citation in
17  the mail regarding the oil spill?
18    A. No.
19    Q. No contact with any Sears employees
20  between that time?
21    A. To the best of my knowledge, no.
22    MS. TRAN: Let's mark that as the next
23  exhibit. I believe this is going to be
24  Exhibit 9.

Page 134

1    (Exhibit 9 marked
2    for identification)
3    Q. Eric, you've just been handed what's
4  been marked as Exhibit No. 9 which is -- well,
5  have you ever seen this document before?
6    A. I don't remember.
7    Q. Take a look at it, and let me know
8  when you're done.
9    (Pause)
10    A. I remember it now.
11    Q. What is it?
12    A. It's a bunch of questions, right?
13    Q. No.
14    A. You tell me.
15    Q. I'm asking you. As you look at it, do
16  you know what this document is?
17    A. Something to do with the court system,
18  right?
19    Q. I need you to answer me yes or no. I
20  can't answer your questions regarding the
21  document.
22    Do you know what this document is as
23  you look at it today? Have you seen it before,
24  Eric?

Page 135

1    A. I think I did.
2    Q. Is this the complaint that you filed
3  in the lawsuit against Sears?
4    A. Yeah.
5    Q. If you turn to Page 4, Paragraph 19?
6    A. Yes.
7    Q. It says, At closing time on or about
8  October 16, 2003 management of the automotive
9  section of the Saugus store observed a spill of
10  waste oil, paren, less than 30 gallons, close
11  paren, on the floor of the oil change bay. The
12  spill was confined to the bay by the lack of
13  volume in the spill, a drain in the bay floor,
14  and the slope of the floor towards the drain.
15    Is that an accurate reading of that
16  paragraph?
17    A. Yeah. You read it correctly.
18    Q. How do you have knowledge about the
19  oil spill that happened on the evening of
20  October 16?
21    A. The citation I received in the mail.
22    Q. And the citation said all of these
23  things that are itemized in Paragraph 19?
24    A. It says destruction of property.

Page 136

1    Q. So then how do you know that the oil
2  spill happened on October 16 and that it was
3  confined to the bay by a lack of volume in the
4  spill, a drain in the bay floor, and by the
5  slope of the floor?
6    A. I hired a lawyer.
7    Q. To your knowledge, on what do you base
8  the facts -- on what do you base this allegation
9  in the complaint, Paragraph 19?
10    A. Say that again.
11    Q. What facts do you have to support
12  Paragraph 19 of the complaint?
13    A. I got no facts.
14    Q. So you don't know any of the
15  circumstances regarding the oil spill that
16  happened on October 16, is that correct, the one
17  described in Paragraph 19?
18    A. No.
19    Q. Do you have any facts to support
20  Paragraph 20 in which you state, Management of
21  the automotive section made the decision to
22  leave the spill in place until the following
23  morning, October 17, 2003, at which time an
24  employee was assigned to clean up the spill?

34  (Pages 133 to 136)

Page 137

1    A. What was the question again?
2    Q. Do you have any facts to support that
3 statement?
4    A. No.
5    Q. Where did you learn --
6    A. I hired a lawyer.
7    Q. That doesn't answer my question.
8 Where did you learn the information contained in
9 that statement?
10    A. I hired a lawyer, and he told me. He
11 gave me the facts.
12    MR. CLOHERTY: Don't get into your
13 discussions with your lawyer.
14    Q. I want to know where you learned. If
15 you learned it from your lawyer, just say, I
16 learned it from my lawyer. I don't want to know
17 the specifics of any conversation you had with
18 your lawyer.
19    A. That's what I'm saying. I learned it
20 from my lawyer.
21    Q. So you have no independent facts that
22 you know, not through communications with your
23 lawyer, that support this statement; is that
24 correct?

Page 138

1    A. Correct.
2    Q. Same thing with Paragraph 21, do you
3 have any independent facts to support that
4 paragraph, facts that you learned not through
5 conversations with any lawyer?
6    A. No.
7    Q. Do you know any of the details
8 regarding the oil spill?
9    A. Say that again.
10    Q. Do you know any of the details
11 regarding the oil spill? Did you see the oil
12 spill?
13    A. No.
14    Q. Did you help clean up the oil spill?
15    A. The one I did?
16    Q. The one that's alleged in your
17 complaint.
18    A. No.
19    Q. In Paragraph 23 you state, When it
20 became apparent that the spill was now an
21 environmental cleanup situation, defendant
22 William Sullivan threatened the employees of the
23 automotive department with being fired if they
24 did not confirm that the plaintiff was the party

Page 139

1 who caused the waste oil to flow into the
2 parking lot.
3    Is that an accurate reading of that
4 paragraph?
5    A. You read it right.
6    Q. On what do you base your allegation
7 that William Sullivan threatened employees of
8 automotive department? What facts do you have
9 to support that allegation?
10    A. I got no facts.
11    Q. So did you ever hear William Sullivan
12 threaten employees of the automotive department?
13    A. No.
14    Q. Did anybody ever tell you that William
15 Sullivan threatened employees of the automotive
16 department?
17    A. No.
18    Q. Do you know who William Sullivan is?
19    A. No.
20    Q. Have you ever met William Sullivan?
21    A. No.
22    Q. On what do you base that allegation?
23    A. Say that again.
24    Q. What facts do you have to support

Page 140

1 Paragraph No. 23?
2    A. I have no facts.
3    Q. In Paragraph 25 you state that
4 defendant Mansfield created a report falsely
5 stating that the ethnicity of the plaintiff was
6 unknown, the waste oil had a value of $3,000 so
7 the plaintiff could be charged with the felony
8 of malicious destruction of property over $250,
9 and defendant Coviello and a Mr. Jose Hernandez
10 had witnessed the spill.
11    Is that an accurate reading of that
12 paragraph?
13    A. You read that accurately.
14    Q. What evidence do you have to suggest
15 that Officer Mansfield created a false report
16 stating that the ethnicity of the plaintiff was
17 unknown?
18    A. The citation.
19    Q. Do you have any reason to believe that
20 Officer Mansfield knew what your ethnicity was?
21    A. I don't understand that.
22    Q. You allege Officer Mansfield created a
23 false report and that part of that falseness was
24 that he wrote that your ethnicity was unknown.

SHEA COURT REPORTING SERVICES
617-227-3097

Page 141

1    Do you understand that?
2        A. Not really.
3        Q. Can you read Paragraph 25 for me to
4    yourself.
5        A. Ethnicity.
6        Q. What is your understanding of what
7    ethnicity is?
8        A. I don't understand that question.
9        Q. What is your understanding of the
10   allegations contained in Paragraph No. 25?
11       A. I don't understand that word.
12       Q. Do you believe Officer Mansfield
13   created a false police report?
14       A. Yeah, I think so.
15       Q. On what do you base that belief?
16       A. Because I didn't know what the heck
17   was going on with that citation that they sent
18   me in the mail.
19       Q. Understanding you didn't know why you
20   got the citation, on what do you base the belief
21   that officer Mansfield created a false police
22   report?
23       A. The citation was for me that I didn't
24   know nothing about.

Page 142

1        Q. I don't understand your answer.
2            On what do you base the belief that
3    Officer Mansfield created a false police report?
4            Very specifically in Paragraph 25 you
5    allege the police report was false because it
6    stated that the ethnicity of the plaintiff was
7    unknown because it stated that the waste oil had
8    a value of $3,000 and because it stated that
9    Coviello and Mr. Jose Hernandez had witnessed
10   the spill.
11           Have you ever seen a police report
12   issued by Officer Mansfield that stated those
13   things?
14       A. I don't remember.
15       Q. As you sit here today, you don't have
16   any memory of seeing a police report written by
17   Officer Mansfield that stated those things; is
18   that correct?
19       A. I don't remember. I might have, but I
20   don't remember.
21       Q. So do you have any knowledge as to
22   whether or not Officer Mansfield created a false
23   report stating these things that you allege in
24   Paragraph 25?

Page 143

1        A. I feel it was false.
2        Q. On what do you base your belief that
3    it's false?
4        A. Because I was getting a citation for
5    something I didn't do.
6        Q. Okay.
7        A. I don't understand.
8        Q. Let's go back to that. Actually, you
9    know what, let's stay with this.
10           You understand that you filed a
11   lawsuit against Sears, a bunch of named
12   defendants, and Officer Mansfield, correct?
13       A. Correct.
14       Q. And you understand that as part of
15   that lawsuit you've alleged that each of those
16   people did certain things, correct?
17       A. I guess so.
18       Q. Is that your understanding?
19       A. I don't understand.
20       Q. What don't you understand?
21       A. What are you asking me? If these
22   people were in the events of that day?
23       Q. No. I'm asking you as a general
24   matter, you understand that when you filed this

Page 144

1    lawsuit against Sears, the named defendants, and
2    Officer Mansfield that you made allegations
3    about what each of those people did; is that
4    correct?
5        A. That's correct.
6        Q. One of the things that you've alleged
7    is that Officer Mansfield created a report
8    falsely stating that the ethnicity of the
9    plaintiff was unknown; is that correct?
10       A. Correct.
11       Q. What evidence do you have to support
12   that?
13       A. I got no evidence, I guess.
14       Q. Thank you.
15           Page 7 of the complaint -- actually,
16   Page 6, the last paragraph on Page 6 going into
17   Page 7, paragraphs numbered 32 and 33, can you
18   read Paragraph 33 to yourself, please, for me.
19   Let me know when you're done.
20           (Pause)
21       A. To 33 also?
22       Q. Yes.
23           (Pause)
24       Q. All set?

36 (Pages 141 to 144)

Case 1:04-cv-12164-MLW    Document 45-3    Filed 02/09/2007    Page 12 of 23

Page 145

1    A. Yes. I read it.
2    Q. In Paragraph 33 you allege that Sears,
3  William Sullivan, Kevin Sullivan, Richard
4  Spellman, Barbara Tagliarino, Gary Mansfield and
5  Alicia Coviello conspired to interfere with your
6  civil rights by obstructing justice.
7       Do you understand that?
8    A. Somewhat.
9    Q. What evidence do you have to support
10 that allegation?
11   A. I have no evidence.
12   Q. What facts do you have to support any
13 conspiracy between those parties?
14   A. I don't know.
15   Q. Do you have any facts to support a
16 conspiracy between those parties?
17   A. I honestly don't know.
18   Q. You don't know if you have facts to
19 support a conspiracy between those parties?
20   A. Correct.
21   Q. So as you sit here today, you can't
22 tell me whether or not you have any facts that
23 supports a conspiracy between those parties to
24 interfere with your civil rights?

Page 146

1    A. Correct. I don't understand it.
2    Q. What don't you understand?
3    A. Basically what you're telling me,
4  you're asking me.
5    Q. I'm asking you do you have any
6  evidence to support that Sears, Roebuck & Co.,
7  William Sullivan, Kevin Sullivan, Richard
8  Spellman, Barbara Tagliarino, Barry Mansfield
9  and Alicia Coviello conspired to interfere with
10 your civil rights? What evidence do you have to
11 support that allegation?
12   A. I'm telling you I don't know.
13   Q. You don't know or you don't have any?
14   A. I don't know.
15   Q. You don't know if you have any
16 evidence to support that allegation?
17   A. Yeah.
18   Q. Then on what do you base that
19 allegation? On what do you base that
20 allegation?
21   A. I don't understand.
22   Q. If you don't know if it's true, how
23 can you make the allegation?
24   A. Then I must have something.

Page 147

1    Q. What do you have?
2    A. A document or something.
3    Q. What do you have?
4    A. A document or something.
5    Q. Where is the document? What document
6  do you have?
7    A. It's in my pocket. I don't know.
8    Q. Let me see.
9    A. I honestly don't know. I don't
10 remember.
11   Q. You don't remember whether or not they
12 conspired against you?
13   A. They probably did, I guess.
14   Q. They probably did, but you don't know?
15   A. Mm-hmm.
16   Q. Is that accurate?
17   A. Correct.
18   Q. You understand that you filed a
19 lawsuit claiming that they did conspire against
20 you, correct?
21   A. Correct. All right.
22   Q. Yet you don't have any knowledge of
23 whether or not they actually conspired against
24 you; is that correct?

Page 148

1    A. That shouldn't be correct.
2    Q. What shouldn't be correct?
3    A. What you just said.
4    Q. What?
5    A. Here. It's all false.
6    Q. What's all false?
7    A. Whatever this says, I guess.
8    Q. I don't understand, Eric. What is
9  false?
10   A. I don't understand you either.
11 That's...
12   Q. What is false?
13   A. Whatever -- see, I'm lost here.
14   Q. I'll ask it very simply. You've
15 alleged that the Sears, Roebuck & Co., William
16 Sullivan, Kevin Sullivan, Richard Spellman,
17 Barbara Tagliarino, Gary Mansfield and Alicia
18 Coviello conspired to interfere with your civil
19 rights.
20      Do you understand that you made that
21 allegation?
22   A. Yeah.
23   Q. What evidence do you have to support
24 that they conspired to interfere with your civil

37 (Pages 145 to 148)

1  rights?
2      A. Some type of document, I guess.
3      Q. Eric, what evidence do you have to
4  support that they conspired and interfered with
5  your civil rights?
6      A. None, I guess. I don't know.
7      Q. None, you guess, or none?
8      A. I'm lost right now.
9      Q. Why are you lost?
10     A. I don't know. I don't understand the
11 question.
12     Q. What don't you understand?
13     A. Like, you keep asking me for
14 documents.
15     Q. I'm not asking you for documents. I'm
16 asking you what evidence, what do you know? Do
17 you have any knowledge or any facts to support
18 your allegation that those parties listed in
19 Paragraph 33 conspired and interfered with your
20 civil rights? What knowledge do you have to
21 support that allegation?
22     A. The citation I received in the mail.
23     Q. That's the only thing you have to
24 support the allegation that they conspired and

1  interfered with your civil rights?
2      A. Yes.
3      Q. So on the basis of a citation you
4  received from the Commonwealth of Massachusetts,
5  you've determined that the parties listed in
6  Paragraph No. 33 conspired together to interfere
7  with your civil rights?
8      A. Yes.
9      Q. Going down to Paragraph No. 36, can
10 you read that paragraph for me?
11     A. Can I stop and take a break?
12     Q. Absolutely.
13     (Recess taken)
14 BY MS. TRAN:
15     Q. We've been looking at the complaint.
16 I understand you're not an attorney, and you
17 didn't draft this document. So if there's any
18 confusion, please stop me. I'll try to break it
19 down so that it's a good question.
20     A. You already confused me twice. I
21 don't know.
22     Q. Going back to Paragraph No. 33?
23     A. Yeah.
24     Q. Do you know of any agreement between

1  any Sears employees to interfere with your
2  rights?
3      A. Like an employee interfere with my
4  rights?
5      Q. Anybody employed by Sears to interfere
6  with your rights. Do you know if anybody
7  employed by Sears agreed to interfere with your
8  rights?
9      A. No.
10     Q. Moving down to Paragraph No. 36, do
11 you want to take a second to review that very
12 quickly.
13     (Pause)
14     A. Okay.
15     Q. Do you know of any agreement between
16 any Sears employee or any of the people listed
17 in that paragraph to interfere with your rights?
18     A. Yes.
19     Q. What agreement do you know of?
20     A. The citation I got.
21     Q. So you believe that that citation is
22 evidence of an agreement between Sears employees
23 to interfere with your rights; is that accurate?
24     A. Yeah. The citation does interfere my

1  rights.
2      Q. I'm asking you what your understanding
3  of it is. So if it's your understanding that
4  the citation is evidence of an agreement, that's
5  all I need to know. Is that your understanding?
6      A. No.
7      Q. No. That's not your understanding?
8      A. Yes.
9      Q. We're getting tripped up by the double
10 negatives, so let's be clear.
11     Is it your testimony the only evidence
12 you have of any agreement between any Sears
13 employees to interfere with your rights is that
14 citation that you were issued?
15     A. Correct.
16     Q. Going backwards in the complaint to
17 Page No. 4, Paragraph No. 16, can you read that
18 paragraph for me.
19     (Pause)
20     A. Okay.
21     Q. Is that paragraph referencing the
22 comments made to you by Sal that you testified
23 about earlier?
24     A. Correct.

SHEA COURT REPORTING SERVICES
617-227-3097

Page 153

1    Q. Did anybody else employed by Sears
2  ever call you a Gook?
3    A. Other than Sal?
4    Q. Correct.
5    A. No.
6    Q. Still on Page 4, Paragraph 17, can you
7  read Paragraph 17 for me?
8      (Pause)
9    Q. In that paragraph it states in October
10  of 2003 defendant Sears, Roebuck & Co., through
11  it's management, fired the plaintiff without
12  explanation after he exercised his 1st Amendment
13  right to free speech with a fellow employee.
14      Is that an accurate reading of that
15  paragraph?
16    A. Yes, it is.
17    Q. Were you actually fired without an
18  explanation?
19    A. Correct.
20    Q. Didn't you testify earlier that when
21  you were terminated, you were told that you were
22  being terminated because you swore at a
23  customer?
24    A. From what they told me, yes.

Page 154

1    Q. That's what they told you?
2    A. Yes.
3    Q. So you were, in fact, provided with an
4  explanation when you were terminated?
5    A. Basically, yes.
6    Q. Going down to No. 18, can you read
7  Paragraph 18 for me to yourself.
8      (Pause)
9    Q. All set?
10    A. Yes.
11    Q. In Paragraph 18 the paragraph states,
12  The plaintiff was fired for something he did not
13  do, parens, allegedly swore at a customer, close
14  parens, as a pretext for his dismissal for
15  racial and ethnic prejudice by defendant Sears
16  Roebuck & Co., and the management group in
17  control of the Saugus store.
18      Is that an accurate reading of that
19  paragraph?
20    A. That's what it says.
21    Q. What evidence do you have to suggest
22  that you were terminated as a result of your
23  race?
24    A. The argument with Sal.

Page 155

1    Q. Aside from that argument with Sal, do
2  you have any other facts to support the
3  allegation that you were terminated because of
4  your race?
5    A. No.
6    Q. I want to talk a little bit about your
7  prosecution for the malicious destruction of
8  property. If you turn to Page 5, Paragraph 26,
9  can you read that paragraph for me to yourself.
10      (Pause)
11    A. Mm-hmm.
12    Q. Then can you also read Paragraph 27
13  for me which is on Page 6.
14      (Pause)
15    A. Mm-hmm.
16    Q. Those two paragraphs talk about
17  testimony. Paragraph 26 talks about testimony
18  bay Alicia Coviello, and 27 talks about a
19  conversation you had with Jose Hernandez; is
20  that correct?
21    A. Yes.
22    Q. Did those two things happen on
23  separate days or the same day?
24    A. The same day.

Page 156

1    Q. Do you remember how many times you
2  were in court as a result of the charges brought
3  against you for malicious destruction of
4  property?
5    A. Two to three times, maybe four.
6    Q. And do you remember which time it was
7  that you spoke with Jose?
8    A. The first.
9    Q. The first time?
10    A. Yes.
11    Q. And is it your understanding that Jose
12  left without testifying that first day; is that
13  correct?
14    A. Correct.
15    Q. Do you know why you were in court that
16  first day? Do you remember?
17    A. For the citation?
18    Q. Yeah. Do you know specifically what
19  the hearing was about that you were in court for
20  that day?
21    A. Destruction of property.
22    Q. I understand that. There are
23  different procedures that happen in criminal
24  courts. I'm just asking whether or not you know

39 (Pages 153 to 156)

Page 157

1  which one you were there for that day.
2      A. Oh, yeah.
3      Q. What was it?
4      A. The citation I got in the mail for the
5  destruction of property.
6      Q. Did you ever see Jose in court on any
7  other times with regard to your malicious
8  destruction of property charge?
9      A. No.
10     Q. So it was just that one day that you
11 saw him there?
12     A. Yes.
13     Q. And it's your understanding he did not
14 testify that day; is that correct?
15     A. Yes.
16     Q. Do you know who John Baldi, Sr., is?
17     A. Yes.
18     Q. Who is he?
19     A. John Baldi, Jr.'s father.
20     Q. How do you know him?
21     A. Through John Baldi, Jr.
22     Q. Have you ever spoken with John Baldi,
23 Sr., regarding the circumstances surrounding
24 your termination or anything involved in this

Page 158

1  lawsuit?
2      A. Yes.
3      Q. What conversations have you had with
4  him about either of those things?
5      A. About what's going on with my
6  termination.
7      Q. Can you be more specific about what
8  you guys discussed?
9      A. I don't remember.
10     Q. Do you know when you had these
11 conversations with him?
12     A. I don't remember.
13     Q. Do you know how many times you spoke
14 with him about your lawsuit or your termination?
15     A. I don't remember.
16     Q. Have you ever talked with him about
17 the oil spill that happened at Sears that you
18 were charged with?
19     A. I don't remember.
20     (Exhibit 10 marked
21         for identification)
22     Q. I'm going to hand you what's been
23 marked as Exhibit No. 10. I've handed you
24 what's been marked as Exhibit No. 10 which is

Page 159

1  titled, Plaintiff's Disclosure Pursuant to LR
2  26.2(A) and LR 26.1(B)(1) & (2).
3          Understanding you're not an attorney,
4  you didn't draft these documents, I just want to
5  point you to the first page. Paragraph 3,
6  Subparagraph A. Do you see where I'm pointing
7  you to?
8      A. A.
9      Q. Are you looking on Page 1 of
10 Exhibit 10, at that part?
11     A. Yes.
12     Q. Do you see where it says underneath
13 John A. Baldi, This individual has knowledge of
14 the circumstances of the two oil spills that
15 occurred at Sears at the Square One Mall in
16 Saugus, Massachusetts?
17     A. Mm-hmm.
18     Q. Do you know what knowledge he has of
19 those spills?
20     (Pause)
21     A. Okay.
22     Q. Do you know what knowledge he has
23 about the spills?
24     A. That there was an oil spill at Sears.

Page 160

1      Q. Do you know anything else about what
2  he knows about them?
3      A. Not really.
4      Q. Looking down underneath that -- I'm
5  sorry, John A. Baldi is John Baldi, Sr., is that
6  correct?
7      A. Yes.
8      Q. And John W. Baldi is his son?
9      A. Yes.
10     Q. Looking down at Subparagraph B
11 underneath John W. Baldi it says, This
12 individual was a coworker of plaintiff and
13 witnessed one or both of the two oil spills. He
14 was also approached by agents of defendants and
15 told to lie about the circumstances of the two
16 spills.
17         Is that an accurate reading of that
18 paragraph?
19     A. You read it right.
20     Q. Do you know who supposedly approached
21 him and told him to lie about the two oil
22 spills?
23     A. No.
24     Q. Do you know what he was told to say?

SHEA COURT REPORTING SERVICES
617-227-3097

Page 161

1    A. I don't think so. Wait. No, wait.
2  No. I don't remember.
3    Q. Okay. I'm going to hand you back
4  Exhibit No. 9. Looking again at
5  Paragraph No. 17, the paragraph states that you
6  were terminated after you exercised your 1st
7  Amendment right to free speech with a fellow
8  employee? Did you read that part?
9    A. Mm-hmm.
10   Q. Do you know what free speech with a
11  fellow employee is being referred to in that
12  paragraph?
13   A. Yes.
14   Q. Can you tell me what it is?
15   A. Just me.
16   Q. Did you have a conversation with a
17  fellow employee that you think precipitated --
18  that you think resulted in your termination?
19   A. Explain that one again.
20   Q. In the paragraph it states that you
21  believe you were terminated after exercising
22  your 1st Amendment right to free speech with a
23  fellow employee.
24      Did you read that part of the

Page 162

1  paragraph?
2    A. Yeah, I read it.
3    Q. What conversation with a fellow
4  employee did you have that you think resulted in
5  your termination?
6    A. The swearing.
7    Q. So the swearing with the customer
8  you're talking about?
9    A. Yes.
10   Q. Did you have any conversation with any
11  fellow employee that you think resulted in your
12  termination?
13   A. No.
14   Q. Did you say anything to any fellow
15  employee that you think resulted in your
16  termination?
17   A. I don't remember.
18   Q. Just give me one second.
19      (Pause)
20   Q. After your termination from Sears, how
21  long was it before you got another job?
22   A. About three months.
23   Q. Where was your job, the next job you
24  had after Sears?

Page 163

1    A. Firestone.
2    Q. And you started at Firestone, I
3  believe you testified earlier, in November of
4  2003; is that accurate?
5    A. Is that right?
6    Q. That's what you testified to
7  previously. Is that accurate?
8    A. Probably not.
9    Q. Do you remember when you started your
10  job at Firestone?
11   A. Between December or January.
12   Q. What's that?
13   A. Probably December or January.
14   Q. You testified previously that you
15  ended your employment at Firestone in January of
16  2004?
17   A. Yes, around that time frame. Probably
18  December I started maybe.
19   Q. So you started in December and ended
20  in January; is that correct?
21   A. Correct.
22   Q. What did you do in the two months
23  between the time you were terminated by Sears
24  and when you were hired by Firestone?

Page 164

1    A. Tried to collect unemployment and look
2  for work.
3    Q. Were you able to collect unemployment?
4    A. No.
5    Q. Do you know why?
6    A. They said I was terminated.
7    Q. Is Firestone the first job you were
8  offered after your employment with Sears?
9    A. Yes.
10   Q. What did you do to seek work after you
11  were terminated from Sears?
12   A. Continue looking for work.
13   Q. How did you look for work?
14   A. Got applications from local shops and
15  local stores.
16   Q. And filled out those applications?
17   A. Yes.
18   Q. And submitted them?
19   A. Most of them.
20   Q. Did you do this every day?
21   A. Tried to, yeah.
22   Q. Tried to or did?
23   A. I did it not every day, but...
24   Q. How frequently would you do that?

41 (Pages 161 to 164)

Page 165

1    A. Four times a week.
2    Q. How many shops do you think you
3  applied to before you were able to gain
4  employment at Firestone?
5    A. I don't remember. It was a few
6  though.
7    Q. By "a few," what do you mean?
8    A. A few.
9    Q. How many is a few, approximately?
10    A. I don't remember. It was a few.
11    Q. Did you do anything else besides fill
12  out applications?
13    A. As I said.
14    Q. What kinds of things did you do when
15  you worked on applications?
16    A. Searching for jobs online.
17    Q. In addition to filling out
18  applications, you also searched for jobs online?
19    A. Oh, yeah.
20    Q. How did you search for jobs online?
21    A. Computer.
22    Q. I understand you mean a computer.
23  What types of sites did you visit to search for
24  jobs online?

Page 166

1    A. I don't remember.
2    Q. How frequently did you search for jobs
3  online?
4    A. Every other day.
5    Q. Other than searching for jobs online
6  and filling out applications, what else did you
7  do?
8    A. I don't remember.
9    Q. After your termination from Sears, did
10  you ever treat with any psychiatrist or
11  psychologist as a result of your termination?
12    A. No.
13    Q. Have you ever treated with any
14  psychiatrist or psychologist?
15    A. No.
16    Q. What effect, if any, did your
17  termination have on you, aside from the fact
18  that you needed to look for new work?
19    A. Depression.
20    Q. Can you describe for me what you mean
21  by depression?
22    A. Just stressed out. I've never been
23  terminated like that, false termination.
24    Q. Did you talk to anybody about your

Page 167

1  depression?
2    A. My family.
3    Q. Who did you talk to?
4    A. My mother, my father.
5    Q. What did you guys talk about?
6    A. The situation. I honestly don't
7  remember. But I was talking about what I felt
8  at the time.
9    Q. Did you seek any professional
10  treatment as a result of your depression?
11    A. No.
12    Q. Have you ever sought any professional
13  treatment as a result of your --
14    A. No.
15    Q. -- depression?
16    Let me finish the question. I know
17  you know what I'm going to say. It's easier for
18  her.
19    A. That's true. She has to keep up.
20    Q. Other than the depression you felt
21  after your termination, what effect, if any, did
22  your termination have on you?
23    A. I wasn't bringing in income. I was
24  losing income.

Page 168

1    Q. Anything else?
2    A. I don't remember.
3    Q. Do you know roughly how much you make
4  at your -- how much you make at your current
5  job, including commissions?
6    A. Right now?
7    Q. Yes.
8    A. I'm averaging about, say, about $1100.
9    Q. $1100 per week?
10    A. It's always different.
11    Q. Understanding. But on average?
12    A. I would say 11.
13    Q. About $1100?
14    A. Mm-hmm.
15    Q. How much did you make on a weekly
16  basis when you were employed at Sears?
17    A. Sears paid us every two weeks, and
18  every two weeks it averaged $800.
19    Q. $800 every two weeks, so roughly about
20  $400 a week?
21    A. Yes.
22    Q. So you make right now about $700 or so
23  more a week than what you made when you were
24  employed at Sears, on average?

Page 169

1    A. Correct.
2    Q. Have you ever sought any treatment for
3  any substance abuse?
4    A. What do you mean?
5    Q. Have you ever been an inpatient for
6  any drug or rehabilitation treatment?
7    A. No.
8    Q. Have you ever sought any treatment for
9  any excessive use of alcohol?
10    A. No.
11    Q. I'm going to show you again Exhibit
12  No. 9. If you can look at this caption at the
13  top, specifically the people listed above, the
14  name of the defendants. If you could take a
15  quick look for me.
16    A. Okay.
17    Q. As you sit here today, do you have any
18  knowledge of any conversations among those
19  people with regard to your termination?
20    A. Me, conversations with those people?
21    Q. Do you know of any conversations they
22  had among themselves with regard to your
23  termination?
24    A. No.

Page 170

1    Q. Have you ever spoken with
2  Officer Mansfield?
3    A. No.
4    Q. Has anybody ever spoken with
5  Officer Mansfield on your behalf?
6    A. I don't think so.
7    MS. TRAN: I think that's it for me.
8  John?
9        CROSS EXAMINATION
10  BY MR. CLOHERTY:
11    Q. Good afternoon, Mr. Souvannakane. I'm
12  John Cloherty. I represent Officer Gary
13  Mansfield in this lawsuit. I have some
14  follow-up questions for you.
15    A. Okay.
16    Q. Do you know who Officer Gary Mansfield
17  is of the Saugus Police Department?
18    A. No, I don't.
19    Q. Have you ever met him in person?
20    A. No, I haven't.
21    Q. Have you ever had any contact with him
22  before the issuance of the citation that you
23  received in the mail?
24    A. No, I haven't.

Page 171

1    Q. I wasn't here earlier when you were
2  asked about your prior contacts with the police
3  by Ms. Tran. Did any of those contacts involve
4  the Saugus Police Department ever arresting you?
5    A. No.
6    Q. So you were never arrested by the
7  Saugus Police Department or any of its officers
8  at any time?
9    A. No.
10    Q. Now, you first became aware of the
11  charges concerning the oil spill by way of a
12  citation you received in the mail; is that fair
13  to say?
14    A. Yes, it is fair.
15    Q. I'm going to mark as an exhibit the
16  defendant's disclosure because co-defense
17  attorney has already made copies. And among
18  these documents are various records reproduced
19  to your attorney. So we'll have them marked and
20  I'll show them to you.
21    (Exhibit 11 marked
22    for identification)
23    Q. Showing you, sir, what's been marked
24  as Exhibit No. 11, and I provided your attorney

Page 172

1  a copy as well. I suggest to you this is a copy
2  of the discovery documents we produced to your
3  attorney in this lawsuit.
4    I want to direct your attention to the
5  last page of this exhibit.
6    The quality of the copy may be
7  somewhat poor. Do you recognize that document,
8  sir?
9    A. I don't remember. Oh, yeah. This is
10  the citation; isn't it?
11    Q. That's what I'm asking you. Is that
12  the citation, a copy of the citation you
13  received in the mail?
14    A. Yes.
15    Q. Or similar to the citation that you
16  received in the mail, sir?
17    A. I would say similar.
18    Q. When you got that citation, sir, what
19  was the first thing that you did?
20    A. Questioned myself.
21    Q. Did you speak to anyone in the employ
22  or formerly in the employ of Sears after you
23  received that in the mail?
24    A. Not right away, no.

43 (Pages 169 to 172)

Page 173

1    Q. Did you call any of your friends that
2  used to work with you at Sears about why you
3  were being mailed a citation?
4    A. Yes, matter of fact, I informed a
5  fellow employee.
6    Q. Who was that, sir?
7    A. John Baldi, Jr.
8    Q. How soon after you received the
9  citation in the mail did you tell Mr. John
10 Baldi, Jr., that you got it?
11   A. It wasn't right away. I don't
12 remember.
13   Q. Within a day or two?
14   A. I honestly don't remember.
15   Q. But you do remember having a
16 conversation with him about it?
17   A. Oh, yes.
18   Q. Did you speak in person or on the
19 telephone?
20   A. Telephone.
21   Q. What was the nature of that
22 discussion? What did you say and what did he
23 reply?
24   A. I told him I received a citation in

Page 174

1  the mail by a Saugus officer.
2    Q. Did you ask him what's it all about?
3    A. No.
4    Q. What did he reply to you after you
5  told him you received a citation in the mail?
6    A. He asked for the officer's name. and I
7  gave him the officer's name.
8    Q. Then what happened after you told him
9  the officer's name?
10   A. That's when he told me there was an
11 oil spill.
12   Q. What did he tell you about the oil
13 spill?
14   A. That it was a big oil spill that they
15 had to clean up, and my name was in the
16 environment, in the Sears, Roebuck environment.
17   Q. When you say "the environment," you
18 mean people at Sears, Roebuck were talking about
19 your name?
20   A. Yes.
21   Q. According to Mr. Baldi?
22   A. Yes.
23   Q. Did he tell you what was being said
24 about you at Sears, Roebuck?

Page 175

1    A. He told me that they think I did it.
2    Q. And how did you respond to him?
3    A. I didn't agree.
4    Q. Did you tell him you did not do it?
5    A. Yes.
6    Q. What did he say in reply?
7    A. He said, I know you didn't do it.
8    Q. Did he say anything else?
9    A. From there on, no.
10   Q. Did he explain to you why he knew you
11 did not do it?
12   A. I wasn't there at the time, I guess.
13   Q. Did Mr. Baldi ever tell you he knew
14 who did cause the oil spill?
15   A. No.
16   Q. Have you ever heard from any source at
17 any time as to who caused the oil spill that you
18 were being charged with?
19   A. No.
20   Q. Do you today know who caused that oil
21 spill that you are being charged with?
22   A. No.
23   Q. Has anyone told you that they know who
24 caused that oil spill that you were charged

Page 176

1  with?
2    A. No.
3    Q. Earlier in your testimony you did
4  testify that you yourself spilled some oil when
5  you were checking your toolbox; is that correct?
6    A. Correct.
7    Q. Are you contending that there were two
8  oil spills, one that you caused and then a
9  separate one that was the subject of a criminal
10 charge?
11   A. I'm assuming so.
12   Q. Why are you assuming that there were
13 two different oil spills, and you weren't being
14 charged for that one next to your toolbox?
15   A. I cleaned it up.
16   Q. How much of a volume of oil was
17 spilled at that one that you cleaned up?
18   A. It wasn't much, but it was oil on the
19 ground.
20   Q. What steps did you take to clean up
21 that oil?
22   A. Right when I noticed that the oil
23 barrel tipped over, I rushed and picked up the
24 oil barrel. I went to grab these foam pads that

44 (Pages 173 to 176)

Page 177

1    we have that absorbs oil, and that's what I
2    used.
3        Q. Were you trained in your employment at
4    Sears or elsewhere on how to deal with oil
5    spills if that happens?
6        A. Yes.
7        Q. What was your training?
8        A. Oil training.
9        Q. What did they train you to do?
10       A. What to do if you spill oil.
11       Q. What steps did they tell you to take?
12       A. I don't remember. But foam pads was a
13   good thing though.
14       Q. What did you do after you put down the
15   foam pads on the oil that spilled?
16       A. I just cleaned them up.
17       Q. Was there a special area to dispose of
18   those foam pads after a cleanup?
19       A. You wait until it absorbs all the oil,
20   then you just pick it up and throw it in the oil
21   wastebasket.
22       Q. And how long did it take to do the
23   cleanup from the time you had that spill next to
24   your toolbox?

Page 178

1        A. I don't remember.
2        Q. Was it a matter of hours or matter of
3    minutes?
4        A. I would say minutes.
5        Q. Less than an hour?
6        A. Yes.
7        Q. Were there any other efforts that you
8    had to make to clean up the oil besides putting
9    down those oil pads?
10       A. Yeah.
11       Q. What else did you have to do?
12       A. Wipe it.
13       Q. Did you have to spray any kind of
14   solvent on the ground?
15       A. No, not necessarily.
16       Q. What did you wipe it up with besides
17   the pads?
18       A. A fresh foam pad.
19       Q. Then you disposed of that in the same
20   manner?
21       A. Yes.
22       Q. Did you take any other steps to do
23   that cleanup?
24       A. No, not that I remember. I cleaned it

Page 179

1    up good though.
2        Q. So based on having cleaned it up, you
3    do not believe that this citation was for that
4    oil spill that you cleaned up?
5        A. Yes.
6        Q. Now, did you talk to Mr. Baldi about
7    Officer Mansfield in particular when you called
8    him?
9        A. Not necessarily.
10       Q. Did he indicate to you that he knew
11   Officer Mansfield?
12       A. He's the one that told me about
13   Officer Mansfield.
14       Q. What did he tell you about
15   Officer Mansfield?
16       A. That he was down at Sears, Roebuck, I
17   guess, at the date of the oil spill.
18       Q. What else did he tell you about
19   Officer Mansfield?
20       A. That he was questioning everybody.
21       Q. Did he tell you anything else about
22   Officer Mansfield?
23       A. That's all I remember.
24       Q. Did Mr. Baldi, Jr., know who Officer

Page 180

1    Mansfield was from the day of the oil spill?
2        A. I don't know.
3        Q. He didn't tell you I know
4    Officer Mansfield from around town or anything
5    like that?
6        A. I don't know.
7        Q. Do you have a memory of him telling
8    you that he knew Officer Mansfield and who he
9    was?
10       A. No.
11       Q. Did Mr. Baldi relate to you who
12   Officer Mansfield spoke to at Sears?
13       A. He just said everyone.
14       Q. Did he include himself as having
15   spoken to Officer Mansfield?
16       A. Yes.
17       Q. Did he tell you what Mr. Baldi and
18   Officer Mansfield talked about?
19       A. No.
20       Q. At any point in time after the time
21   you first spoke to him about the citation, did
22   Mr. Baldi, Jr., tell you what he and
23   Officer Mansfield spoke about?
24       A. Yes.

45  (Pages 177 to 180)

Page 181

1    Q. What did he tell you at a later point
2  in time?
3    A. He just asked John Baldi, Jr., who did
4  it.
5    Q. What did John Baldi, Jr., respond?
6    A. He doesn't know.
7    Q. Was there any further discussion that
8  Mr. Baldi, Jr., related to you about his talks
9  with Officer Mansfield?
10    A. No. That was it as I remember.
11    Q. Did Mr. Baldi, Jr., tell you that he
12  witnessed the oil spill?
13    A. No.
14    Q. Did he see the cleanup of the oil
15  spill that was the subject of this citation?
16    A. Yes.
17    Q. What did he tell you about the cleanup
18  of the oil spill?
19    A. They had to come clean it up.
20    Q. Did they hire a company to come clean
21  it up?
22    A. Correct.
23    Q. Did Mr. Baldi say that he saw that and
24  witnessed the company clean it up?

Page 182

1    A. I don't remember.
2    Q. Did he tell you anything further about
3  the cleanup other than they hired someone to
4  clean it up?
5    A. I don't remember.
6    Q. Did you ever hear any statements made
7  about use of a hose to clean up the oil spill?
8    A. I believe so.
9    Q. Who told you about that?
10    A. Probably Baldi.
11    Q. You are saying probably. Do you have
12  a particular memory of him telling you this?
13    A. He's the only person that told me
14  about the oil spill.
15    Q. Did you talk to any Sears employees at
16  any time about the oil spill that was the
17  subject of this charge?
18    A. No.
19    Q. So your only source of information
20  would have been Mr. Baldi, Jr., correct?
21    A. Correct.
22    Q. His dad doesn't work at Sears, does
23  he?
24    A. No.

Page 183

1    Q. Does his father have any connection
2  with Sears at all?
3    A. No.
4    Q. Had he ever worked there in the past?
5    A. I don't know.
6    Q. Other than Mr. Baldi's statement, are
7  you aware of anyone else relating to you any
8  conversations with Officer Mansfield about the
9  investigation of the oil spill?
10    A. Say that again.
11    Q. Let me ask it a different way.
12    A. I understand. I wasn't focused.
13    Q. Other than Mr. Baldi, Jr., who told
14  you what Officer Mansfield did to investigate
15  the oil spill, did anyone else tell you about
16  Officer Mansfield's actions about the oil spill?
17    A. No.
18    Q. Would you recognize Officer Mansfield
19  if you saw him today?
20    A. Not from a hole in the wall.
21    Q. You never met him in person?
22    A. Uh-uh.
23    Q. Is that a yes or no?
24    A. No.

Page 184

1    Q. After you had the citation mailed to
2  you, did you appear in court in response to that
3  citation?
4    A. The date on the citation?
5    Q. Yes.
6    A. I showed up in court.
7    Q. You showed up on the date that was
8  stated on the citation?
9    A. Yes.
10    Q. And there was a hearing on the day
11  that you showed up?
12    A. Yes, there was.
13    Q. And that hearing was to determine
14  whether a summons should issue on the criminal
15  charge, correct?
16    A. I don't remember.
17    Q. There was evidence taken as far as
18  testimony being given in court that day,
19  correct?
20    A. I don't remember.
21    Q. Do you remember on the date you showed
22  up in court whether there were any Sears
23  employees there that day?
24    A. Yes.

46 (Pages 181 to 184)

Page 185

1    Q. Who was there on behalf of Sears?
2    A. Jose Fernandez (sic).
3    Q. Who else?
4    A. You are talking employees, right?
5    Q. Right.
6    A. Just Jose Fernandez (sic).
7    Q. Was Alicia Coviello there that first
8  day when you showed up in court?
9    A. She was there, too.
10   Q. You don't consider her a Sears
11 employee?
12   A. I do now.
13   Q. Other than Alicia Coviello and
14 Mr. Hernandez, were there any other Sears
15 employees in court that day?
16   A. No.
17   Q. Do you know if Officer Mansfield was
18 there that day in court?
19   A. I don't think so.
20   Q. Do you know if the Saugus Police
21 Department has a different officer who appears
22 for court hearings?
23   A. There was an officer there.
24   Q. But it wasn't Officer Mansfield, was

Page 186

1  it?
2    A. Not that I know of.
3    Q. Do you know who that officer was that
4  was in court that day?
5    A. No.
6    Q. Did either Mr. Hernandez or
7  Ms. Coviello give any sworn statements to the
8  clerk of the court that day?
9    A. I don't remember.
10   Q. Were you yourself asked to raise your
11 right hand and swear to tell the truth and give
12 a statement to the clerk that day?
13   A. I don't remember.
14   Q. Do you recall the case being called
15 before the clerk that day?
16   A. I don't understand.
17   Q. Do you recall being in court and the
18 matter coming to the attention of the clerk and
19 the clerk hearing anything about your case that
20 day?
21   A. No.
22   Q. Do you know who the clerk was that
23 day?
24   A. A woman.

Page 187

1    Q. Do you know what her name is?
2    A. No, I don't.
3    THE WITNESS: Could I get a break?
4    MR. CLOHERTY: Yeah. Do you want to
5  take five minutes?
6    THE WITNESS: Yes.
7    (Recess taken)
8  BY MR. CLOHERTY:
9    Q. At that hearing, the clerk for the
10 Lynn District Court, her name is Jane Grady
11 Sternwall. Does that sound familiar?
12   A. No.
13   Q. Doesn't refresh your recollection as
14 to the name of the clerk that day when you first
15 appeared in court?
16   A. No.
17   Q. Did you have anyone with you on your
18 behalf that day?
19   A. Yes, I did.
20   Q. Who else was there on your behalf?
21   A. John Baldi, Sr.
22   Q. Why was John Baldi, Sr., there on your
23 behalf?
24   A. Just to support me.

Page 188

1    Q. Is he an attorney?
2    A. No.
3    Q. Do you have any memory today of any
4  statements or sworn testimony before the clerk
5  that day at all, that first day that you
6  appeared in court?
7    A. Ask me that again.
8    Q. Do you have any memory of any sworn
9  statements being taken by the clerk that first
10 day you appeared in court?
11   A. I don't remember.
12   Q. Now, you've already testified you
13 received a citation to appear in court that day,
14 correct?
15   A. Yes.
16   Q. You were never arrested by
17 Officer Mansfield, correct?
18   A. Correct.
19   Q. You were never arrested by any member
20 of the Saugus Police Department about these
21 charges, correct?
22   A. Correct.
23   Q. You were never held in custody for any
24 period of time by Officer Mansfield, were you?

47 (Pages 185 to 188)

Page 189

1    A. Correct.
2    Q. And you were never detained by
3  Officer Mansfield and told not to move, were
4  you?
5    A. Correct.
6    Q. In fact, you've never had any contact
7  with him whatsoever, have you?
8    A. Correct.
9    Q. Now, the matter after the first day
10  you appeared on the citation proceeded to other
11  hearings in Lynn District Court. You said you
12  appeared three or four times total. Do you
13  recall that, sir?
14    A. Yes, sir.
15    Q. And among those times was a trial
16  before a judge of the district court, correct?
17    A. Correct.
18    Q. And at that trial there was testimony
19  taken, correct?
20    A. Yes, there was.
21    Q. Do you know who testified at the
22  trial?
23    A. Jose.
24    Q. And did anyone else testify?

Page 190

1    A. That girl.
2    Q. "That girl" is Alicia Coviello?
3    A. Yes.
4    Q. She testified as well?
5    A. Yes, she did.
6    Q. Did you yourself testify that day?
7    A. Yes.
8    Q. Did anyone else testify on your
9  behalf?
10    A. My lawyer.
11    Q. Besides your lawyer, did any other
12  witnesses come forward on your behalf besides
13  yourself?
14    A. I don't remember.
15    Q. Do you remember the result or the
16  outcome of that trial, sir?
17    A. Not guilty.
18    Q. Now, in your complaint there's an
19  allegation that Mr. Hernandez left the courtroom
20  at one point in time and refused to testify. Do
21  you recall that, sir?
22    A. Yes, sir.
23    Q. But he did testify at the trial of
24  your case, correct?

Page 191

1    A. Yes, he did.
2    Q. So the occasion when he left the
3  courtroom was when, when did that happen?
4    A. The first time, the citation date.
5    Q. Did you have any discussions with him
6  about why he was leaving the courtroom?
7    A. Yes.
8    Q. What discussions did you have with
9  him?
10    A. He came to me first, How you doing,
11  meet and greet. And from there, What are you
12  doing here. I asked him, What are you doing
13  here. And he goes, I'm here for Sears. And
14  from there he goes, he just walked around real
15  quick and he comes back at me. You know what,
16  sorry man, but fuck this lying shit. And he
17  leaves.
18    Q. Did he say anything else to you?
19    A. That is it.
20    Q. Did you ask him what he meant by "this
21  lying shit" that he was telling you about?
22    A. No. He said it real quick, and he
23  left. That was it.
24    Q. Did you have any subsequent

Page 192

1  conversations with him about what he meant by
2  that?
3    A. No.
4    Q. Have you ever talked to him since that
5  date in the courtroom about what he meant?
6    A. No.
7    Q. In fact, after telling you that, he
8  later did testify in court at your trial,
9  correct?
10    A. Yes.
11    Q. Was Officer Mansfield present at the
12  trial, sir?
13    A. I don't believe so.
14    Q. And you didn't have any police officer
15  witnesses testify at the trial, did they?
16    A. I don't think so. I don't remember,
17  to be honest with you. I just remember what I'm
18  telling you.
19    Q. Has anyone ever told you, other than
20  Mr. Baldi, that they spoke to Officer Mansfield
21  about this investigation?
22    A. No.
23    Q. Other than Mr. Baldi and what you
24  testified earlier, have you learned from any

48  (Pages 189 to 192)