Exhibit C

**BARBARA TAGLIARINO**
**April 28, 2006**



ORIGINAL

```
                                              Page 1
 1              UNITED STATES DISTRICT COURT

 2           FOR THE DISTRICT OF MASSACHUSETTS

 3                          C.A. NO. 04-12164-MLW

 4

 5

 6   ERIC SOUVANNAKANE,

 7              Plaintiff

 8   v.

 9   SEARS, ROEBUCK AND CO.,

10              Defendant

11

12

13

14

15        DEPOSITION OF:  BARBARA TAGLIARINO

16           Law Offices of Kurt Olson

17             500 Federal Street

18           Andover, Massachusetts

19         April 28, 2006        10:05 a.m.

20

21

22

23            Charlotte C. Rosati

24       Registered Professional Reporter
```

**BARBARA TAGLIARINO**
**April 28, 2006**

Page 2

1  APPEARANCES:

2

3  Representing the Plaintiff:

4  LAW OFFICES OF KURT OLSON

5  500 Federal Street

6  Andover, MA 01810

7  (978) 681-0800

8  BY:  KURT OLSON, ESQ.

9

10

11  Representing the Defendant:

12  SUGARNAN, ROGERS, BARSHAK & COHEN, P.C.

13  101 Merrimac Street

14  Boston, MA 02114-4001

15  (617) 227-3030

16  BY:  CHRISTINE M. NETSKI, ESQ.

17

18

19  Representing Gary Mansfield:

20  PIERCE, DAVIS & PERRITANO, LLP

21  Ten Winthrop Square

22  Boston, MA 02110-1257

23  (617) 350-0950

24  BY:  JOHN J. CLOHERTY III, ESQ.

**BARBARA TAGLIARINO**
**April 28, 2006**

```
1                        I N D E X

2

3    WITNESS:          BARBARA TAGLIARINO

4

5    EXAMINATION BY:                      PAGE:

6    Mr. Olson                              4

7

8

9

10

11

12   E X H I B I T S                     PAGE:

13

14   No. 1          Handwritten note, 1pp     12

15   No. 2          Handwritten note, 1pp     16

16   No. 3          Statement, 2pp            17

17   No. 4          Saugus Police Department  19

18                  Narrative

19   No. 5          ENPRO Services, Inc.      20

20                  invoice, 2pp

21

22

23

24
```

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

**BARBARA TAGLIARINO**
**April 28, 2006**

Page 4

1              STIPULATIONS

2                      It is agreed by and between

3      the parties that all objections, except

4      objections as to the form of the questions, are

5      reserved and may be raised at the time of trial

6      for the first time.

7                      It is further agreed by and

8      between the parties that all motions to strike

9      unresponsive answers are reserved and may be

10     raised at the time of trial for the first time.

11                     It is further agreed by and

12     between the parties that the reading and signing

13     of the deposition by the deponent my be signed

14     under the pains and penalties of perjury within

15     (30) thirty days of receipt.

16                          - - - -

17             BARBARA TAGLIARINO, having been

18     satisfactorily identified and duly sworn by the

19     Notary Public, deposes and states as follows:

20

21     EXAMINATION BY MR. OLSON:

22

23         Q.    **Good morning, Ms. Tagliarino.**

24         A.    Good morning.

**BARBARA TAGLIARINO**
**April 28, 2006**

Page 5

1         Q.    I met you downstairs.  My name is Kurt

2    Olson, and I represent the Plaintiff, Eric

3    Souvannakane, in this action.

4                        Could you please state your

5    name, and spell your last name, for the record,

6    please?

7         A.    Barbara Tagliarino.

8    T-A-G-L-I-A-R-I-N-O.

9         Q.    The Court Reporter asked us to sit

10   closely to her today so she could understand

11   everything, but I will still ask you to keep

12   your voice up, and rather than nodding in

13   responding to a question, be sure to speak an

14   answer to a question.

15                        Also please wait until I

16   finish asking my questions, and I'll wait for

17   you to finish your response before I ask you

18   another question, so the Court Reporter won't

19   have a difficult time.  If you need a break at

20   any time during the course of this deposition,

21   please let me know, and I will take a break.

22                        You understand today that

23   your testimony is given under oath?

24        A.    Yes.

**BARBARA TAGLIARINO**
**April 28, 2006**

Page 6

1      Q.    All right.  And did you speak with

2   anyone in order to prepare for today's

3   deposition?

4      A.    Yes.

5      Q.    Okay.  With whom did you speak?

6      A.    Chris.

7      Q.    Did you make any notes in preparation

8   for today's deposition?

9      A.    No.

10     Q.    And did you bring any documents with

11   you?

12     A.    No.

13     Q.    Okay.  Have you ever been deposed

14   before?

15     A.    Yes.

16     Q.    And what was that for?

17     A.    Uh.  An associate that was terminated

18   from Sears.

19     Q.    Okay.  Was that an associate

20   terminated from the Automotive Department, or

21   somewhere else?

22     A.    Full line stores.

23     Q.    A little background information.

24   Where do you live now?

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

**BARBARA TAGLIARINO**
**April 28, 2006**

Page 7

1       A.    Farmington, Connecticut.

2       Q.    **Okay.  And educational background.**

3    **Where were you educated?**

4       A.    Buffalo, New York.

5       Q.    **High school?  College?**

6       A.    Bishop McMahon High School, and Bryant

7    & Stratton Community College, Buffalo,

8    New York.

9       Q.    **And where are you currently employed?**

10      A.    Sears, Burlington, Mass.

11      Q.    **And prior to being employed at the**

12   **Burlington store, where did you work?**

13      A.    Saugus, Mass.

14      Q.    **When did you leave the job at Saugus**

15   **to move on to Burlington?**

16      A.    Two months ago.

17      Q.    **And what is your current position with**

18   **Sears?**

19      A.    Store manager.

20      Q.    **And how long have you been in that**

21   **position?**

22      A.    Seven years.

23      Q.    **I believe that some of the documents**

24   **we've received refer to you as general manager;**

**BARBARA TAGLIARINO**
**April 28, 2006**

Page 8

1    is that correct?

2        A.    It's the same.

3        Q.    The same thing, okay.  To your

4    knowledge, does Sears have an

5    anti-discrimination policy?

6        A.    Yes.

7        Q.    Okay.  And could you tell me what that

8    policy consists of?

9        A.    Uh.

10       Q.    If you know.

11       A.    Yeah, I don't know.

12       Q.    Okay.  As part of your duties as

13   manager of a store, is there something that you

14   regularly do to insure compliance with the

15   anti-discrimination policy?

16       A.    Sears has a Code of Conduct policy.  I

17   think that's included in that.  And I think

18   yearly it's signed by the associates.

19       Q.    Okay.  And assuming-- I'm sorry.  At

20   the Automotive Department, there are supervisors

21   who work on a regular basis.  Did those people

22   also receive training in the anti-discrimination

23   policy?

24       A.    Yes.

**BARBARA TAGLIARINO**
**April 28, 2006**

Page 9

1      Q.   Okay.  And are there signs posted in

2   Sears that inform employees of the

3   anti-discrimination policy?

4      A.   Yes.

5      Q.   Okay.  And if someone happened to

6   lodge a complaint about inappropriate racial or

7   ethic slurs, is that something that you would

8   want to know about?

9      A.   Yes.

10      Q.   And if you have received those types

11   of complaints in the past, what have you done

12   about them?

13      A.   I get in touch with my district

14   manager in Human Resource, Corporate Sears, and

15   then proceed from that.

16      Q.   Okay.  And is the policy with the

17   upper level management clearly articulated

18   somewhere; in other words, what you're supposed

19   to do?  Is that laid out in the policy?

20      A.   It's laid out from the Human Resource

21   Department, Corporate Sears.

22      Q.   Okay.  Who decides whether to hire an

23   applicant for employment at any given Automotive

24   Department?  Actually, let's stick to the Saugus

**BARBARA TAGLIARINO**
**April 28, 2006**

1    store.  I'm sorry.  Who would have decided

2    whether to hire an applicant?

3        A.    If it's full line stores, it would be

4    my assistant managers or myself.

5        Q.    Do you know Eric Souvannakane?

6        A.    Yes.

7        Q.    Okay.  And do you know who hired him?

8        A.    Anthony Cieri, C-I-E-R-I.

9        Q.    Do you know if Mr. Cieri is still

10   employed with Sears, Saugus?

11       A.    Yes, he is.

12       Q.    Do you know anything about

13   Mr. Souvannakane's work performance history?

14       A.    No.

15       Q.    Did you ever receive any reports from

16   subordinates, Mr. Cieri, or others about his

17   performance history?

18       A.    No.

19       Q.    Are there any criteria either within

20   the Automotive Department or full line stores

21   for evaluating an employees' performances?

22       A.    Yes.

23       Q.    And are those based on specific

24   policies?

**BARBARA TAGLIARINO**
**April 28, 2006**

Page 11

1      A.    Yes.

2      Q.    Okay.  How often would you receive

3   reports from the Automotive Department

4   supervisors about work employees' performances?

5      A.    I would not.

6      Q.    Okay.  Have you ever heard certain

7   employees in the Automotive Department at Sears,

8   Saugus complain that employees who work hard are

9   fired, and those who are lazy are kept on?

10     A.    No.

11                       MS. NETSKI:  Objection to

12   the form.

13     Q.    (By Mr. Olson)  Do you recall calling

14   Eric Souvannakane into your office on September

15   29th, 2003?

16     A.    Somewhat.

17     Q.    Okay.  Do you know why you called him

18   into the office on that date?

19     A.    To terminate him.

20     Q.    I think this was the prior one.  There

21   were actually two incidents.

22     A.    I don't remember.

23     Q.    Okay.  Do you remember that there were

24   two different times when you called him into

**BARBARA TAGLIARINO**
**April 28, 2006**

Page 12

1    your office?

2         A.    No.

3         Q.    Okay.  Do you recall the substance of

4    any conversation you might have had with

5    Mr. Souvannakane at that time?

6         A.    No.

7         Q.    Okay.  Do you remember if he denied

8    that he ever swore at customers?

9         A.    No.

10        Q.    Okay.  Did you remember warning

11   Mr. Souvannakane that swearing at customers is

12   inappropriate behavior?

13        A.    I don't remember.

14        Q.    Okay.  Excuse me.

15                    MR. OLSON:  At this time I

16   would like to mark this as Exhibit 1 for

17   identification purposes.

18                    (Exhibit No. 1 was marked

19   for identification)

20        Q.    (By Mr. Olson)  Would you like to look

21   at the original?

22        A.    (Complying)

23        Q.    Do you see your name on this document?

24        A.    Yes.

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

**BARBARA TAGLIARINO**
**April 28, 2006**

Page 13

1      Q.   Is this the only record that Sears

2    would have that Mr. Souvannakane received for

3    swearing at customers?

4      A.   I don't know.

5      Q.   Okay.  Do you know who it is that

6    signed this document in addition to

7    Mr. Souvannakane?

8      A.   It looks like Anthony Cieri.

9      Q.   I'm sorry.  Is it Ciera or Cieri?

10     A.   Cieri.

11     Q.   Okay.  Could you explain why you

12   wouldn't have signed this document personally if

13   your name is on it?

14     A.   Because Anthony has full authorization

15   to discipline his associates.

16     Q.   Okay.  So Mr. Cieri has the authority

17   to discipline.  Does he also have the authority

18   to fire?

19     A.   Yes.

20     Q.   Okay.  So Mr. Souvannakane did not

21   necessarily have to come to your office in order

22   to be terminated; is that correct?

23     A.   Depending on the situation.

24     Q.   Okay.  Do you recall whether you have

BARBARA TAGLIARINO
April 28, 2006

Page 14

1    ever warned any other employees about swearing

2    at customers?

3         A.    I don't remember.

4         Q.    Okay.  Generally speaking, what kind

5    of supervision is exercised over employees

6    working in the Auto Department?

7                        MS. NETSKI:   Objection.

8    But you can answer.

9         A.    Umm.  Anthony Cieri is the store

10   manager of Auto.  He has full autonomy as to

11   what goes on in the Auto Center.

12        Q.    (By Mr. Olson)  Do you know whether

13   Mr. Cieri has knowledge of what any particular

14   tech is doing at any one time?

15                        MS. NETSKI:   Objection.

16   You can answer.

17        A.    I don't know.

18        Q.    (By Mr. Olson)  Okay.  Do you know if

19   certain tasks are assigned by Mr. Cieri during

20   the course of a day?

21        A.    I don't know.

22        Q.    Do you know whether individual techs

23   have a certain amount of freedom in terms of

24   what task they perform on a given day?

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

**BARBARA TAGLIARINO**
**April 28, 2006**

Page 15

1       A.    I don't know.

2       Q.    Okay.  Do you recall an incident in

3    the Tech Department where an employee allegedly

4    fought with a customer and wound up injuring a

5    female Sears employee?

6       A.    I don't remember.

7       Q.    Okay.  Do you recall whether a female

8    employee ever came into your office to complain

9    about being hit during the course of that

10   incident?

11      A.    No.

12      Q.    Okay.  Do you recall whether any

13   employees were fired as a result of that

14   physical altercation?

15      A.    No.

16      Q.    Do you recall if you have ever taken

17   any steps in the Sears store to try and lighten

18   the tensions between employees and customers?

19              MS. NETSKI:  Objection.

20   You can answer.

21      A.    No.

22      Q.    (By Mr. Olson)  Do you have a policy

23   of writing out witness statements and then

24   having witnesses sign the statements?

**BARBARA TAGLIARINO**
**April 28, 2006**

Page 16

1    A.    Yes.

2    Q.    Okay.  And what is that policy based

3    on?  In other words, when would you do something

4    like that?

5    A.    Depending on the situation that

6    occurred between associates or customers.

7    Q.    Okay.

8    A.    Accidents.

9                    MR. OLSON:  I would like to

10   mark this as Exhibit No. 2 for identification.

11                   (Exhibit No. 2 was marked

12   for identification)

13   Q.    (By Mr. Olson)  Do you recognize this

14   document?

15   A.    No.

16   Q.    Okay.  If you look at the ninth line

17   down on this document, it's the line that begins

18   with the words, "to talk to management".

19   A.    Eh-heh.

20   Q.    And then the next sentence says, "Andy

21   spoke to the customer to calm her down."  Do you

22   see that?

23   A.    Yes.

24   Q.    Do you also see at the bottom where it

**BARBARA TAGLIARINO**
**April 28, 2006**

Page 17

1   says it looks like Andy DiGaetano's signature?

2       A.   Yes.

3       Q.   Is this an example of a time when

4   someone at Sears would have written out a

5   witness statement and then have the witness

6   sign?

7       A.   Yes.

8                       MR. OLSON:  I would like to

9   mark this as Exhibit No. 3 for identification.

10                      (Exhibit No. 3 was marked

11  for identification)

12      Q.   (By Mr. Olson)  Do you recognize this

13  document, Ms. Tagliarino?

14      A.   No.

15      Q.   If you turn to the second page of this

16  document, do you see where it says, "Written

17  with permission of Jose Hernandez to John Reid

18  and William Sullivan", and then an arrow points

19  to their signatures, it looks like, down below.

20      A.   Yes.

21      Q.   Okay.  Is this another example of a

22  time when you may have filled out a witness

23  statement and then have the witness sign?

24                      MS. NETSKI:  Objection.

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

BARBARA TAGLIARINO
April 28, 2006

Page 18

1    There's no evidence that she filled out this

2    statement.

3                    MR. OLSON:  Can she

4    answer?

5        A.    The question again, please?

6        Q.    (By Mr. Olson)  You spoke earlier how

7    there's a policy at Sears where you will fill

8    out witness statements and then have the witness

9    sign.  Would this be another example?

10       A.    Yes.

11       Q.    Thank you.  Do you know John Reid?

12       A.    Yes.

13       Q.    And is John Reid still employed at

14   Sears, Saugus, as far as you know?

15       A.    John Reid is the Auto Center district

16   manager.

17       Q.    Does that mean that he supervises

18   Mr. Cieri?

19       A.    Yes.

20       Q.    Okay.  Do you know how far his reach

21   would extend; in other words, how far his

22   district is?

23       A.    It is Boston and Nashua.

24       Q.    Okay.  So any stores within that

**BARBARA TAGLIARINO**
**April 28, 2006**

Page 19

1    geographical area; is that correct?

2        A.    Yes.

3        Q.    **Thank you.**

4                    MR. OLSON:  I would like to

5    mark this as Exhibit No. 4 for identification.

6                    (Exhibit No. 4 was marked

7    for identification)

8        Q.    **(By Mr. Olson)  Have you ever seen**

9    **this document before?**

10       A.    No.

11       Q.    **If you would like, look on lines 3 and**

12    **4 of this document?**

13       A.    (Complying)

14       Q.    **Do you see where it says, "The spiller**

15    **required Sears to hire a hazardous waste company**

16    **which cost Sears approximately three thousand**

17    **dollars"?**

18       A.    Yes.

19       Q.    **And do you see where that looks like a**

20    **narrative for Patrolman Gary E. Mansfield?**

21                   MS. NETSKI:  Objection.

22    That's what it says.

23       Q.    **(By Mr. Olson)  On the top of the**

24    **document?**

**BARBARA TAGLIARINO**
**April 28, 2006**

Page 20

1      A.   Yes.

2      Q.   **Thank you.  Do you think the figure of**

3   **three thousand dollars was accurate?**

4      A.   I don't know.

5      Q.   **Okay.**

6                    MR. OLSON:  I would like to

7   mark this as Exhibit No. 5 for identification.

8                    (Exhibit No. 5 was marked

9   for identification)

10      Q.   **(By Mr. Olson)  Referring you to the**

11   **second page of this document at the bottom--**

12      A.   (Complying)

13      Q.   **-- where it says, Total, and an amount**

14   **listed there for four thousand four hundred**

15   **eighty-three dollars and sixty-five cents, do**

16   **you see that?**

17      A.   Yes.

18      Q.   **Okay.  And do you recognize this**

19   **document?**

20      A.   No.

21      Q.   **Okay.  Did you have anything to do**

22   **with contacting ENPRO Services to perform a**

23   **clean-up at Sears?**

24      A.   No.

**BARBARA TAGLIARINO**
**April 28, 2006**

Page 21

1    Q.    Okay.  So you would have no way of

2    explaining the discrepancy between the three

3    thousand-dollar cost and this four thousand four

4    hundred eighty-three dollar cost; is that right?

5    A.    Yes.

6    Q.    You spoke earlier about there being a

7    discrimination policy at Sears-- I'm sorry--

8    anti-discrimination policy at Sears.  Are there

9    any standards, written or otherwise, dealing

10   with termination or disciplinary policies at

11   Sears?

12   A.    Yes.  There's an associate handbook.

13   Q.    And if there's a handbook, is that

14   handbook given to employees when they're first

15   hired?

16   A.    Yes.

17   Q.    And does this handbook contain

18   information about both the anti-discrimination

19   policy and the hiring and firing policy?

20   A.    Yes.

21   Q.    Thank you.  Are there posters around

22   Sears that inform employees about the discharge

23   or disciplinary policies?

24   A.    No.

**BARBARA TAGLIARINO**
**April 28, 2006**

Page 22

1        Q.    Okay.  And in the handbook, are
2    employees told about what particular offenses
3    could result in discharge or discipline?
4        A.    Yes.
5        Q.    Okay.  And does the handbook also
6    inform them about how many different warnings or
7    notices they would receive before being
8    terminated?
9        A.    I don't remember.
10        Q.    Okay.  I think you said earlier that
11    Mr. Cieri as manager of the Automotive
12    Department has the authority to fire employees
13    on his own; is that correct?
14        A.    Yes.
15        Q.    And did the manager recommend to you
16    that Mr. Souvannakane be fired?
17        A.    Yes.
18        Q.    Okay.  And did you make the decision
19    to fire him based on Mr. Cieri's recommendation?
20        A.    No.
21        Q.    Okay.  Then upon what did you make the
22    decision?
23        A.    Corporate Human Resource Department.
24        Q.    And who did you speak with at Human

**BARBARA TAGLIARINO**
**April 28, 2006**

Page 23

1   Resources?

2       A.   I don't remember.

3       Q.   Did you have occasion to call Human

4   Resources, or did they contact you for some

5   reason?

6       A.   No.  We called them.

7       Q.   Did you terminate Mr. Souvannakane

8   without notice?

9       A.   Yes.

10      Q.   Okay.  And do you usually give notice

11  to employees before terminating them?

12      A.   No.

13      Q.   Okay.  Why did you find it necessary

14  to terminate Mr. Souvannakane without notice in

15  this case?

16      A.   Can you explain what you mean by--

17      Q.   Sure.  Was the termination to

18  discharge Mr. Souvannakane based on Human

19  Resources' call to you--

20      A.   Yes.

21      Q.   -- to do so?  Did anyone conduct an

22  investigation into the allegations against

23  Mr. Souvannakane before you decided to fire him?

24      A.   Corporate HR does that.

**BARBARA TAGLIARINO**
**April 28, 2006**

Page 24

1      Q.    And do you know who it was

2    specifically that did the investigation?

3      A.    No.

4      Q.    When did you first hear of the spill

5    at the Sears Automotive Department?

6      A.    A couple of days after.

7      Q.    Okay.  And did you consider the spill

8    a major incident?

9      A.    Yes.

10      Q.    Okay.  You said that you only heard

11    about it a couple of days afterward.  If it was

12    a major incident, would you have wanted to know

13    about it sooner?

14      A.    I was off all week.

15      Q.    Okay.  So then you never had occasion

16    to view the results of the spill; is that

17    correct?

18      A.    No.  Correct.

19      Q.    Did anyone tell you about witnesses

20    who may have seen the oil spill?

21      A.    No.

22      Q.    Okay.  Do you know William Sullivan?

23      A.    Yes.

24      Q.    And do you know what his position is

**BARBARA TAGLIARINO**
**April 28, 2006**

Page 25

1    at Sears?

2        A.    He's the District Loss Prevention

3    Manager for Boston.

4        Q.    Okay.  Have you ever received any

5    complaints about Mr. Sullivan attempting to

6    coerce witnesses into testifying falsely?

7        A.    No.

8        Q.    Would it concern you if you did

9    receive such complaints?

10       A.    Yes.

11       Q.    Have you heard that Mr. Hernandez, the

12   witness who allegedly--  who signed the

13   complaint-- sorry-- the statement alleging that

14   Mr. Souvannakane had spilled the oil, later told

15   Mr. Souvannakane, "I'm not going to lie for

16   Sears.  I'm out of here"?

17                    MS. NETSKI:  Objection.

18                    MR. CLOHERTY:  Objection.

19       A.    No.

20       Q.    (By Mr. Olson)  Okay.  Were you ever

21   told what the spill consisted of in the

22   Automotive Center?

23       A.    No.

24       Q.    Okay.  Do you know what Sears normally

**BARBARA TAGLIARINO**
**April 28, 2006**

Page 26

1    does with its waste oil?

2        A.    No.

3        Q.    Do you know whether Sears pays an

4    independent company to come and pick up the

5    waste oil?

6        A.    I don't know.

7        Q.    Okay.  Do you know who would be in

8    charge of that?

9        A.    Anthony Cieri.

10       Q.    Okay.  Do you know whether or not any

11   other property was damaged during the course of

12   the oil spill?

13       A.    I don't know.

14       Q.    Okay.  Do you know Alicia Coviello?

15       A.    Yes.

16       Q.    I believe that's C-O-V-I-E-L-L-O.  Is

17   that correct?

18       A.    I think so.

19       Q.    Do you know her position at Sears?

20       A.    She was a Loss Prevention associate.

21       Q.    Okay.  Is she no longer working at

22   Sears?

23       A.    Correct.

24       Q.    Okay.  What is your evaluation of

**BARBARA TAGLIARINO**
**April 28, 2006**

Page 27

1    Ms. Coviello's work performance while she worked

2    at Sears?

3        A.    Excellent.

4        Q.    Okay.  Did you ever receive any

5    complaints about Ms. Coviello's work

6    performance?

7        A.    No.

8        Q.    Did you hear that after Miss Coviello

9    heard about the oil spill in the Automotive

10   Department, that she went to the Automotive

11   Department with a roll of paper towels?

12       A.    No.

13       Q.    Do you have any reason to believe that

14   Miss Coviello may have given false testimony

15   against Mr. Souvannakane?

16       A.    No.

17       Q.    Do you know about a spill at the Sears

18   Automotive Center that happened over the past

19   couple of months?

20       A.    No.

21       Q.    Okay.

22                    MR. OLSON:  That's it.

23                    THE WITNESS:  Okay.

24                    MR. OLSON:  Any questions?

**BARBARA TAGLIARINO**
**April 28, 2006**

Page 28

1              MS. NETSKI:   John?

2              MR. CLOHERTY:   Nothing.

3              MR. OLSON:   Thanks very

4    much.

5

6        (Deposition concluded at 10:35 a.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

**BARBARA TAGLIARINO**
**April 28, 2006**

Page 29

1      I, CHARLOTTE C. ROSATI, a Notary Public in

2  and for the Commonwealth of Massachusetts, do

3  hereby certify that BARBARA TAGLIARINO came

4  before me on the 28th day of April, 2006, at

5  Andover, Massachusetts, and was satisfactorily

6  identified and duly sworn by me to testify to

7  the truth and nothing but the truth as to her

8  knowledge touching and concerning the matters in

9  controversy in this cause; that the deponent was

10  thereupon examined upon her oath, and said

11  examination reduced to writing by me; and that

12  the statement is a true record of the testimony

13  given by the deponent, to the best of my

14  knowledge and ability.

15      I further certify that I am not a relative

16  or employee of counsel or attorney for any of

17  the parties, nor a relative or employee of such

18  parties, nor financially interested in the

19  outcome of the action.

20

21

22  WITNESS MY HAND this 28th day of April, 2006

23  Charlotte C. Rosati, Notary Public

24  My Commission expires:      January 19, 2007

**BARBARA TAGLIARINO**
**April 28, 2006**

Page 30

1   Today's date:       April 28, 2006

2   To:                 Kurt Olson, Esq.

3   Copied to:          Christine M. Netski, Esq.

4   Copied to:          John J. Cloherty III, Esq.

5   From:               Charlotte C. Rosati, RPR

6   Deposition of:      Barbara Tagliarino

7   Taken:              April 28, 2006

8   Action:             SOUVANNAKANE

9                       vs. SEARS, ROEBUCK

10

11

12        Enclosed is a copy of the deposition of

13   Barbara Tagliarino.  Pursuant to the Rules of

14   Civil Procedure, the deponent has thirty days to

15   sign the deposition from today's date.

16        Please have Ms. Tagliarino sign the

17   enclosed signature page.  If there are any

18   errors, please have her mark the page, line and

19   error on the enclosed correction sheet.  The

20   deponent should not mark the transcript itself.

21   This addendum should be forwarded to all

22   interested parties.

23        Thank you for your cooperation in this

24   matter.

**BARBARA TAGLIARINO**
**April 28, 2006**

```
                                          Page 31
 1              UNITED STATES DISTRICT COURT

 2            FOR THE DISTRICT OF MASSACHUSETTS

 3                       C.A. NO. 04-12164-MLW

 4

 5

 6    ERIC SOUVANNAKANE,

 7               Plaintiff

 8    v.

 9    SEARS, ROEBUCK AND CO.,

10               Defendant

11

12

13

14

15         I, BARBARA TAGLIARINO, do hereby certify

16    under the pains and penalties of perjury that

17    the foregoing testimony is true and accurate, to

18    the best of my knowledge and belief.

19         WITNESS MY HAND this    day of

20    2006.

21

22                        BARBARA TAGLIARINO

23    CCR

24
```

**BARBARA TAGLIARINO**
**April 28, 2006**

```
                                                    Page 32

1                        CORRECTION SHEET

2    DEPONENT:      Barbara Tagliarino

3    CASE:          Souvannakane v. Sears, Roebuck

4    DATE TAKEN:    April 28, 2006

5

6    PAGE   LINE    CHANGE AND CORRECTION AND REASON

7    -----------------------------------------------------------

8    -----------------------------------------------------------

9    -----------------------------------------------------------

10   -----------------------------------------------------------

11   -----------------------------------------------------------

12   -----------------------------------------------------------

13   -----------------------------------------------------------

14   -----------------------------------------------------------

15   -----------------------------------------------------------

16   -----------------------------------------------------------

17   -----------------------------------------------------------

18   -----------------------------------------------------------

19   -----------------------------------------------------------

20   -----------------------------------------------------------

21   -----------------------------------------------------------

22   -----------------------------------------------------------

23   -----------------------------------------------------------

24   -----------------------------------------------------------
```

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA    Worcester, MA    Boston, MA    Lawrence, MA    Providence, RI