# Exhibit A

## Page 1

```
                        Volume: I
                        Pages: 1-212
                        Exhibits: 1-12
        UNITED STATES DISTRICT COURT
        FOR THE DISTRICT OF MASSACHUSETTS
- - - - - - - - - - - - - - - - - x
ERIC SOUVANNAKANE,

        Plaintiff,      Civil Action

    v.              No. 0412164MLW

SEARS, ROEBUCK & CO., WILLIAM
SULLIVAN, RICHARD SPELLMAN,
BARBARA TAGLIARINO, KEVIN SULLIVAN,
ALICIA COVIELLO, GARY MANSFIELD,
    Defendants.
- - - - - - - - - - - - - - - - - x

    DEPOSITION of ERIC SOUVANNAKANE, a witness
called by counsel for the Defendants Sears
Roebuck & Co., William Sullivan, Richard
Spellman, Barbara Tagliarino, Kevin Sullivan and
Alicia Coviello taken pursuant to the applicable
provisions of the Massachusetts Rules of Civil
Procedure, before Toni F. Beckwith, Registered
Merit Reporter, CSR No. 111293 and Notary Public
in and for the Commonwealth of Massachusetts, at
the Offices of Sugarman, Rogers, Barshak &
Cohen, P.C., 101 Merrimac Street, Boston,
Massachusetts, on Wednesday, February 8, 2006,
commencing at 10:11 a.m.
```

## Page 2

```
 1  APPEARANCES:
 2
 3      KURT S. OLSON, ESQUIRE
        500 Federal Street
 4      Andover, Massachusetts 01801
        Counsel for the Plaintiff
 5
 6
        SUGARMAN, ROGERS, BARSHAK & COHEN, P.C.
 7      By Liza J. Tran, Esquire
        and
 8      Christine M. Netski, Esquire
        and
 9      Sulekeyn Walker, Esquire
        101 Merrimac Street
10      Boston, Massachusetts 02114
        Counsel for Sears, Roebuck & Co.,
11      William Sullivan, Richard Spellman,
        Barbara Tagliarino, Kevin Sullivan
12      and Alicia Coviello
13
14      PIERCE, DAVIS & PERRITANO, LLP
        By John J. Cloherty, III, Esquire
15      Ten Winthrop Square
        Boston, Massachusetts 02110
16      Counsel for Gary Mansfield
17
18  (Exhibits retained by Attorney Tran)
19
20
21
22
23
24
```

## Page 3

```
 1              INDEX
    Deposition of:  Direct Cross Redirect Recross
 2
    ERIC SOUVANNAKANE
 3
    By Ms Tran  5        206
 4
    By Mr. Cloherty    170
 5
 6
 7
 8          EXHIBITS
    No.                 Page
 9
10  1   Plaintiff's Response to
        Defendant Sears, Roebuck & Co.,
11      First Set of Interrogatories    30
12
    2   Plaintiff's Response to
13      Defendant Sears, Roebuck & Co.,
        First Request for Production
14      of Documents            30
15
    3   Plaintiff's Response to
16      Defendant Gary Mansfield's
        First Set of Interrogatories    30
17
18  4   Plaintiff's Response to
        Defendant Gary Mansfield's
19      First Request for Production
        of Documents            30
20
21  5   Handwritten Note dated 10/2/03    100
22
    6   Documentation of Performance
23      Issues            100
24
```

## Page 4

```
 1
            (Exhibits, continued)
 2
    No.                     Page
 3
 4
    7   Handwritten Note dated 10/14/03    100
 5
 6  8   Handwritten Note dated 1/15/03    100
 7  9   Preface            134
 8  10  Plaintiff's Disclosure
        Pursuant to LR 26.2(A)
 9      & LR 26.1(B)(1)&(2)        158
10  11  Defendant Gary Mansfield's
        Local Rule 26.2(A) Disclosure    171
11
12  12  Formal Trespass Notice        206
13
14
15
16
17
18
19
20
21
22
23
24
```

SHEA COURT REPORTING SERVICES
617-227-3097

Page 5

1       PROCEEDINGS
2       MS. TRAN: Do you want to agree to the
3   usual stipulations to reserve objections, except
4   as to form, until trial? Do you want to waive
5   the signing, or do you want him to read and
6   sign?
7       MR. OLSON: I want him to read and
8   sign.
9       MS. TRAN: We can waive the notary.
10      Q. My name is Liza Tran. I represent
11  Sears Roebuck & Co., as well as Richard
12  Spellman, William Sullivan, Kevin Sullivan,
13  Alicia Coviello, Barbara Tagliarino, which I
14  believe is the laundry list of Sears employees
15  that are named individually in the lawsuit that
16  you have filed.
17      Have you ever been deposed before?
18      A. No.
19      Q. Just some very brief information on
20  how the deposition will proceed. I'm going to
21  ask you a series of questions. Everything we
22  say is being recorded by the court reporter over
23  here.
24      I'm going to ask that you let me

Page 6

1   finish asking my question in its entirety before
2   you answer, even if you know what I'm going to
3   say, and I will let you finish your answer
4   before I ask another question. This way the
5   court reporter can record what we're both
6   saying. She can't record us if we're talking
7   over each other.
8       Also I need you to keep your voice up
9   so she can hear you. If at any time you need to
10  take a break, let me know. If you need to talk
11  to your counsel, use the rest room, I'm happy to
12  accommodate you. I'd ask that you answer
13  whatever question is pending at that moment
14  before we break at any time.
15      A. All right.
16      Q. If I ask you any questions that you
17  don't understand or you're not sure of the
18  answer, feel free to let me know and ask me to
19  repeat the question. I'm happy to do that. You
20  don't have to guess at what I'm asking.
21      If for whatever reason you don't
22  understand what I'm saying, just stop me and
23  I'll happily repeat the question, okay?
24      A. Sure.

Page 7

1       Q. Also, because everything is being
2   recorded, I'm going to need you to respond
3   verbally. So you can't shrug or nod your head
4   because she can't record that if she's writing
5   down what we're saying. So you have to answer
6   verbally even if normally you shrug your head to
7   answer.
8       A. Understood.
9       Q. Can you please state your full name
10  for the record?
11      A. Eric Souvannakane.
12      Q. Do you have a middle name?
13      A. No.
14      Q. Can you spell your last name?
15      A. S O U V A N N A K A N E.
16      Q. And what is your date of birth?
17      A. October 25, 1982.
18      Q. Where were you born?
19      A. Salem, Massachusetts.
20      Q. Where do you currently reside?
21      A. Where am I living?
22      Q. Yes.
23      A. 12 Eutaw Ave., Lynn, Mass.
24      Q. How long have you lived at 12 Eutaw

Page 8

1   Ave.?
2       A. About four and a half years now.
3       Q. Is it a house or an apartment?
4       A. It's an apartment building.
5       Q. Where did you live before that
6   residence?
7       A. I lived on Endicott Street.
8       Q. Do you remember the actual address?
9       A. No, I don't.
10      Q. Do you remember how long you
11  approximately lived on Endicott Street?
12      A. About three years.
13      Q. And what town or city is Endicott
14  Street located in?
15      A. Lynn, Massachusetts.
16      Q. Do you remember where you lived before
17  you lived on Endicott Street?
18      A. Yes. 90 Neptune Street.
19      Q. Where is 90 Neptune Street?
20      A. Lynn, Mass.
21      Q. Do you remember approximately how long
22  you lived at 90 Neptune Street?
23      A. I believe one year.
24      Q. Are you married?

2 (Pages 5 to 8)

Page 9

1    A. No.
2    Q. Do you have any children?
3    A. I have one daughter.
4    Q. What is her name?
5    A. Zuriah, Z U R I A H.
6    Q. How old is Zuriah?
7    A. One years old.
8    Q. Does she live with you?
9    A. Yes.
10   Q. Does anybody else live with you
11   besides your daughter?
12   A. The mother of the child.
13   Q. What is her name?
14   A. Sarah.
15   Q. What is Sarah's last name?
16   A. McDonald.
17   Q. Can you spell her last name?
18   A. M C D O N A L D.
19   Q. What is your educational background?
20   A. The automotive industry.
21   Q. Did you go to high school?
22   A. Yes, I did.
23   Q. Did you graduate?
24   A. Yes, I did.

Page 10

1    Q. Did you go to college or any post high
2    school?
3    A. No, I haven't.
4    Q. Have you ever done any trainings or
5    seminars or anything for the automotive work
6    that you do?
7    A. Yes, I did.
8    Q. What trainings have you done?
9    A. Automotive training, the vocational
10   building in the high school facility.
11   Q. Is this something you did while you
12   were in high school?
13   A. Yes.
14   Q. Have you done anything post high
15   school in terms of trainings for your
16   profession?
17   A. Jobs, local jobs.
18   Q. But no other educational courses,
19   seminars, trainings, anything like that?
20   A. No.
21   Q. How long have you been in the
22   automotive industry?
23   A. About seven years.
24   Q. What year did you graduate high

Page 11

1    school?
2    A. '02.
3    Q. So you were working in the automotive
4    industry while you were in high school?
5    A. Yes.
6    Q. What do you do in the automotive
7    industry?
8    A. Right now?
9    Q. Yes.
10   A. I'm a car salesman right now.
11   Q. Where are you a car salesman?
12   A. Ira Toyota in Danvers.
13   Q. How long have you been employed by Ira
14   Toyota?
15   A. Since October.
16   Q. October of what year?
17   A. '05.
18   Q. Is that all you do at Ira Toyota, is
19   sell cars?
20   A. Sales consultant, yeah.
21   Q. Do you make a set salary at Ira Toyota
22   or do you make a commission?
23   A. Commission. And there is a set
24   salary.

Page 12

1    Q. So it's both, combination?
2    A. Yes.
3    Q. What is your salary there?
4    A. It's 250.
5    Q. Can you be more explicit?
6    A. $250 a week.
7    Q. What percentage of commission do you
8    get for any cars that you sell?
9    A. 15 percent.
10   Q. Have you sold many cars since you've
11   been there, since October?
12   A. A good amount.
13   Q. Would you be able to estimate
14   approximately?
15   A. Roughly 17 a month.
16   Q. 17 cars per month?
17   A. Yes.
18   Q. When you say you get 15 percent
19   commission, is that 15 percent of the total
20   purchase price of the car?
21   A. 15 percent of the total gross that's
22   held.
23   Q. That's held by who?
24   A. By myself.

3   (Pages 9 to 12)

Page 13

1    Q. Can you explain how that works to me?
2    A. The car is sold at invoice -- well,
3    there's a price at invoice, and on top of that
4    there's an equipment charge. And I get a
5    percentage of the equipment charge. whatever
6    percentage I get to hold from that.
7    Q. What is a standard equipment charge on
8    a --
9    A. Depending on the make, model of
10   vehicle, it's all different. Anywhere from
11   $3,000 to $7,000.
12   Q. When you say you get 15 percent of how
13   much you get to hold off of that, what do you
14   mean by hold it, hold the equipment charge?
15   A. Whatever a customer agrees to a
16   figure.
17   Q. I haven't bought many cars in my
18   lifetime, so you'll have to excuse me. What do
19   you mean by whatever they agree to a figure?
20   A. Say the car is MSRP at 30 grand. An
21   invoice --
22   MR. OLSON: Manufacturer's suggested
23   retail price.
24   MS. TRAN: Thank you.

Page 14

1    A. And the invoice price is at 25,
2    there's a $5,000 gross held in the vehicle. And
3    from there whatever I sell the car at, between
4    25 and 30 is what I make out of the deal, 15
5    percent.
6    Q. So the difference between the MSRP and
7    then what you sell the car at you make 15
8    percent of that difference?
9    A. Yes.
10   Q. Where were you employed before you
11   were employed at Ira Toyota?
12   A. Pride Chevrolet.
13   Q. Where is Pride Chevrolet located?
14   A. Lynn. Mass.
15   Q. How long were you employed at Pride
16   Chevrolet?
17   A. Year and a half.
18   Q. What did you do there?
19   A. Auto body technician.
20   Q. What does that entail?
21   A. Bodywork on vehicles.
22   Q. Just bodywork, no engine work?
23   A. No.
24   Q. Did you make a set salary?

Page 15

1    A. Yes.
2    Q. What was your salary while you were
3    there?
4    A. $450.
5    Q. Per week?
6    A. Yes.
7    Q. Did you work a full-time schedule?
8    A. 40 hours a week.
9    Q. Did you work at Pride Chevrolet right
10   up until the time you took the job at Ira
11   Toyota?
12   A. No, I haven't.
13   Q. No?
14   A. No.
15   Q. So when did you leave Pride Chevrolet?
16   A. I left about in May.
17   Q. May of 2005?
18   A. Yeah.
19   Q. What did you do between the time that
20   you left Pride Chevrolet and the time you
21   started at Ira Toyota?
22   A. Collect unemployment.
23   Q. Were you terminated from Pride
24   Chevrolet?

Page 16

1    A. Laid off.
2    Q. What reasons were you given for the
3    layoff, if any?
4    A. It was slow.
5    Q. Was anybody else laid off besides you?
6    A. People were getting laid off once a
7    week. One person a week was getting laid off.
8    Q. For about how long?
9    A. I'd say for a good two months.
10   Q. So from May of 2005 until October of
11   2005 you collected unemployment as a result of
12   the layoff from Pride Chevrolet?
13   A. Correct.
14   Q. What did you do before you were
15   employed at Pride Chevrolet?
16   A. I was employed by Firestone Automotive
17   Shop.
18   Q. Do you remember when you started at
19   Pride Chevrolet?
20   A. February of '04.
21   Q. Do you remember for how long you were
22   employed at Firestone Automotive Shop?
23   A. About a month and a half. I left
24   Firestone in January.

4  (Pages 13 to 16)

Page 17

1      Q. January of what year?
2      A. About '05 -- '04.
3      Q. So you started there in December or
4  November of 2003?
5      A. November.
6      Q. Where is Firestone Automotive located?
7      A. Lawrence, Mass.
8      Q. What did you do while you were
9  employed by Firestone?
10     A. I was an automotive technician.
11     Q. What did that entail?
12     A. Maintenance work on vehicles,
13  tune-ups, and alignments.
14     Q. So unlike when you were at Pride
15  Chevrolet, this involved some engine work?
16     (Pause)
17     MR. OLSON: You need to respond.
18     A. Yes. I apologize.
19     Q. That's okay. Even those of us that do
20  this frequently often forget.
21     Did you have a set salary while you
22  were employed by Firestone?
23     A. It was a flat rate commission.
24     Q. Can you explain a flat rate commission

Page 18

1  to me?
2      A. Depending how many hours are given on
3  the job is what I get. Flat rate they give you
4  an hourly rate. And say the job is worth four
5  hours, you get four hours of what your pay is.
6      Q. By "the job," you mean the work that
7  you did on a particular car?
8      A. Yes.
9      Q. So they paid you an hourly rate for
10  however long it took you to complete each car?
11     A. Depending on how many hours they gave
12  you on that vehicle.
13     Q. Meaning they would set a limit as to
14  how much time it should take?
15     A. Yes.
16     Q. What was the hourly rate that you were
17  given?
18     A. $13.75.
19     Q. Per hour?
20     A. Yes.
21     Q. So is it safe to say the more cars you
22  were able to complete in a given day, the more
23  money you would make?
24     A. Yes.

Page 19

1      Q. Why did you leave Firestone?
2      A. Great distance from home, back and
3  forth.
4      Q. Where were you living at that point?
5      A. 12 Eutaw.
6      Q. That was in Lynn?
7      A. Lynn, Mass., yes.
8      Q. Is that the only reason you left
9  Firestone?
10     A. Yes.
11     Q. Did you leave voluntarily?
12     A. Please elaborate.
13     Q. Did you leave voluntarily or were you
14  fired or terminated?
15     A. Oh, I just left voluntarily.
16     Q. Where were you employed before you
17  were employed at Firestone?
18     A. Sears.
19     Q. How long were you employed at Sears?
20     A. A year and a couple of months.
21     Q. And by Sears, you mean the Sears
22  located where?
23     A. Saugus, Massachusetts.
24     Q. I'm going to skip over that one for

Page 20

1  now, because we're going to come back to it, and
2  go to the job that you held prior to your job at
3  Sears. Where was that?
4      A. The job before Sears?
5      Q. Yes.
6      A. Ledgewood Nursing Rehabilitation.
7      Q. Where is Ledgewood Nursing
8  Rehabilitation?
9      A. Beverly, Massachusetts.
10     Q. What did you do at Ledgewood Nursing
11  Rehabilitation?
12     A. Training for a certified nursing
13  assistant.
14     Q. Did you work as a certificate nursing
15  assistant, or were you training as a certified
16  nursing assistant?
17     A. Training.
18     Q. Did you get paid for that work?
19     A. Yes, I did.
20     Q. What was your salary while you were
21  employed there?
22     A. $12.
23     Q. Per hour?
24     A. Yes.

SHEA COURT REPORTING SERVICES
617-227-3097

Page 21

1    Q. What kind of work did you do at the
2  Ledgewood Nursing Rehab?
3    A. Take care of the elderly.
4    Q. What did that entail, generally?
5    A. Feed them, bathe them, help them out.
6    Q. How long were you employed there?
7    A. A little under two months.
8    Q. Do you remember when you left
9  Ledgewood?
10    A. June.
11    Q. Of what year?
12    A. I believe this is '03.
13      MR. OLSON: You'd better go back
14  another one.
15      MS. TRAN: Kurt, if you can let me...
16      MR. OLSON: Yes. Sorry.
17    Q. I'm confused then, because I doubt
18  it's June of 2003, so I want to clarify the year
19  because you left Sears in 2003, right?
20    A. I believe so.
21    Q. And you were employed by Sears for a
22  year and a half?
23    A. Then this is '02 then. This is while
24  I was in high school.

Page 22

1    Q. So you were employed at Ledgewood
2  before your employment at Sears, but they didn't
3  overlap; is that correct?
4    A. Correct.
5    Q. So approximately June of 2002 you left
6  Ledgewood?
7    A. Yes, 2002.
8    Q. Did you complete the training for the
9  certified nursing assistant?
10    A. Yes, I did.
11    Q. So are you now certified as a nursing
12  assistant?
13    A. Not really. no.
14    Q. Why are you not certified if you
15  completed the training?
16    A. It expired.
17    Q. So at some point you were certified as
18  a nursing --
19    A. Yes, I was.
20    Q. If you can let me finish, even though
21  you know what I'm going to ask you so she can
22  record.
23    A. All right.
24    Q. Did you ever do any other work as a

Page 23

1  nursing assistant besides your work at
2  Ledgewood?
3    A. No.
4    Q. Why did you leave Ledgewood?
5    A. It wasn't a job for me.
6    Q. Did you leave voluntarily or were you
7  terminated?
8    A. Voluntarily.
9    Q. Were you working at Ledgewood while
10  you were in high school?
11    A. Yes.
12    Q. During the time that you worked at
13  Ledgewood, did you do any other automotive work
14  during that time?
15    A. Other than the program in school?
16    Q. Right. Anything that you were
17  employed by an outside employer for?
18    A. No.
19    Q. Where were you employed prior to being
20  employed by Ledgewood Nursing Rehab?
21    A. I don't understand.
22    Q. Were you employed someplace else prior
23  to your work at Ledgewood?
24    A. No.

Page 24

1    Q. So that was your first job?
2    A. Oh, wait. Pep Boys.
3    Q. Pep Boys, P E P?
4    A. Yeah, P E P, boys.
5    Q. Where is Pep Boys?
6    A. Salem, Massachusetts.
7    Q. When were you employed by Pep Boys?
8    A. I want to say October.
9    Q. Of what year?
10    A. This is '01.
11    Q. Were you in high school at this time?
12    A. Yes.
13    Q. Do you remember approximately how old
14  you were?
15    A. 18.
16    Q. How long did you work at Pep Boys for?
17    A. Almost three months.
18    Q. Did you get that employment through
19  your school, or was it something that you got
20  separate from school?
21    A. Separate.
22    Q. What did you do while you were
23  employed at Pep Boys?
24    A. Maintenance technician.

SHEA COURT REPORTING SERVICES
617-227-3097

Page 25

1   Q. What did that entail?
2   A. Tires, oil changes, batteries.
3   Q. Did you receive a salary while you
4   were employed there?
5   A. Yes.
6   Q. What was that salary?
7   A. $400.
8   Q. Per week?
9   A. Per week.
10  Q. Why did you leave your employment at
11  Pep Boys?
12  A. Termination.
13  Q. What were you terminated for?
14  A. Being late.
15  Q. Was that the only reason you were
16  terminated?
17  A. Yes.
18  Q. How frequently were you late?
19  A. Out of a week -- I'd say twice a week
20  because of school.
21  Q. So was it the case that your school
22  schedule conflicted with your work schedule?
23  A. Yes. I didn't have a car at the time.
24  Q. How did you get to work?

Page 26

1   A. Walk.
2   Q. Have you ever been reprimanded at any
3   other job for being late?
4   A. No.
5   Q. Were you employed anywhere else prior
6   to your employment at Pep Boys?
7   A. Burger King. My first job.
8   Q. That was your first job?
9   A. Yes.
10  Q. Do you remember approximately how long
11  you were employed at Burger King?
12  A. No, I don't.
13  Q. Do you remember where that Burger King
14  was located?
15  A. Salem, Massachusetts.
16  Q. Did you leave that job voluntarily or
17  were you terminated?
18  A. Voluntarily.
19  Q. You previously testified that you're
20  currently employed as a car salesman at Ira,
21  correct?
22  A. Correct.
23  Q. Why did you decide to become a car
24  salesman as opposed to continuing on as an

Page 27

1   automotive technician?
2   A. It was still car business, but I
3   wanted to try something new.
4   Q. Is that the only reason that you
5   decided to do the car sales?
6   A. I'd say so.
7   Q. You'd say so?
8   A. It's more mental work than physical
9   work.
10  Q. If you wanted to, do you think you
11  would be able to get a job as an automotive
12  technician today?
13  A. Yes.
14  Q. Have you ever had any trouble getting
15  work as an automotive technician?
16  A. No.
17  Q. Do you like car sales?
18  A. Yes.
19  Q. Have you ever been involved in any
20  other civil lawsuits?
21  A. Yes.
22  Q. What were they? Let's take them one
23  at a time starting with the earliest one.
24  A. Car accident.

Page 28

1   Q. When approximately was the car
2   accident?
3   A. I don't remember.
4   Q. Do you remember the year?
5   A. No, I don't.
6   Q. Do you remember roughly how long ago
7   it was?
8   A. No -- yeah. Four, five years back.
9   I'm not quite sure.
10  Q. Were you driving or were you a
11  passenger in that accident?
12  A. A passenger. No. I was driving.
13  Q. Were you driving your own car or
14  somebody else's car?
15  A. It was my car.
16  Q. What car was it?
17  A. I apologize. I was a passenger.
18  Q. The first accident?
19  A. The first one I was a passenger.
20  Q. Were you injured as a result of that
21  accident?
22  A. Yes.
23  Q. Were there any fatalities as a result
24  of that accident?

7  (Pages 25 to 28)

Page 29

1       A. No, there wasn't.
2       Q. Did you file a lawsuit as a result of
3   that accident?
4       A. Yes, I did.
5       Q. Who did you sue?
6       A. I don't remember. The person that hit
7   us.
8       Q. What were your injuries as a result of
9   that accident?
10      A. Back and neck problems.
11      Q. Did you treat with anybody?
12      A. A chiropractor.
13      Q. Do you remember approximately how long
14  you treated with the chiropractor for?
15      A. No.
16      Q. Did you settle that lawsuit?
17      A. Yes.
18      Q. Do you remember for how much money?
19      A. No.
20      Q. Do you remember what year you settled
21  the lawsuit?
22      A. No.
23      Q. Do you remember what city or town or
24  county the lawsuit was brought in?

Page 30

1       A. No.
2       MS. TRAN: Can you give me one second?
3   I'm missing one document. Thanks.
4       (Exhibits 1 through 4 marked
5       for identification)
6       MS. TRAN: I've marked as Exhibit No.
7   1 the plaintiff's response to the defendant
8   Sears, Roebuck & Co.'s first set of
9   interrogatories. Marked as Exhibit No. 2 is the
10  Plaintiff's response to defendant Sears, Roebuck
11  & Co.'s first request for production of
12  documents. Marked as Exhibit No. 3 is the
13  plaintiff's response to defendant Gary
14  Mansfield's first set of interrogatories.
15  Marked as Exhibit No. 4 is the plaintiff's
16  response to defendant Gary Mansfield first
17  request for production of documents.
18      Q. Eric, I'm going to show you what's
19  been marked as Exhibit No. 3, particularly
20  Answer No. 6 on Page 2 which has a listing of
21  civil lawsuits that you've been involved in.
22      That first car accident we were just
23  discussing, do you know which one of those
24  lawsuits is relative to that first car accident?

Page 31

1       A. No.
2       Q. How many other civil lawsuits have you
3   been involved in besides the car accident that
4   we were just discussing?
5       A. Another car accident.
6       Q. Do you remember approximately when
7   that car accident took place?
8       A. Not really, but it was right after the
9   first one, not too long.
10      Q. Within a year of the first one?
11      A. Maybe a little more than a year.
12      Q. Were you a passenger or a driver in
13  that accident?
14      A. I was the driver.
15      Q. Were you driving your own car or
16  somebody else's car?
17      A. My own car.
18      Q. What car was it?
19      A. Audi A4.
20      Q. Did you sue somebody as a result of
21  that car accident?
22      A. Yes.
23      Q. Who did you sue?
24      A. The other person's insurance company.

Page 32

1       Q. By other person, do you mean the other
2   driver?
3       A. The vehicle was stolen, but...
4       Q. The person that you sued, when you
5   said "the other person's insurance company," did
6   you mean the driver of the other car that was
7   involved in the accident, their insurance
8   company?
9       A. Yes.
10      Q. I'm sorry. Was it the driver of the
11  accident's insurance company or was it the owner
12  of the car's insurance company. Do you
13  remember?
14      A. The owner of the car's insurance
15  company.
16      Q. And the owner of the car and the
17  driver were not the same person; is that
18  correct?
19      A. No.
20      Q. Were you injured as a result of that
21  accident?
22      A. Yes, I was.
23      Q. What injuries did you sustain?
24      A. My whole left side.

Page 33

1    Q. What do you mean by "left side"?
2    A. My neck, arm, my back, my face.
3    Q. What damage was done to your neck,
4  your back, your arm and your face?
5    A. Just pain.
6    Q. But no open wounds or scarring or
7  anything like that?
8    A. Yes.
9    Q. Yes, what?
10    A. Couple of cuts.
11    Q. Where were the cuts?
12    A. In my arm.
13    Q. Were they severe cuts or were they
14  scratches?
15    A. Scratches.
16    Q. Did you treat with a doctor as a
17  result of those injuries?
18    A. Yes.
19    Q. Who did you treat with?
20    A. The hospital, the emergency room.
21    Q. What hospital were you taken to?
22    A. Salem, Mass.
23    Q. Going back to the first accident that
24  we discussed, were you taken to a hospital as a

Page 34

1  result of that accident?
2    A. Yes.
3    Q. What hospital were you taken to in
4  that first accident?
5    A. Salem, Mass.
6    Q. I don't want to know any discussions
7  that you've had with any attorneys who have
8  represented you, but were you represented by an
9  attorney for that first car accident?
10    A. Yes.
11    Q. What was the name of that attorney?
12    A. Mike Maloney.
13    Q. Where is Mike Maloney located?
14    A. Lynn, Mass.
15    Q. Were you represented by an attorney in
16  your lawsuit regarding the second accident?
17    A. Repeat that question?
18    Q. Were you represented by an attorney in
19  your lawsuit regarding the second accident?
20    A. Yes.
21    Q. What's the name of that attorney?
22    A. Mike Maloney.
23    Q. Same Mike from the first accident?
24    A. Yes.

Page 35

1    Q. Did you settle that second lawsuit?
2    A. Yes.
3    Q. For how much?
4    A. I don't remember.
5    Q. Do you remember if it was over $5,000?
6    A. No, I don't remember.
7    Q. Do you remember if it was over
8  $10,000?
9    A. Not that high.
10    Q. So somewhere between zero and $10,000?
11    A. Yes.
12    Q. When I say somewhere between zero and
13  $10,000, I mean $10,000 that settled for the
14  total, not how much you got out of the
15  settlement. Do you understand that distinction?
16    A. Yes.
17    Q. With regard to the first lawsuit, you
18  say you settled that one as well. Was that one
19  more than $5,000?
20    A. I don't know.
21    Q. Was it for more than $10,000?
22    A. I know it wasn't more than $10,000.
23    Q. It wasn't more than $10,000?
24    A. Yeah.

Page 36

1    Q. So somewhere between zero and $10,000
2  for the second one?
3    A. Yes.
4    Q. Have you ever been involved in any
5  other lawsuits, civil lawsuits?
6    A. No.
7    Q. I'm going to show you again what's
8  been marked as Exhibit No. 3, again referencing
9  Answer No. 6, the last two lawsuits listed?
10    A. Mm-hmm.
11    Q. Are those the two civil lawsuits we've
12  just been discussing? Souvannakane versus
13  Njuguna, and the second one is Souvannakane
14  versus Hernandez.
15    A. Mm-hmm.
16    Q. Are those the only two civil lawsuits
17  that you've been involved in?
18    A. At this point I'm confused.
19    Q. Those two lawsuits listed there, the
20  ones that I just mentioned?
21    A. Yeah.
22    Q. Are those the only two civil lawsuits
23  that you've ever been involved in?
24    A. Yes, I guess.

SHEA COURT REPORTING SERVICES
617-227-3097

Page 37

1    Q. You guess. What's confusing you?
2    A. The first one here, Commonwealth
3  versus Souvannakane.
4    Q. Commonwealth versus Souvannakane, any
5  lawsuit that's brought -- typically any lawsuit
6  brought by the Commonwealth of Massachusetts
7  against an individual is a criminal lawsuit.
8  I'm not asking you about criminal things right
9  now. I'm only asking you about civil lawsuits.
10    A. Oh yeah, those two there.
11    Q. So those two are the two lawsuits
12  we're discussing?
13    A. Yes.
14    Q. But you don't know which one relates
15  to which accident?
16    A. No. These are the dates marked right
17  there, right?
18    Q. Those are the dates that they were
19  settled, but whether or not those were the dates
20  that they took place on, I don't know.
21    A. Okay.
22    Q. Do you happen to know?
23    A. No.
24    Q. Have you ever been involved in --

Page 38

1  strike that.
2      Have you ever been charged with a
3  felony in the last ten years?
4    A. No.
5    Q. Have you ever been charged with a
6  misdemeanor?
7    A. I want to say no, but I'm not sure.
8    Q. Have you ever been criminally charged
9  for a crime?
10    A. Yes.
11    Q. What were you charged with?
12    A. I don't know if it was vehicular
13  homicide. Leaving the scene of an accident.
14    Q. Are those two separate charges?
15    A. Yes.
16    Q. So you were charged once with
17  vehicular homicide and once with leaving the
18  scene of a accident?
19    A. Yes.
20    Q. Did they arise out of the same set of
21  circumstances or were they two different events?
22    A. Same situation.
23    Q. Any other charges?
24    A. At this point, I don't remember.

Page 39

1      Q. I'm going to show you what's been
2  marked as Exhibit No. 4. These are document
3  responses that you submitted to discovery
4  requests by Officer Mansfield.
5        I'll show you what is tabbed as
6  response to Request No. 12 of that document
7  request. Just take a look at it for me.
8    A. All this (indicating)?
9    Q. Yes. Take your time.
10    A. Mm-hmm.
11    Q. Not that it matters, I'm going to give
12  you the marked copy. It's the same thing. Just
13  take a look at the one that's marked.
14      (Pause)
15    A. Which one do you want me to look at?
16    Q. Look at the whole thing. Take your
17  time reviewing it. There's a page after that as
18  well.
19    A. Okay.
20      (Pause)
21    Q. I haven't asked you any questions yet.
22  So feel free to look at it, and then I'll ask
23  you questions.
24    A. I'm done.

Page 40

1      Q. On the top it's identified as the
2  record information as of 1/11/2006. I think
3  that date is accurate. It's cut off a bit.
4      MR. OLSON: Mm-hmm.
5    Q. Going down the list, there's a charge
6  for July 7, 2004 to compulsory insurance
7  violation. Do you remember that charge?
8    A. It's rings a bell, but I'm not so sure
9  what that is for.
10    Q. Do you remember appearing in court as
11  a result of that charge?
12    A. No.
13    Q. Do you remember any penalty or any
14  adverse action taken against you as a result of
15  that charge either by the Commonwealth of
16  Massachusetts or by your insurance company?
17    A. No.
18    Q. Do you remember being arrested as a
19  result of that charge?
20    A. No.
21    Q. Going down to the next one, which is
22  also dated July 7, 2004, there's an offense for
23  attaching the wrong MV plates?
24    A. Yes.

Page 41

1    Q. Do you remember that charge?
2    A. Yes.
3    Q. Do you remember being arrested as a
4  result of that charge?
5    A. No.
6    Q. Do you remember any adverse action
7  taken against you as a result of that charge,
8  any fines you had to pay?
9    A. Yes.
10   Q. Did you have to appear in court as a
11 result of that charge?
12   A. Yes.
13   Q. What resulted from that court
14 appearance?
15   A. Pay a fine.
16   (Inaudible comment made by witness
17   to Attorney Olson)
18   Q. Just to be clear, I know you want
19 to -- he actually can't talk to you during the
20 course of the deposition. So if you want to
21 talk to him, take a break, that's totally fine.
22 He can't answer any questions as I ask you
23 questions or confirm things for you, even though
24 he may want to.

Page 42

1    A. I don't have a question there.
2    Q. You had to pay a fine as a result of
3  attaching the wrong MV plates, and then that was
4  it?
5    A. Yes.
6    Q. Moving down to the next one dated
7  March 24, 2004 for malicious destruction of
8  property, do you remember being arrested as a
9  result of that charge?
10   A. No.
11   Q. Did you have to appear in court as a
12 result of that charge?
13   A. Yes.
14   Q. Is that the charge relating to the oil
15 spill at Sears?
16   A. Yes.
17   Q. We'll come back to that one later on
18 in the deposition.
19   Moving down, June 27, 2003, minor
20 possession of alcoholic beverage, and then
21 there's some letters that I don't know what
22 they're supposed to stand for.
23   Do you remember being arrested as a
24 result of that charge?

Page 43

1    A. Yes.
2    Q. What were the circumstances
3  surrounding that, briefly, surrounding that
4  charge?
5    A. I don't understand.
6    Q. You were arrested. Where were you
7  when you were arrested?
8    A. In jail.
9    Q. You were arrested while you were in
10 jail? Where were you when you were arrested for
11 the charge?
12   A. Revere.
13   Q. And were you arrested because at the
14 time that the police arrived for whatever reason
15 you had alcohol on you?
16   A. Say that again.
17   Q. Why were you arrested?
18   A. The cop pulled me over.
19   Q. So you were pulled over for a traffic
20 stop?
21   A. Yeah.
22   Q. How old were you, do you remember?
23   A. I don't remember.
24   Q. Well, if it's March 24, 2004, how old

Page 44

1  would you have been?
2    A. 19 or 20. Maybe 21. Obviously 20.
3    MR. OLSON: June '03, not '04.
4    MS. TRAN: You're right. I'm sorry.
5  June '03.
6    A. I was a minor with alcohol, under 21.
7    Q. So you were under 21 years old, and
8  you had alcohol in the car when you were pulled
9  over?
10   A. Yes, I did. My passenger did.
11   Q. I'm sorry, what was that?
12   A. My passenger did.
13   Q. How many passengers were in the car
14 with you?
15   A. Two.
16   Q. Were all three of you arrested?
17   A. No, just me.
18   Q. Were the other two passengers over the
19 age of 21?
20   A. No.
21   Q. And did you have to appear in court as
22 a result of that charge?
23   A. Yes.
24   Q. What was the result of that court

11 (Pages 41 to 44)

Page 45

1  appearance?
2      A. Pay a fine.
3      Q. Were you ever convicted of anything as
4  a result of that charge, to your knowledge?
5      A. No. Convicted as of?
6      Q. Meaning was there a guilty charge on
7  your record or not that you know of?
8      A. I don't know of.
9      Q. Next going down the list is July 24,
10 2002. The offense is listed as possession
11 Class D, C O N T, substance. I assume that
12 means controlled substance. Were you arrested
13 as a result of that charge?
14     A. No.
15     Q. Did you have to appear in court as a
16 result of that charge?
17     A. Yes.
18     Q. What resulted from that court
19 appearance?
20     A. Fine.
21     Q. Do you remember approximately how old
22 you were at that time?
23     A. No.
24     Q. What were the circumstances -- well,

Page 46

1  you weren't arrested. How were you charged with
2  the offense?
3      A. I don't remember. It's right there.
4  Possession of Class D.
5      Q. I know what the offense is. How did
6  you get notice of the court hearing?
7      A. Citation.
8      Q. When was the citation issued?
9      A. The night we got pulled over.
10     Q. So it was again a motor vehicle stop
11 and a police officer issued a citation?
12     A. Yes.
13     Q. And then you had to appear in court as
14 a result of that citation?
15     A. Yes.
16     Q. Did you have passengers in the car
17 with you at that time?
18     A. I was a passenger.
19     Q. How many people were in the car with
20 you?
21     A. The driver.
22     Q. What was the substance that you were
23 cited for?
24     A. Marijuana.

Page 47

1      Q. Going down the list, we have August 3,
2  2001. The offense is listed as HOM BY MV while
3  under the influence of liquor. I assume that
4  means homicide by motor vehicle while under the
5  influence of liquor.
6      Do you remember being arrested as a
7  result of that charge?
8      A. Yes.
9      Q. What were the circumstances of that
10 arrest?
11     A. I don't know. All the charges was
12 dropped, so...
13     Q. Understanding they were dropped, what
14 were the circumstances of the arrest?
15     A. I don't really understand.
16     Q. Were you arrested as a result of a car
17 accident?
18     A. Not a car accident -- yeah, car
19 accident, I guess.
20     Q. Were you driving or were you a
21 passenger in that?
22     A. I was the driver.
23     Q. Did you hit another car or a person?
24     A. A person hit me.

Page 48

1      Q. A person or car hit you?
2      A. A person.
3      Q. So a pedestrian walking hit your car?
4      A. Basically.
5      Q. While you were driving?
6      A. Yeah. It doesn't make sense, but it
7  makes sense.
8      Q. What were the circumstances of that
9  accident?
10     A. Fatal.
11     Q. The pedestrian who hit you while you
12 were driving your car died?
13     A. Yes.
14     Q. Do you remember having to appear in
15 court as a result of that charge?
16     A. Yes.
17     Q. What resulted from that court hearing?
18     A. Everything was dropped.
19     Q. Were you put on probation?
20     A. No.
21     Q. Do you know why the charges were
22 dropped?
23     A. It wasn't my fault.
24     Q. Is that what the judge or the court

Page 49

```
 1   said to you, or is that why you think the
 2   charges were dropped?
 3       A. That's what basically why they dropped
 4   the charges.
 5       Q. Was that the reason given to you?
 6       A. To the best of my knowledge, yes.
 7       Q. On the same date there's also a
 8   separate offense for leaving the scene, person
 9   injured. Is that relating to the motor vehicle
10   accident that resulted in the fatality?
11       A. Yes.
12       Q. Did you, in fact, leave the scene?
13       A. Yes.
14       Q. If you left the scene after the person
15   was injured, how were you arrested? Were you
16   arrested later by the police?
17       A. I called the police.
18       Q. So did you call police when you got
19   home?
20       A. Yes.
21       Q. Did you know you had hit somebody when
22   you were at the scene?
23       A. No.
24       Q. So why did you call the police when
```

Page 50

```
 1   you got home?
 2       A. I was attacked.
 3       Q. By whom?
 4       A. A large group of drunk teenage
 5   individuals.
 6       Q. Attacked in your home?
 7       A. No, in my car at the scene.
 8       Q. Before or after the accident?
 9       A. Before and after.
10       Q. Where were you coming from when the
11   accident happened?
12       A. I was coming from the scene of the
13   accident.
14       Q. Where was the scene of the accident?
15       A. In Lynn.
16       Q. Where in Lynn?
17       A. I don't remember.
18       Q. You don't know where the accident
19   occurred?
20       A. I don't know the exact address.
21       Q. That's okay. Can you give me a
22   landmark where approximately it was? Were you
23   at a friend's house, were you driving on the
24   road?
```

Page 51

```
 1       A. I was at a party, I guess.
 2       Q. Why were you attacked?
 3       A. No idea.
 4       Q. So you called the police because of
 5   the attack but not because of the accident; is
 6   that correct?
 7       A. Correct.
 8       Q. Next one, same date, the offense is
 9   listed as operating recklessly. I assume that's
10   also related to the same accident?
11       A. Mm-hmm.
12       Q. Can you run through very briefly what
13   happened that night? I'm just trying to
14   understand the circumstances.
15       A. Went to a house party -- I'll answer
16   your question to the best of my knowledge.
17       Q. That's okay.
18       A. Went to a house party that my cousin
19   told me to come by, checked it out, stepped
20   inside, all hell broke loose; stepped inside the
21   vehicle to get away, bats, glass, whatever
22   was -- I was in the car. I was being attacked,
23   people jumping on the car, breaking windows.
24   Threw it in drive trying to get away, couldn't
```

Page 52

```
 1   do nothing, too many people, foot on the brake,
 2   didn't know what to do. I released the brake
 3   pedal. From there, I went home.
 4       Q. When you said you stepped into the
 5   party, all hell broke loose. What do you mean
 6   by that?
 7       A. Stepped inside and all hell broke
 8   loose.
 9       Q. What do you mean by "all hell broke
10   loose"?
11       A. It was out of control.
12       Q. What was out of control?
13       A. The individuals that were inside the
14   house.
15       Q. And by "out of control," what were
16   they doing?
17       A. Drugs.
18       Q. There were drugs at the house at the
19   party?
20       A. I'm pretty sure there was.
21       Q. Is that what you mean when you say
22   "all hell broke loose"?
23       A. It was out of the control. I don't
24   understand.
```

Page 53

1     Q. Well, when you say "all hell broke
2  loose," I assume that's the reason why you left
3  the party and went to your car; is that correct?
4     A. Yes.
5     Q. So what specifically caused you to
6  leave the party and go to your car?
7     A. It wasn't an environment for me.
8     Q. And do you know why the people from
9  the party followed you out?
10    A. No.
11    Q. So you go to a party. And when you
12 get there, you decide the environment is not for
13 you, and you turn around and leave, and people
14 randomly just come out and start beating on the
15 car and start attacking you with bats and glass?
16    A. Yes.
17    Q. And then when you are leaving, they
18 are still on the car, so you go because you
19 don't know what else to do, and you don't know
20 that you hit somebody; is that correct?
21    A. Correct.
22    Q. And then you go home and call the
23 police because you've been attacked?
24    A. Correct.

Page 54

1     Q. But you have no understanding why you
2  were attacked?
3     A. To this day, yes.
4     Q. Were you yourself using drugs or
5  alcohol that evening?
6     A. No.
7     Q. Nothing?
8     A. A little bit of beer, but that's about
9  it. Not enough to be drunk.
10    Q. But enough to be under the influence
11 of liquor, as you were charged?
12    A. No.
13    Q. How much beer did you have that night?
14    A. Two bottles. That's well before all
15 this took place, anyway.
16    Q. So there's that incident with the --
17 okay. Strike that. Moving on.
18       We'll go to the next one which is
19 dated, on this same list, which is dated October
20 24, 2000. The offense is listed as disturbing
21 the peace?
22    A. Mm-hmm.
23    Q. Then in parens it says breach, and
24 then in parens again it says DP.

Page 55

1        Do you remember being arrested as a
2  result of that incident?
3     A. Yes.
4     Q. Were you arrested at the scene of
5  wherever that incident took place?
6     A. Yes.
7     Q. What were the circumstances
8  surrounding that arrest?
9     A. Confusion, but...
10    Q. What do you mean by that?
11    A. I don't really remember, but there was
12 a lot of confusion. That's all I know.
13    Q. Where were you arrested when you were
14 arrested for disturbing the peace?
15    A. Salem, Mass.
16    Q. Where was the exact address?
17    A. I don't remember.
18    Q. Where you at a friend's house?
19    A. Walking through to go to a friend's
20 house.
21    Q. Walking down the street to go to a
22 friend's house?
23    A. Walking inside the apartment to go to
24 a friend's house.

Page 56

1     Q. So you were inside the apartment
2  building?
3     A. Yes.
4     Q. Why were you arrested for disturbing
5  the peace?
6     A. Officer stopped me and asked me some
7  questions.
8     Q. The officer inside the apartment
9  building stopped you and asked you questions?
10    A. Yes.
11    Q. Why did he stop you?
12    A. To get information that I didn't know
13 what the hell he was talking about.
14    Q. You'll have to explain. I don't
15 understand what you're talking about, so you'll
16 have to explain. Why did he stop you?
17    A. To get information that I don't...
18    Q. He randomly wanted information from
19 you?
20    A. Yeah.
21    Q. What happened after he stopped you?
22    A. Told don't go nowhere. He went to go
23 check a couple of apartments to see what's
24 really going on, and that was it.

14 (Pages 53 to 56)

Page 57

1    Q. That's all that happened? Why were
2  you arrested?
3    A. Came back at me, came back and just
4  took us in.
5    Q. So you were peacefully walking through
6  the apartment building and randomly stopped by a
7  police officer and he arrested you for reasons
8  you can't understand?
9    A. Yes.
10   Q. It seems to happen a lot,
11 Mr. Souvannakane.
12      The next offense is dated October 24,
13 2000, resisting arrest. I assume that's related
14 to the same incident where you were arrested for
15 disturbing the peace?
16   A. Yes.
17   Q. Did you, in fact, resist arrest?
18   A. No.
19   Q. Why did he charge you for resisting
20 arrest, do you know?
21   A. They didn't even know why they took me
22 in. They had to think five minutes for the
23 charge, and that was it.
24   Q. So, again, you were charged with

Page 58

1  resisting arrest, but you didn't actually resist
2  an arrest, and nobody understands why you were
3  charged for it?
4    A. No. They handcuffed me.
5    Q. What happened when they handcuffed
6  you?
7    A. What else? What could I do?
8    Q. Did you resist arrest?
9    A. No.
10   Q. Did you have to appear in court as a
11 result of those charges?
12   A. Yeah.
13   Q. What resulted from that court
14 appearance?
15   A. Six month without a finding.
16   Q. So probation for six months; then
17 assuming you don't get into trouble during that
18 time, it's not -- it's no finding, nothing on
19 your record; is that correct?
20   A. Yes.
21   Q. Did you complete the terms of your
22 probation?
23   A. Yes.
24   Q. Have you ever been charged with any

Page 59

1  other crimes besides the ones listed on that
2  sheet?
3    A. Right here (indicating)?
4    Q. Yes.
5    A. No.
6    Q. Have you ever been convicted of any of
7  the offenses that you were charged for that are
8  listed on that sheet?
9    A. Convicted, as in?
10   Q. Found guilty. To your knowledge, do
11 you have a conviction on your record?
12   A. To the best of my knowledge, I don't
13 even know.
14   Q. Aside from the few times that you were
15 arrested and I assume spent some time in jail as
16 a result of those arrests, have you ever spent
17 any time in jail as a result of any of the
18 offenses that are listed on that sheet in front
19 of you?
20   A. Yes.
21   Q. The time that you spent in jail, was
22 that time in holding cells after you were
23 arrested waiting to go to court or was it any
24 longer length of time?

Page 60

1    A. Holding.
2      MS. TRAN: I'm going to take a very
3  brief bathroom break.
4      (Recess taken)
5  BY MS. TRAN:
6    Q. Do you remember when you were hired by
7  Sears?
8    A. August.
9    Q. Of what year?
10   A. At this point in time, I want to say
11 '03, '04.
12   Q. So it was either 2003 or 2004?
13   A. Yes.
14   Q. You previously testified that you were
15 employed by Sears for about a year and a half?
16   A. Year and a couple of months.
17   Q. And were you terminated from Sears in
18 October of 2003?
19   A. Yes.
20   Q. So then is it accurate to say that you
21 were hired in August of 2002?
22   A. Sure.
23   Q. Sure, that's correct?
24   A. Yes, correct.

Page 61

1    Q. And what was your job title at Sears?
2    A. Tire tech and oil lube tech, battery
3  tech, maintenance tech.
4    Q. Were those titles that you held all at
5  the same time, or were they titles that you held
6  separately?
7    A. All at the same time.
8    Q. What did your job responsibilities at
9  Sears entail?
10   A. Tires, oil changes, batteries.
11   Q. Was it unusual at Sears at that time
12 for one person to hold that many positions or
13 was it something that was common?
14   A. I'd say common to me.
15   Q. What do you mean by common to you?
16   A. Something I can handle.
17   Q. Did anybody else hold more than one
18 position or more than one title?
19   A. Yes.
20   Q. Do a lot of other auto techs hold more
21 than one title or just a few?
22   A. A few.
23   Q. Do you remember who they were?
24   A. No.

Page 62

1    Q. Do you remember any of them?
2    A. No.
3    Q. Did you have a set schedule when you
4  were working at Sears?
5    A. Yes.
6    Q. Did that schedule change during the
7  course of your employment or was it the same for
8  the entire time?
9    A. Same for the entire time.
10   Q. What was that schedule?
11   A. I don't remember.
12   Q. Did you work weekends as well as
13 weekdays?
14   A. Yes.
15   Q. Do you remember if you worked standard
16 nine to five shifts or if you worked evening
17 shifts?
18   A. I don't remember. Some -- go ahead.
19   Q. Do you remember how many hours a week
20 you worked when you were employed by Sears?
21   A. I would say 40. I was full time.
22   Q. An average day at Sears, what kind of
23 work did you do? I know you said you did oil
24 changes and changed tires and batteries. But

Page 63

1  what does that entail, what type of things?
2    A. Tires, oil changes and batteries, yes.
3    Q. By "tires," what do you mean?
4    A. Swapping them and repairing them.
5    Q. And when you say "batteries," what do
6  you mean?
7    A. Recharge or replace.
8    Q. When you say "oil changes," you mean
9  standard oil changes?
10   A. Yes.
11   Q. Did you do alignments and things like
12 that or just the oil changing?
13   A. Just those three titles.
14   Q. If somebody came in for a full oil
15 change that included a tire alignment, would you
16 do the tire alignment, too, or would you just do
17 the oil change?
18   A. I would do what I'm capable of doing,
19 then I would pass it on to the alignment tech.
20     MR. OLSON: Just a second.
21     MS. TRAN: Sure.
22     (Counsel conferred with witness)
23   A. Just to run it back and clarify
24 something. When you asked me about tire

Page 64

1  alignments, what do you mean?
2    Q. I'm sorry?
3    A. When you asked me about tire
4  alignments, what did you mean?
5    Q. What I meant was you had said earlier
6  that you changed tires and repaired tires. Did
7  you also do alignment of tires?
8    A. Alignment is a whole different thing
9  from the tires.
10   Q. I understand that. Did you also
11 align, or did you just do repairs and changing
12 of the tires?
13   A. What I did was I did the tire work on
14 the vehicle, and from there the alignment tech
15 does the alignment, aligns the suspension.
16   Q. Were you limited to any one area of
17 the automotive shop when you were working or did
18 you work in more than one?
19   A. More than one.
20   Q. Were there any areas of the auto shop
21 that you didn't work in?
22   A. Yeah. Actually, no. I worked in all
23 areas.
24   Q. And by areas you understand I mean the

16 (Pages 61 to 64)

Page 65

1   physical locations of the shop?
2       A. Mm-hmm.
3           MR. CLOHERTY: You have to say yes or
4   no.
5       A. Yes.
6       Q. Were there specific areas set up in
7   the automotive shop when you were working there
8   to do tires and specific areas for oil changes
9   and specific areas for battery changes?
10      A. Correct.
11      Q. Did those areas ever overlap?
12      A. Yes.
13      Q. Same thing, were there specific areas
14  for alignments and other type of work done?
15      A. Correct.
16      Q. Were those areas ever used
17  interchangeably?
18      A. If it had to be done, yes.
19      Q. While you were employed by Sears, who
20  was your direct supervisor?
21      A. I was employed by a manager named
22  Rick; then from there another manager took over
23  named Anthony.
24      Q. And do you know what Rick's last name

Page 66

1   was?
2       A. No. I don't remember.
3       Q. Was he your direct supervisor when you
4   were first employed?
5       A. Yes.
6       Q. Do you remember about how long you
7   were employed at Sears when he left?
8       A. I don't remember.
9       Q. Do you remember what Anthony's last
10  name was?
11      A. No.
12      Q. Do you know who William Sullivan is?
13      A. No.
14      Q. Do you know if he's a Sears employee?
15      A. No.
16      Q. Have you ever heard the name before?
17      A. No.
18      Q. Do you know who Kevin Sullivan is?
19      A. Yes.
20      Q. Who is he?
21      A. A fellow employee, was a fellow
22  employee.
23      Q. What was his position with Sears?
24      A. Service writer.

Page 67

1           MS. NETSKI: I'm sorry, what?
2           THE WITNESS: Service writer.
3       Q. What does a service writer mean?
4       A. Person who writes up labor work from a
5   customer.
6       Q. Did he actually do any of the labor
7   work, or did he actually write it up?
8       A. He wrote it up, no labor work.
9       Q. Did Kevin ever supervise you during
10  the course of your employment?
11      A. I'll say yes.
12      Q. You'll say yes or yes?
13      A. Yes.
14      Q. So yes, Kevin did supervise you?
15      A. I would say he was left in charge.
16      Q. What do you mean by "left in charge"?
17      A. Watch the store until the manager gets
18  back.
19      Q. Was he frequently left in charge in
20  that manner?
21      A. No.
22      Q. When you say "watch the store until
23  the manager gets back," does that include the
24  automotive section of the store or just the

Page 68

1   front section of the store dealing with
2   customers?
3       A. Most the time he was up front. But if
4   there was something that needed to be done, he
5   would come back.
6       Q. And do what?
7       A. Tell what needed to be done.
8       Q. When he's left in charge, was it your
9   understanding that he was in charge of both the
10  automotive section as well as the front end of
11  the store or just the front end? Would you
12  consider him your supervisor when he was in
13  charge?
14      A. No. No one ever told me physically
15  Kevin is in charge.
16      Q. Did Kevin have the authority to hire
17  or fire you?
18      A. No.
19      Q. Did you ever have any conversations
20  with Kevin regarding the circumstances of your
21  termination from Sears?
22      A. Repeat your question.
23      Q. Did you ever have any conversations
24  with Kevin regarding the circumstances of your

Page 69

1 termination from Sears?
2    A. No. That's after, right? No.
3    Q. Either before or after.
4    A. No.
5    Q. Did you and Kevin get along?
6    A. I will say yes.
7    Q. You will say yes or yes?
8    A. Yes, ma'am.
9    Q. Thank you.
10      Were you guys friends?
11    A. No.
12    Q. Why not?
13    A. Good question.
14    Q. Just never happened?
15    A. Fellow employee acquaintance.
16    Q. Do you feel Kevin ever discriminated
17 against you on the basis of your race?
18    A. I don't remember.
19    Q. You don't remember whether or not he
20 ever discriminated against you on the basis of
21 your race?
22    A. I want to say no. No.
23    Q. So no, he did not ever discriminate
24 against you on the basis of your race?

Page 70

1    A. Yeah.
2    Q. Is that correct?
3    A. Correct.
4    Q. To your knowledge, Kevin was not
5 involved in the decision to terminate your
6 employment; is that correct?
7    A. I don't know.
8    Q. Would Kevin have had the authority to
9 do that?
10    A. No.
11    Q. Do you know who Alicia Coviello is?
12    A. Yes.
13    Q. Who is she?
14    A. A girl that works at Sears.
15    Q. Do you know what her job title was at
16 Sears?
17    A. No.
18    Q. Did she work in the automotive
19 department?
20    A. No.
21    Q. How did you know Alicia?
22    A. Court.
23    Q. Could you be more specific?
24    A. Appear for a citation that was issued.

Page 71

1    Q. When?
2    A. I don't remember.
3    Q. What court?
4    A. Lynn District Court.
5    Q. Did you speak with her when she
6 appeared?
7    A. No.
8    Q. Did she appear more than once?
9    A. I don't remember.
10    Q. Did you know her or speak with her
11 during the time that you were employed by Sears
12 prior to the citation?
13    A. No, but...
14    Q. Just to be clear. That's a no, you
15 didn't know her or speak to her while you were
16 employed at Sears.
17    A. Correct.
18    Q. And what were you going to say?
19    A. She did loss prevention. Now I know
20 what she did.
21    Q. That was her job title at Sears?
22    A. Yes.
23    Q. You never had any occasion to talk to
24 her before your termination?

Page 72

1      (Pause)
2    Q. Is that a no?
3    A. After the termination?
4    Q. Before your termination.
5    A. No.
6    Q. And after your termination, the only
7 time you ever spoke to her was at the court
8 appearance; is that correct?
9    A. Before that we spoke, but I don't know
10 who she was.
11    Q. When did you speak with her?
12    A. No idea. She gave me a hard time to
13 get my last paycheck.
14    Q. So sometime after you were terminated
15 was the first time you spoke with her; is that
16 correct?
17    A. Yeah, but I don't know who she was.
18    Q. Do you remember about how long after
19 you were terminated that discussion happened?
20    A. No.
21    Q. Do you remember when you went to get
22 your last paycheck?
23    A. No.
24    Q. Was it within a week of your

Page 73

1    termination?
2        A. I don't remember.
3        Q. Within a month?
4        A. Yeah. I would say within the month.
5        Q. So it was within a month, to the best
6    of your knowledge?
7        A. Well, I'll just say I don't remember.
8        Q. Would you have waited six months to go
9    get your last paycheck?
10       A. No, not that long.
11       Q. Three months?
12       A. Not that long.
13       Q. And that conversation you had with
14   Alicia when you went to get your last paycheck
15   was the first time you had ever spoken with her?
16       A. Yes.
17       Q. When you said she gave you a hard
18   time, what do you mean?
19       A. She didn't want to give me my check.
20       Q. Did she tell you she didn't want to
21   give you your check?
22       A. Not in those exact words, but
23   basically.
24       Q. What did she say?

Page 74

1        A. I don't remember, but she gave me a
2    tough time.
3        Q. When did you appear to get your last
4    paycheck?
5        A. I don't remember.
6        Q. Do you remember where you went to get
7    your last paycheck?
8        A. Sears.
9        Q. Which building? The Sears in Saugus,
10   I assume?
11       A. Yes, the Sears in Saugus.
12       Q. Which building?
13       A. The main building.
14       Q. Where the retail store is located?
15       A. Yes.
16       Q. Did you go into the human resources
17   department?
18       A. Yes.
19       Q. Is Alicia the only person you spoke
20   with to get your last paycheck?
21       A. The secretary.
22       Q. You spoke with the secretary before
23   you spoke with Alicia?
24       A. Yes.

Page 75

1        Q. When you say Alicia gave you a hard
2    time, can you be more specific?
3        A. She gave me a hard time.
4        Q. Can you be more specific?
5        A. She wouldn't give it up.
6        Q. Can you be more specific?
7        A. I don't remember the events that
8    happened that day. Word for word, I don't
9    remember. But all I remember is she gave me a
10   tough time.
11       Q. Did you eventually get your last
12   paycheck?
13       A. No.
14       Q. Why not?
15       A. She wouldn't give it up.
16       Q. Did she say why?
17       A. I don't remember.
18       Q. Did you eventually after that
19   discussion with Alicia get your last paycheck
20   from Sears?
21       A. Yes.
22       Q. How did you receive that check?
23       A. I went to Sears a week after that day
24   and I spoke to a secretary, the same secretary

Page 76

1    before Alicia, and she gave it to me with no
2    hassle.
3        Q. But you don't, as you sit here today,
4    remember why Alicia wouldn't give you your last
5    paycheck; is that correct?
6        A. Correct.
7        Q. To your knowledge, was Alicia in a
8    position to hire or fire you?
9        A. I honestly don't know. She's loss
10   prevention. She wasn't in management, I don't
11   think. I don't know nothing about her. All I
12   know is loss prevention.
13       Q. Do you know whether or not loss
14   prevention had any authority to hire or fire
15   employees?
16       A. Don't know.
17       Q. Did Alicia ever discriminate against
18   you on the basis of your race?
19       A. I don't know.
20       Q. You don't know if she ever
21   discriminated against you on the basis of your
22   race?
23       A. I don't know.
24       Q. That one time you spoke to her, that's

Page 77

1  the first time you met her; is that correct?
2      A. Other than we had to appear in court
3  for that citation.
4      Q. Other than --
5      A. We didn't share no words.
6      Q. Other than appearing in court, the
7  only time you ever spoke to her was after your
8  termination when you went to get your paycheck;
9  is that correct?
10     A. Correct.
11     Q. Do you know who Barbara Tagliarino is?
12     A. Barbara rings a bell.
13     Q. Do you know who she is?
14     A. I want to say the manager in charge of
15 the whole Sears operation.
16     Q. Have you ever met her?
17     A. Termination day, yes.
18     Q. When you say you want to say she's the
19 manager, do you believe she is the manager or do
20 you want to say she is the manager?
21     A. I want to say she's the manager.
22     Q. But you don't know for sure?
23     A. No.
24     Q. Is Barbara Tagliarino the same Barbara

Page 78

1  you met with at your termination?
2      A. I'm not familiar with the last name.
3  The first name is Barbara.
4      Q. You met with a woman named Barbara
5  when you were terminated?
6      A. Yes.
7      Q. Was anybody else present when you were
8  terminated?
9      A. Yes, my automotive manager, Anthony,
10 at the time.
11     Q. Had you ever met Barbara before the
12 day of your termination?
13     A. No.
14     Q. Do you know what Barbara's job title
15 was at Sears?
16     A. The woman named Barbara that I knew of
17 was the general manager of the store.
18     Q. Did Barbara have authority to hire or
19 fire you, to your knowledge?
20     A. I will say yes. The Barbara I know?
21     Q. Yes, the Barbara you know?
22     (Pause)
23     Q. Yes?
24     A. The Barbara that I know of, yeah, the

Page 79

1  general manager, yes.
2      Q. Prior to the day of your termination
3  you never spoke with Barbara, the Barbara you
4  knew?
5      A. The Barbara that's -- after the
6  termination?
7      Q. Prior to your termination, you never
8  spoke with Barbara; is that correct?
9      A. Yes.
10     Q. The Barbara employed by Sears that
11 we're discussing?
12     A. Explain that again.
13     Q. Prior to the day of your termination,
14 is it correct that you never spoke with Barbara?
15     A. Yeah.
16     Q. Did you speak with Barbara after your
17 termination?
18     A. No.
19     Q. So that conversation you had in which
20 you were terminated is the only time you ever
21 spoke with Barbara?
22     A. Correct.
23     Q. Did Barbara ever discriminate against
24 you on the basis of your race?

Page 80

1      A. Not that I know of.
2      Q. Do you know who Richard Spellman is?
3      A. No, I don't.
4      Q. Do you know if he's employed by Sears?
5      A. I don't know.
6      Q. Do you know who Anthony Cieri is?
7      A. No. I know Anthony, my manager
8  Anthony, but I don't know if that's the same
9  Anthony.
10     Q. Your manager Anthony, do you know what
11 his job title is?
12     A. Shop manager.
13     Q. And he managed the automotive shop
14 when you worked --
15     A. Yes.
16     Q. -- at Sears?
17     A. Yes.
18     Q. If you can let me finish my question
19 even though you know what it's going to be so
20 she can record it.
21     A. I apologize.
22     Q. That's okay.
23     A. It slipped my mind.
24     Q. It does mine all the time. Don't

SHEA COURT REPORTING SERVICES
617-227-3097

Page 81

1  worry.
2      Did you get along with Anthony?
3      A. I'd say we had a good relation until
4  the termination.
5      Q. How frequently did you see Anthony
6  while you were employed at Sears?
7      A. When we worked the same -- when he --
8  when we worked the same schedule.
9      Q. To your knowledge, did Anthony have
10  the authority to terminate your employment at
11  Sears?
12      A. Yes.
13      Q. Did Anthony ever discriminate against
14  you on the basis of your race?
15      A. Not that I know of.
16      Q. Do you know who Jose Hernandez is?
17      A. Yes.
18      Q. Who is he?
19      A. A fellow employee.
20      Q. When you were employed at Sears?
21      A. When I was employed at Sears.
22      Q. Did you and Jose get along?
23      A. Yes.
24      Q. Was Jose a supervisor or was he the

Page 82

1  same level as you?
2      A. Same level.
3      Q. Do you know who Michael Katsaris is?
4      A. Yes.
5      Q. Who is he?
6      A. A fellow employee.
7      Q. At Sears?
8      A. Yes.
9      Q. Was he also an automotive tech?
10      A. Yes.
11      Q. Did you and Michael get along?
12      A. I'd say yes.
13      Q. Do you know who John Baldi is?
14      A. Yes.
15      Q. Who is he?
16      A. Fellow employee.
17      Q. By John Baldi, I mean John Baldi, Jr.
18  Do you understand me?
19      A. Yes.
20      Q. He's a fellow employee at Sears?
21      A. Yes.
22      Q. Did you and John get along?
23      A. Yes.
24      Q. Did you ever talk with Jose Hernandez

Page 83

1  about the circumstances of your terminations
2  from Sears?
3      A. No.
4      Q. Did you ever talk -- I'm sorry. Go
5  ahead.
6      A. This would be after the termination?
7      Q. Either before or after the
8  termination, did you ever talk with Jose about
9  any of the circumstances that gave rise to your
10  termination?
11      A. No.
12      Q. Did you ever speak with Michael
13  Katsaris about the circumstances that gave rise
14  to your termination or about the termination
15  itself?
16      A. No.
17      Q. Did you ever speak with John Baldi
18  about the circumstances that gave rise to your
19  termination or about the termination itself?
20      A. After or before?
21      Q. Before or after.
22      A. Yes.
23      Q. What did you and John talk about with
24  regard to your termination?

Page 84

1      A. Why did I get terminated.
2      Q. When did you talk to John about why
3  you got terminated?
4      A. The day I returned his pickup truck
5  that he let me borrow.
6      Q. When did you return the pickup truck?
7      A. The day of termination.
8      Q. Do you remember what day you were
9  terminated?
10      A. No. I don't remember.
11      Q. During the course of your appointment
12  at Sears, do you remember if anybody
13  discriminated against you on the basis of your
14  race, or do you know if anybody discriminated
15  against you on the basis of your race?
16      A. Yes.
17      Q. Who?
18      A. A man named Sal, Sal something.
19      Q. Do you remember his last name?
20      A. No, I don't.
21      Q. Do you remember what his job title was
22  at Sears?
23      A. Service writer.
24      Q. So he had the same job title as Kevin

21 (Pages 81 to 84)

Page 85

1 Sullivan?
2     A. Yes.
3     Q. How did Sal discriminate against you?
4     A. He came at me one day angry and he
5 told me to go back to Cambodia you fucking Gook.
6     Q. Those are the exact words he used?
7     A. Yes.
8     Q. Why was he angry at you?
9     A. Because I didn't do something that I
10 wasn't supposed to do. No. Let me rephrase
11 that. He expected me to do something that was
12 out of my job title.
13     Q. What did he expect you to do?
14     A. Go to the warehouse and grab a tire
15 when a sales writer is supposed to do it.
16     Q. Go to the warehouse and grab a tire.
17 you said?
18     A. Yes.
19     Q. Where is the warehouse?
20     A. Downstairs underneath -- under the
21 automotive center.
22     Q. And did Sal ask you to do that?
23     A. Yes. But I was busy myself.
24     Q. Was Sal a supervisor?

Page 86

1     A. No.
2     Q. Did Sal have the authority to
3 terminate your employment at Sears, to your
4 knowledge?
5     A. No.
6     Q. Was Sal still employed by Sears when
7 you were terminated?
8     A. I believe so.
9     Q. So he was still employed by Sears when
10 you left; is that correct?
11     (Pause)
12     Q. Is that a yes?
13     A. Yes.
14     Q. Thank you.
15     MS. TRAN: Do you want to take a quick
16 break?
17     (Recess taken)
18 BY MS. TRAN:
19     Q. Getting back to the incident you
20 described with Sal?
21     A. Okay.
22     Q. Was anybody else present when he made
23 these comments to you?
24     A. No.

Page 87

1     Q. It was just you and him at the shop?
2     A. Yes.
3     Q. What did you say in response when he
4 told you to go back to Cambodia?
5     A. I'm trying to remember.
6     Q. Take your time.
7     A. To the best of my knowledge, after he
8 spoke his racial slur I replied, I'm not
9 Cambodian. He said. Whatever you are. I called
10 him, Shut up, meatball, something like that.
11     Q. Is Sal Italian?
12     A. I guess so. I'm not sure. But I
13 guess so.
14     Q. But I assume when you said, Shut up,
15 meatball, you were referring to --
16     A. Yes. That's what I said.
17     Q. What did he say when you told him that
18 you weren't Cambodian?
19     A. Say that again.
20     Q. What did he say when you told him you
21 weren't Cambodian?
22     A. Whatever the hell you are.
23     Q. And that's when you replied, Shut up,
24 meatball?

Page 88

1     A. Basically, yes.
2     Q. By "basically" is that exactly what
3 you said, or is that what you remember saying?
4     A. To the best of my knowledge, I know I
5 said meatball. It was nonsense back and forth.
6     Q. What happened next?
7     A. We went our separate ways.
8     Q. Did you ever have any other
9 interactions with Sal in which he used racial
10 slurs against you?
11     A. Just that one time --
12     Q. Did you inform --
13     A. -- that I know of.
14     Q. That you remember, you mean?
15     A. Yes.
16     Q. Did you inform anybody else at Sears
17 about what Sal told you?
18     A. I don't remember.
19     Q. Do you remember telling Anthony about
20 what Sal said?
21     A. Yes.
22     Q. What did Anthony say in response to
23 that?
24     A. Oh, wow. Really? That's all I

SHEA COURT REPORTING SERVICES
617-227-3097

Page 89

1 remember.
2    Q. You don't remember if he said anything
3 else or if you talked about it with Sal or
4 anything?
5    A. All I remember is one day he pulled me
6 in his office and asked what happened.
7    Q. Who did?
8    A. Anthony.
9    Q. Why did Anthony pull you into his
10 office and ask you what happened?
11    A. To get the breakdown of what really
12 happened.
13    Q. Was this because there was tension
14 between you and Sal during the time that you
15 worked there?
16    A. Him, maybe; me, no.
17    Q. So do you have any knowledge, as you
18 sit here today, as to why Anthony pulled you
19 into his office to ask you what happened?
20    A. Say that again.
21    Q. Do you have any knowledge, as you sit
22 here today, as to why Anthony pulled you into
23 his office to ask you --
24    A. Just to find out what happened.

Page 90

1    Q. Was it shortly after the racial slur?
2    A. Yeah.
3    Q. The same day?
4    A. No.
5    Q. Was it within a week?
6    A. Somewhere in that time frame, I guess.
7    Q. Did you speak with anybody else at
8 Sears about the comment that Sal made to you?
9    A. I don't remember.
10    Q. Do you remember when this happened,
11 Sal's comment to you?
12    A. Sometime during my employment.
13    Q. Do you remember how far into your
14 employment it was?
15    A. I don't remember.
16    Q. Was it more than six months into your
17 employment?
18    A. I honestly don't remember.
19    Q. Do you remember if it was more than a
20 year into your employment?
21    A. I don't remember.
22    Q. And you don't remember telling anybody
23 else at Sears about the comment Sal made to you?
24    A. Yeah.

Page 91

1    Q. Did you tell any of your fellow
2 employees?
3    A. I don't remember.
4    Q. Have you ever discussed the comment
5 Sal made to you with John Baldi?
6    A. Yes.
7    Q. When did you discuss them with John?
8    A. I don't remember.
9    Q. By John, I mean John, Jr. You
10 understand me?
11    A. Yeah.
12    Q. You don't remember when you discussed
13 them with John?
14    A. I don't remember.
15    Q. Was it before or after your
16 termination?
17    A. It was after my termination.
18    Q. Do you remember if it was shortly
19 after your termination?
20    A. I don't remember.
21    Q. Did you discuss these comments that
22 Sal made to you with Jose Hernandez?
23    A. I don't remember.
24    Q. Do you remember discussing it with

Page 92

1 anybody else that you worked with at Sears that
2 was not in a management position?
3    A. I don't remember.
4    Q. To the best of your recollection,
5 Anthony Cieri is the only manager you ever spoke
6 with about the comment that Sal made; is that
7 correct?
8    A. That I remember, yes.
9    Q. Were you ever reprimanded during the
10 time that you were employed by Sears?
11    A. Say that again.
12    Q. Were you ever reprimanded by Sears
13 during the time of your employment by Sears?
14    A. I don't understand that question.
15    Q. Were you ever disciplined for any
16 reason?
17    A. When you say disciplined, what do you
18 mean?
19    Q. Were you ever spoken to for any
20 actions that you had done at Sears? Were you
21 ever reprimanded? Was there ever a warning
22 issued to you for anything that you had done?
23    A. I don't remember.
24    Q. When were you terminated? Do you

23 (Pages 89 to 92)

Page 93

1    remember the date?
2        A. No, I don't.
3        Q. Do you remember the month you were
4    terminated?
5        A. I don't remember.
6        Q. You testified earlier that Barbara and
7    Anthony were the only two people that were
8    present when you were terminated; is that
9    correct?
10       A. Correct.
11       Q. What reason were you given for your
12   termination?
13       A. I don't know.
14       Q. You don't remember?
15       A. I don't remember. Exact written
16   reason?
17       Q. Any reason. What reason were you
18   given for your termination?
19       A. At this point, I don't remember.
20       Q. What were the circumstances
21   surrounding your termination?
22       A. Swearing.
23       Q. Swearing at whom?
24       A. Not me. Another employee.

Page 94

1        Q. Some other employee swore?
2        A. Mm-hmm.
3        Q. But you were terminated for it?
4        A. Yeah.
5        Q. What's the other employees name that
6    swore?
7        A. I don't remember.
8        Q. Who did the other employee supposedly
9    swear at?
10       A. A customer.
11       Q. And you never swore at that customer?
12       A. No.
13       Q. Had you ever been reprimanded for
14   swearing prior to that incident?
15       A. I don't remember.
16       Q. When you say Barbara and Anthony were
17   the only two people present when you were
18   terminated, where was it when you were
19   officially terminated? Were you in Barbara's
20   office or Anthony's office?
21       A. Barbara's office.
22       Q. Was it at the end of a shift that you
23   were called in to Barbara's office?
24       A. No.

Page 95

1        Q. What happened during the termination?
2    Where did you go?
3        A. We went -- Anthony called me in his
4    office, and from there we went to Barbara's
5    office.
6        Q. Did Anthony say why he was calling you
7    into his office?
8        A. Yeah, We have a problem.
9        Q. Did he elaborate, or is that all he
10   said at that time?
11       A. He elaborated.
12       Q. What did he say?
13       A. From the best of my knowledge,
14   basically just the events that happened one
15   night from swearing back and forth.
16       Q. When you say "swearing back and
17   forth," what do you mean?
18       A. The other technician swearing.
19       Q. What happened after Anthony pulled you
20   into his office?
21       A. We have to wait for Barbara.
22       Q. Did you wait in Anthony's office for
23   Barbara?
24       A. No.

Page 96

1        Q. Where did you go?
2        A. Human resources.
3        Q. Did you and Anthony go to human
4    resources together?
5        A. The first time, no.
6        Q. What do you mean by "the first time"?
7        A. After Anthony called me in the office,
8    he told me what happened. So I went to go talk
9    with Barbara.
10       Q. I'm going to stop you for a second.
11   When you say he told you what happened, what do
12   you mean?
13       A. The swearing back and forth with the
14   other technician.
15       Q. What did Anthony say to you about
16   that?
17       A. That's all I remember. He basically
18   said, We got a complaint on you about swearing
19   with another technician, or whatever, and we got
20   to let you go.
21       Q. Did he say the complaint was from
22   another technician or from a customer?
23       A. I don't remember.
24       Q. Did you ask him?

24   (Pages 93 to 96)

Page 97

1    A. I don't remember.
2    Q. What happened next?
3    A. I was waiting for Barbara.
4    Q. Where were you waiting for Barbara?
5    A. Human resources.
6    Q. So after you spoke with Anthony, you
7  went to human resources by yourself?
8    A. Yeah.
9    Q. Did you speak with Barbara?
10    A. No.
11    Q. Why not?
12    A. She wasn't present.
13    Q. What happened next?
14    A. Spoke to a secretary. The secretary
15  told me she called and she's going to be late.
16    Q. What did you do?
17    A. Went back to Anthony.
18    Q. Back to Anthony's office?
19    A. Yes.
20    Q. What happened next?
21    A. We both went to go wait for Barbara.
22    Q. So you went back to Anthony's office,
23  and then you and Anthony both went to human
24  resources to wait for Barbara?

Page 98

1    A. Mm-hmm.
2    MR. CLOHERTY: You have to say yes or
3  no.
4    A. Yes.
5    Q. Then what happened?
6    A. We waited for Barbara.
7    Q. At some point did Barbara arrive?
8    A. Yes.
9    Q. What happened next?
10    A. Come to my office.
11    Q. Who said that?
12    A. Barbara.
13    Q. Did you and Anthony go into Barbara's
14  office?
15    A. Yes, we did.
16    Q. What happened next?
17    A. You're terminated.
18    Q. When you say "you're terminated," is
19  that somebody telling you you're terminated?
20    A. Barbara.
21    Q. So you walk into her office, and the
22  first thing she says is, You're terminated?
23    A. Have a seat.
24    Q. I need you to tell me who is saying

Page 99

1  what.
2    A. Okay.
3    Q. So you walk into her office, and what
4  happens next?
5    A. From what I remember, it's, Have a
6  seat.
7    Q. Who says, Have a seat?
8    A. Barbara says, Have a seat.
9    Q. Okay.
10    A. You're terminated.
11    Q. Barbara says, You're terminated?
12    A. She didn't even -- she didn't even
13  allow me to explain myself. She just basically
14  said, You're terminated. Go. Get off the
15  property.
16    Q. Did you want to explain yourself?
17    A. Oh, yes.
18    Q. What were you going to say if you were
19  given an opportunity to explain yourself?
20    A. It wasn't me.
21    Q. Did you tell Anthony it wasn't you?
22    A. Yes.
23    Q. What did Anthony say?
24    A. He told me that the customer said it

Page 100

1  was me.
2    Q. What did you say when he told you that
3  the customer said it was you?
4    A. I asked him to pull the other
5  technician in.
6    Q. Who was the other technician?
7    A. I don't remember his name.
8    Q. Did he pull the other technician in?
9    A. I don't think he was on schedule. I
10  could be wrong though?
11    Q. But as you sit here today, you don't
12  remember that he was working that day, the other
13  technician?
14    A. Yes.
15    Q. Had you been reprimanded or warned for
16  swearing at a customer prior to that incident?
17    A. I don't remember.
18    MS. TRAN: I'm going to have these
19  marked as 5, 6, 7 and 8.
20    (Exhibits 5 through 8 marked
21    for identification)
22    Q. I'm going to show you what's been
23  marked as Exhibit No. 8. Just take a minute to
24  review that and let me know when you're finished

SHEA COURT REPORTING SERVICES
617-227-3097